Joshua D. Bendor, 031908
Brandon T. Delgado, 035924
OSBORN MALEDON, P.A.
2929 North Central Ave., Suite 2100
Phoenix, Arizona  85012-2793
(602) 640-9000
jbendor@omlaw.com
bdelgado@omlaw.com

Orion Danjuma *(pro hac vice to be filed)*
NY Reg No. 4942249
PROTECT DEMOCRACY PROJECT
82 Nassau St. #601
New York, NY 10038
Tel: (202) 579-4582
orion.danjuma@protectdemocracy.org

Rachel F. Homer *(pro hac vice to be filed)*
DC Bar No. 1045077
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel: (202) 579-4582
rachel.homer@protectdemocracy.org

Attorneys for Plaintiff

Benjamin L. Berwick *(pro hac vice to be filed)*
MA Bar No. 679207
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Tel: (202) 579-4582
ben.berwick@protectdemocracy.org

Jared Davidson *(pro hac vice to be filed)*
LA Bar No. 37093
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| League of Women Voters of Arizona,<br><br>Plaintiff,<br><br>vs.<br><br>Lions of Liberty LLC; Yavapai County Preparedness Team; Jim Arroyo, Lucas Cilano; Nicholas Cilano; Brian Mounsey; Toby Fox; Bruce Mounsey; James Johnson; Melody Jennings; Clean Elections USA; John Does 1-10,<br><br>Defendants. | No. _____<br><br>**COMPLAINT** |

Plaintiff League of Women Voters of Arizona ("Plaintiff" or "the League"),

through its attorneys, brings this complaint against Defendants Lions of Liberty LLC, the

Yavapai County Preparedness Team, Jim Arroyo, Lucas Cilano, Nicholas Cilano, Brian

Mounsey, Toby Fox, Bruce Mounsey, James Johnson, Melody Jennings, Clean Elections USA, and John Does 1-10 (collectively "Defendants").

## INTRODUCTION

1.      **The right of voters to cast their ballots free from intimidation,** threats, or coercion is a foundational principle of a democratic society. *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights."). This lawsuit challenges an escalating scheme of voter intimidation and harassment in Arizona that undermines that right. The challenged scheme relies on, *inter alia*, (1) intimidating voters by collecting their personal information and surveilling them while carrying firearms and wearing military tactical gear, and (2) propagating false information to citizens about the manner in which they can lawfully vote and groundlessly claiming that voters are engaged in election crimes, thereby threatening voters' reputation and personal safety.

2.      This campaign of intimidation is predicated on lies. Defendants have promoted and fixated on a thoroughly debunked conspiracy theory that so-called "ballot mules" illegally "stuffed" ballots in drop boxes during the 2020 election. The theory arises from a widely viewed 2022 disinformation film, *2000 Mules*, which falsely claims to show evidence—including surveillance footage—of the so-called "mules" illegally depositing ballots in drop boxes. In reality, the film—which has been roundly discredited by experts for its flawed analysis—presents images of innocent voters lawfully casting their ballots and uses their images to peddle a dangerous conspiracy theory that has done untold damage to those voters, their families, election workers, and trust in the electoral process.

3.      Defendants and their co-conspirators have propagated the lie that Arizonans violate the law whenever they deposit a ballot for another person—disregarding the fact that Arizona law expressly allows household members, caregivers, and election officials to assist other voters by dropping off their ballots in a drop box. Defendants' falsehoods are both intended to and have the reasonably foreseeable effect of deterring and

intimidating Arizonans from voting, and lawfully assisting others to vote, using methods that the State has employed safely and securely for years.

4.     Based on this disinformation, Defendants have launched two parallel schemes to surveil, harass, and intimidate voters at drop boxes to deter them, and those who are lawfully assisting voters, from exercising the right to vote. Both schemes constitute patently unlawful voter intimidation.

5.     Defendants Lions of Liberty LLC, Yavapai County Preparedness Team, their Defendant members, and others have commenced a widespread campaign to surveil all drop boxes in Yavapai County, film voters, and then report to law enforcement *any* voters who deposit multiple ballots. On its own, these actions constitute unlawful voter intimidation. But there is more. These Defendants are an offshoot of the Oathkeepers, a group publicly perceived as an extremist, militia group who have openly promoted the idea of a "civil war" and the belief that their political enemies have committed "treason" and "must be held to the most severe consequences of accountability." And they have promised to conduct their drop box surveillance while armed and wearing Oathkeepers paraphernalia.

6.     At the same time, Defendant Melody Jennings and Defendant Clean Elections USA have organized a state-wide campaign, "Dropbox Initiative 2022," to surveil and harass voters at Arizona drop boxes. While promoting the campaign under the pretext of uncovering election crimes, in reality, Defendants Jennings and Clean Elections USA are scheming to baselessly accuse voters of being "mules" and to "dox" them (that is, publicly reveal their personal information online), thereby unjustifiably exposing voters to harm to not only their reputations but also their safety. Already, Defendant Jennings and her co-conspirators have peddled images of innocent voters who have used drop boxes and baselessly claimed that they are "mules" to advance their goal of deterring voters from using drop boxes. Moreover, Defendant Jennings has admitted that her monitors are guarding drop boxes while armed and in tactical gear, and that the purpose of these tactics is to intimidate voters: she has boasted that these tactics are already

deterring voters from using drop boxes. Supporters of drop box surveillance have responded in kind, affirming on Twitter that they "will hold round the clock ARMED surveillance of every ballot box in Arizona."

7.     The intent and the reasonably foreseeable effect of Defendants' ongoing campaigns is to intimidate voters and those who will lawfully assist them in exercising their right to vote. Indeed, because of Defendants' campaigns, Arizona voters who wish to lawfully use drop boxes must do so under threat that they will be monitored by armed vigilantes, have their faces and cars filmed, be baselessly reported to law enforcement, and have their reputations and personal safety put at risk. Such concerns are well founded given that Defendants are deploying tactics that have already subjected other voters to false accusations and doxxing.

8.     The threat to voters and to democratic participation is steadily increasing with each passing day. Defendant Jennings helped orchestrate an initial stakeout of drop boxes in Phoenix during the August 2, 2022 primary election. She boasted that this initial surveillance was a "dry run" and promised to greatly expand the scope of her group's surveillance during the general election.

9.     The promise of increasing disruption has already been borne out. During the initial weeks of early voting, multiple incidents of voter intimidation have been reported in Yavapai and Maricopa Counties. Some members of the League have stopped using external drop boxes due to the ongoing risk of voter intimidation and have voted— and advised prospective voters—to vote inside polling locations where security is available.

10.     Defendants' schemes are textbook violations of both the Voting Rights Act of 1965 and the Ku Klux Klan Act of 1871. Congress passed both statutes to prevent the very kinds of vigilante-led voter intimidation Defendants are now deploying. Plaintiff League of Women Voters of Arizona brings this case to ensure that Defendants are prevented from engaging in additional acts of intimidation and held accountable for the

1    acts of intimidation they have already committed. Relief is urgently needed as early
2    voting is underway with the election in only two weeks.

3                                    **PARTIES**

4        11.    **Plaintiff League of Women Voters of Arizona** ("League") is a domestic
5    nonprofit corporation in Arizona. The League is a non-partisan, grassroots organization
6    that encourages informed and active participation in the democratic process. The League
7    of Women Voters of Arizona is an affiliate of the League of Women Voters of the United
8    States. For over 80 years, the League has dedicated its efforts to protecting and promoting
9    the democratic processes of government through public service, civic participation, and
10   robust voter education and registration. The League consists of both a statewide
11   organization and five local chapters with 900 members statewide, and 90 percent of its
12   members use early voting, including mail-in and drop box voting. The League educates
13   voters about upcoming elections, including the dates and deadlines for early in-person
14   and mail-in voting, as well as the availability of drop box voting in the state; works to
15   encourage individuals to vote; and participates in statewide coalitions with other
16   organizations that share similar goals. The organization envisions a democracy where
17   every person has the desire, the right, the knowledge, and the confidence to participate.
18   Because voter intimidation is a vital issue of concern to League members and the public,
19   the League has diverted money, time, and other resources from its crucial election-year
20   civic engagement and election support programs to address Defendants' intimidation
21   tactics.

22       12.    The League uses many tools to achieve these goals, and when its consensus-
23   building and lobbying efforts have proven insufficient, it has participated in litigation to
24   protect the rights of Arizona voters. League volunteers typically help tens of thousands
25   of citizens in Arizona register to vote, check their registration status, update their
26   information, and navigate the system of early in-person and mail-in voting. Throughout
27   the COVID-19 pandemic, the League has provided Arizona citizens with vital voting
28   information through online platforms like VOTE411.org and printed materials, including

                                        5

voter guides. The League continues to encourage Arizona voters to cast their ballot via the mechanism that is safest and most convenient for them, using any of the available early voting options that have been available for decades in Arizona and any of the options to apply for and return a ballot.

13.     **Defendant Lions of Liberty** ("LOL") is a domestic limited liability company (LLC) operating out of Chino Valley, Arizona, which is in Yavapai County. The organization is the "political arm" of Defendant Yavapai County Preparedness Team. According to its website, LOL and its members "are a resolute nucleus of concerned, passionate conservative patriots who are determined to correct the course of our country which has been hijacked and undermined by global elites, communists, leftists, deep state bureaucrats, and fake news." Defendant LOL and its members openly endorse the idea that their political enemies are guilty of "treason" and "war crimes" and "must be held to the most severe consequences of accountability." Defendant LOL is one of the chief organizers of Operation: Dropbox, a campaign to surveil, intimidate, and harass voters in Yavapai County and to spread false information about voting rules.

14.     **Defendant Yavapai County Preparedness Team** ("YCPT") is an Arizona spinoff of the extremist organization, the Oathkeepers. While publicly describing itself as a survivalist organization, YCPT is in reality an extremist, militia-like group that promotes the idea of a coming civil war in America. Members of Defendant YCPT are known to attend public events while armed to intimidate their political opponents. YCPT is a chief co-organizer of Operation: Drop Box.

15.     **Defendant Jim Arroyo** is a resident of Chino Valley, Arizona, the leader of the YCPT, the former vice president of Arizona's chapter of the Oath Keepers, and one of the seven board members of LOL. Arroyo is a co-organizer of Operation: Drop Box.

16.     **Defendant Lucas (Luke) Cilano** is a resident of Arizona and the registered agent of LOL. Cilano describes himself as the group's public face, being generally responsible for running its public meetings and interfacing with local media and is one of the organization's seven board members. In his capacity as a leader of LOL, Cilano is a

co-organizer of Operation: Drop Box. As part of the broader conspiracy to intimidate voters at drop boxes, Defendant Cilano has openly spread misinformation about the legality of drop box voting.

17.    **Defendant Brian Mounsey** is a resident of Chino Valley, Arizona, and one of the seven board members of LOL alongside his twin brother Bruce. Defendant Mounsey is a co-organizer of Operation: Drop Box.

18.    **Defendant Bruce Mounsey** is a resident of Chino Valley, Arizona, and one of the seven board members of LOL alongside his twin brother Brian. Defendant Mounsey is a co-organizer of Operation: Drop Box.

19.    **Defendant Nicholas (Nick) Cilano** is a resident of Prescott Valley, Arizona, and one of the seven board members of LOL. Defendant Cilano is a co-organizer of Operation: Drop Box.

20.    **Defendant James Johnson** is a resident of Arizona and one of the seven board members of LOL. Defendant Johnson is a co-organizer of Operation: Drop Box.

21.    **Defendant Toby Fox** is a resident of Arizona and one of the seven board members of LOL. Defendant Fox is a co-organizer of Operation: Drop Box.

22.    **Defendant Melody Jennings** is a founder of the organization Clean Elections USA and a chief organizer of its Dropbox Initiative 2022, a campaign to surveil, intimidate, and harass voters during the 2022 election in Arizona and to spread disinformation about the legality of drop box voting. Defendant Jennings uses her large social media platform to amplify election-related conspiracy theories and to recruit for and amplify drop box surveillance in Arizona and elsewhere. Her social media handle is @TrumperMel and she has over 35,000 followers.

23.    **Defendant Clean Elections USA** ("CE-USA") is an organization founded by Defendant Jennings. According to its website, Defendant CE-USA is "a grassroots organization committed to election integrity." In reality, Defendant CE-USA is an amplifier of conspiracy theories regarding voter fraud and the legality of drop box voting. Defendant CE-USA actively fundraises for its efforts by amplifying election lies and

1

2

3

other conspiracies. Along with Defendant Jennings, Defendant CE-USA is planning, coordinating, and recruiting for Dropbox Initiative 2022. Defendant CE-USA uses its website and online platform to publicize and recruit for Dropbox Initiative 2022.

4

5

6

24.    **Doe Defendants 1 to 10** are individuals working in concert with the aforementioned named Defendants as volunteers and co-conspirators in the surveillance of drop boxes in Arizona and the monitoring and recording of drop box voters.

7

## FACTUAL ALLEGATIONS

8

9

**I.    Defendants and others conspire and take substantial steps to intimidate voters in the 2022 election**

10

11

12

13

25.    For months, Defendants and others have been actively planning, coordinating, and recruiting for widespread campaigns to surveil, intimidate, and harass Arizona voters at ballot drop boxes, baselessly accuse them—directly or indirectly—of committing voter fraud, and spread false information about legally valid forms of voting.

14

15

16

17

18

26.    Defendants' campaign is inspired by a thoroughly debunked conspiracy theory that so-called "mules" illegally deposited large numbers of ballots at drop boxes to steal the 2020 election in various closely contested states, including Arizona. This conspiracy theory stems from the widely seen 2022 film, *2000 Mules*, which claims to show evidence—including surveillance footage—of "mules" illegally depositing ballots.

19

20

27.    The "mules" conspiracy theory and the supposed "methodology" on which it is premised has been thoroughly and consistently debunked.[1] Indeed, both former

21

22

23

24

25

26

27

28

[1] *See, e.g.,* Reuters Fact Check, *Fact Check-Does '2000 Mules' provide evidence of voter fraud in the 2020 U.S. presidential election?*, Reuters (May 27, 2022), https://www.reuters.com/article/factcheck-usa-mules/fact-check-does-2000-mules-provide-evidence-of-voter-fraud-in-the-2020-u-s-presidential-election-idUSL2N2XJ0OQ.

United States Attorney General William Barr[2] and Arizona Attorney General Mark Brnovich[3] have publicly acknowledged that there is no evidence to support the theory.

28.     Nevertheless, the damage to voters baselessly accused of misconduct in *2000 Mules* has been severe. As the unsubstantiated claims in the documentary spread online, viewers began to circulate viral images of the drop box voters and election officials portrayed in the film.[4]  In one example, activists superimposed over the image of an older woman leaving a ballot drop box in Georgia's suburban Gwinnett County the word "WANTED." The revised image, which spread virally online, stated: "Ballot mule. If you can ID her, call Gwinnett Co. sheriff's office." It also included the Sheriff's badge and the sheriff office's phone number. The Gwinnett County Sheriff's Office has confirmed that the image is fake and it had no involvement in producing the online "WANTED" poster. Some activists have called for physical violence against the voters depicted in *2000 Mules*, along with posting images of those voters and identifying information, such as their license plates, online.

29.     Despite the flimsiness of the underlying allegations, the "mules" theory has gained significant traction amongst election deniers across the country, especially in Arizona, and has incited them to organize campaigns to surveil ballot drop boxes and record images of voters in the 2022 election to prove that "mules" are seeking to illegally deposit ballots.[5]  A vigilante tactic arising out of the *2000 Mules* documentary is to publicize photos of individuals (and their cars and license plates) who have purportedly

---

[2] Grace Panetta, *Former AG Bill Barr laughs at Dinesh D'Souza's election conspiracy theory film '2000 Mules' in January 6 Committee deposition*, Bus. Insider (June 13, 2022), https://www.businessinsider.com/bill-barr-mocks-2000-mules-film-january-6-deposition-video-2022-6.

[3] Letter from Reginald "Reggie" Griggs, Chief Special Agent, Special Investigations Section, Off. of Ariz. Att'y Gen. Mark Brnovich (Oct. 14, 2022).

[4] Andy Kroll, *"Big Lie" Vigilantism Is on the Rise. Big Tech Is Failing to Respond.*, ProPublica (June 17 2022), https://www.propublica.org/article/election-fraud-ballot-mules-facebook-tiktok-memes.

[5] Tiffany Hsu & Stuart A. Thompson, *Hunting for Voter Fraud, Conspiracy Theorists Organize 'Stakeouts'*, N.Y. Times (Aug. 10 2022), https://www.nytimes.com/2022/08/10/technology/voter-drop-box-conspiracy-theory.html.

voted illegally—which in turn subjects those voters to harassment and threats—and use that publication to uncover additional "mules" and deter future drop box voting.

30.     At present, Defendants have, respectively, conspired to organize, coordinate, recruit for, and execute two such surveillance-and-intimidation campaigns in Arizona. While organized under the banner of finding "mules" and uncovering voter fraud, these surveillance-and-intimidation campaigns are simply modern-day efforts to engage in illegal voter intimidation by forcing voters who want to cast their ballots by drop box to do so while being surveilled by vigilantes and under the threat that they will be be baselessly accused of voter fraud. Regardless of the falsity of any of the theories advanced in *2000 Mules* or other disinformation that has inspired Defendants and other conspirators, and regardless of whether Defendants believe those election conspiracy theories, Defendants' conduct is unlawful voter intimidation, directly analogous to conduct that courts have found to be unlawful in the past. Further, as part of Defendants' respective surveillance-and-intimidation campaigns, Defendants and their agents are also knowingly distributing false information about voting by drop box to intimidate and prevent citizens from engaging in lawful voting practices.

## A.     Operation: Drop Box

31.     Defendants LOL, YCPT, Jim Arroyo, Luke Cilano, Nick Cilano, Brian Mounsey, Toby Fox, Bruce Mounsey, James Johnson, and various John Does, have organized a large-scale voter surveillance-and-intimidation campaign in Yavapai County, Arizona, called "Operation: Drop Box." Explicitly inspired by the "mules" conspiracy theory, Defendants represent that the purpose of their campaign is to "secure our election from those who would cause this country harm" by engaging in "ballot box stuffing."



32.     Specifically, Defendants plan to have "patriots" (in their words) take shifts to monitor all drop boxes in Yavapai County and observe whether any voter deposits multiple ballots. Defendants are instructing their volunteers to bring a camera or telephone to their shift and, in the event they witness a voter deposit more than one ballot, to "take a picture of them, their car, and their license plate." Defendants then intend to report these voters to the Yavapai County Sheriff who, according to Defendants, "is already aware of what we are doing and will do what he can."

33.     Defendants have publicly affirmed their intent to photograph and report these individuals to law enforcement notwithstanding the fact that Arizona law expressly allows individuals to deposit multiple ballots in a number of different scenarios. *See* Ariz. Rev. Stat. § 16-1005(I).

34.     For example, Arizona law specifically allows a caregiver to deposit ballots on behalf of those to whom they provide care. A caregiver includes a person who provides medical or health care assistance to any voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility, or adult foster care home. *Id*. § 16-1005(I)(2)(a). Yavapai and Maricopa Counties are home to numerous facilities—

including nursing care facilities and rehabilitation facilities—where individuals may rely on their caretakers to deposit their votes.

35.     In addition to caregivers, Arizona law also allows family members (defined as "a person who is related to the voter by blood, marriage, adoption, or legal guardianship") to deposit ballots on their family members' behalf. *Id*. § 16-1005(I)(2)(c).

36.     Arizona law also specifically provides that a household member (defined as "a person who resides at the same residence as the voter") may deposit the ballots of other household members. *Id*. § 16-1005(I)(2)(d).

37.     In their instructions to volunteers and public statements, Defendants do not account for these lawful bases for depositing multiple ballots. In fact, upon information and belief, Defendants have falsely represented that depositing multiple ballots is *always* illegal.[6]

38.     Neither Defendants nor their volunteers will be able to determine whether people who deposit ballots are doing so lawfully as caregivers, family members, or household members of a voter. Nevertheless, Defendants and their volunteers intend to photograph and report these individuals to law enforcement despite lacking any evidence of wrongdoing.

39.     In addition, Defendants have repeatedly and publicly affirmed these plans in both local and national media, thereby creating an air of fear and anxiety amongst voters who rely on drop boxes to have their votes cast and counted. In fact, in response to a cease-and-desist letter sent by Plaintiff's counsel explaining that their surveillance-and-intimidation tactics constituted illegal voter intimidation, Defendants issued a public statement informing their members that they had come "to the unanimous decision to proceed forward with [the] operation." In that same statement, Defendants invoked the

---

[6] Vyto Starinskas, *Ballot 'Drop Watch' won't intimidate voters, says 'Lion'*, Verde Valley Indep. & Camp Verde Bugle (Oct. 5, 2022), https://www.verdenews.com/news/2022/oct/05/ballot-drop-watch-wont-intimidate-voters-says-lion (Defendant Cilano claiming that "[i]t is illegal in Arizona to put more than one ballot in the box other than your own").

1
2
language of war, comparing themselves, their volunteers, and their tactics to the Revolutionary War and its fighters.

3
4
5
6
40.     While Defendants' plans to surveil and report voters on its own will have the natural and foreseeable consequence of intimidating voters, that intimidation will be compounded exponentially by other alarming aspects of Defendants' plans. For example, Defendant Arroyo has publicly affirmed that their drop box observers may be armed.[7]

7
8
9
10
11
12
13
41.     Moreover, Defendants are also encouraging drop box observers to wear gear that publicly associates them with the extremist militia group, the Oathkeepers, of which YCPT is a spinoff. For example, Defendant Arroyo has encouraged volunteers to wear their Oathkeepers gear while monitoring drop boxes, explaining: "Your shirts and hats are what tell the world you're not ashamed to be an Oath Keeper, or afraid of the government just because of that crap that happened on January the 6th, which was completely staged."[8]

14
15
16
17
18
19
20
21
22
23
24
25
42.     In addition, Defendants' deep ties to extremist groups and their own public statements endorsing political violence against their political opponents will further exacerbate voters' reasonable fears about casting ballots at drop boxes. For example, Defendant YCPT is an Arizona-based spinoff of the Oathkeepers, the extremist militia group that helped storm the U.S. Capitol on January 6, 2021. Upon information and belief, Defendant YCPT is amongst the largest—if not *the* largest—ofshoots of the Oathkeepers in the county. Defendant YCPT and its members openly promote the idea of a "civil war" and the belief that their political enemies have committed "treason" and "must be held to the most severe consequences of accountability." Indeed, a survey of Defendant YCPT's meetings found that the group discussed civil war in all but one of their 22 recruitment meetings during that period, and mentioned guns or firearms in every single meeting. Consistent with their plans to monitor drop boxes while armed, members of Defendant

26
27
28
[7] Tess Owen, *Armed Fringe Groups Are Gearing Up to 'Protect' Midterm Ballot Dropboxes*, Vice News (Oct. 6, 2022), https://www.vice.com/en/article/dy7wvj/lions-of-liberty-oath-keepers-midterm-ballot-boxes.
[8] *Id.*

13

YCPT are also known for attending public events armed.[9] Defendant LOL is the 501(c)(3) "political arm" of YCPT. Defendant Arroyo, who is the leader of YCPT, has openly promoted his belief that the country exists in a state of undeclared civil war, and has boasted about the extent to which YCPT is connected to local law enforcement.

### B.   Dropbox Initiative 2022

43.   Defendant Jennings and Defendant Clean Elections USA ("CE-USA"), along with various John Does, have conspired to organize and execute another large-scale campaign to surveil and harass voters at Arizona drop boxes. Dubbed "Dropbox Initiative 2022," the campaign is actively recruiting volunteer "patriots," and actively conspiring and coordinating with them, to surveil and harass voters at drop boxes in Arizona and every other state with drop boxes to, in Defendants' words, "gather video (and live witness evidence) of any ballot tampering that takes place in real time." Defendants are hoping to have at least ten monitors at each drop box.[10]

44.   Defendant CE-USA's website repeatedly references the "mules" conspiracy as inspiration for Dropbox Initiative 2022. Defendant Jennings has made clear that her and Defendant CE-USA's goal is to "dox" voters that Defendants and their volunteers determine are "mules":



**TrumperMel** ✔
@TrumperMel · Sep 8

Hi! I am Drop Box Ninja Warrior Fire Beard TrumperMel and I am FULLY STOKED that ballot trafficking mules are about to be completely doxxed and put on blast at every drop box across America starting VERY SOON! We have the tech. We are the patriot army. We are the storm!

Come join us and have some fun while saving our country together 🔥🔥🔥 🔥🔥

Https://cleanelectionsusa.org/

@greggphillips

---

[9] Hampton Stall, *Why, CPT?: Arizona Oath Keepers as a microcosm for the movement*, Militia Watch (June 28 2021), https://militia.watch/read/ycpt-az-ok/.

[10] Justin Horowitz, *Steve Bannon hosts QAnon-linked activist to promote organization seemingly focused on intimidating voters*, Media Matters For Am. (Oct. 17 2022), https://www.mediamatters.org/steve-bannon/steve-bannon-hosts-qanon-linked-activist-promote-organization-seemingly-focused.

1
2
3      45.     Defendants Jennings and CE-USA began organizing drop box surveillance
4  during the 2022 summer primary, referring to it as the campaign's "first run" before the
5  general election.[11] Social media postings regarding those surveillance activities—which
6  Defendant Jennings has claimed credit for—makes clear that Defendants' surveillance-
7  and-intimidation tactics indeed had an intimidating effect on voters during the primary,
8  with one post declaring: "We ram [*sic*] one mule off just by being there . . . ."
9      46.     In the run-up to the November 8 election, Defendants Jennings and CE-
10 USA are continuing to actively recruit and coordinate with volunteers for their
11 surveillance-and-intimidation campaign on platforms used by election deniers and
12 extremist groups. For example, Defendants are actively recruiting volunteers on Truth
13 Social, a social media platform well-known for disseminating election-related conspiracy
14 theories. Further, in an October 17, 2022 appearance on Steve Bannon's *War Room*,
15 Defendant Jennings made clear that she ensures all monitors are "one of us," implying
16 that she is only recruiting volunteers who already believe in the "mules" conspiracy
17 theory.
18     47.     As with Operation Drop Box, neither Defendants Jennings and CE-USA
19 nor any of the volunteers or other co-conspirators working on Dropbox Initiative 2022
20 will have any good-faith basis to conclude that a voter who deposits multiple ballots is
21 doing so illegally, because, as noted above, Arizona law specifically permits voters to
22 deposit multiple ballots in a number of circumstances.
23     48.     Nevertheless, Defendants Jennings and CE-USA, along with their agents
24 and John Doe co-conspirators, have formally launched their surveillance-and-
25 intimidation campaign and begun to accuse voters, without evidence, of illegal activity.
26
27
28
───────────────
[11] Hsu & Thompson, *supra*.

49.   For example, on October 17, Defendant Jennings called for additional volunteers to surveil drop boxes in Mesa and Phoenix, alleging that her "crew" had spotted a "mule":

TrumperMel ✔
@TrumperMel · 2d

All Arizona patriots get to either the Mesa box or the Phoenix box ...the only 2 that are outdoors... Right now.
There are mules getting there and doing their thing even with my people there.  Here's what you DO NOT DO!! Do not go within 75 ft of the box. I need someone to park up on the opposite side of my crew there. A mule drove up moments ago backwards so we couldn't see his plate. Kept his back to us the whole time. Who will go now?
DO NOT ENGAGE THEM @greggphillips

🔁 3,180    ❤️ 7,091                              Oct 17, 2022, 23:05

Reply          ReTruth          Like          ...

50.   On the same day, Defendant Jennings also posted another highly shared social media post showing camera footage of a voter, implying (without evidence) that the voter was engaged in illegal activity:



51.     Former President Trump has also shared a number of Defendant Jennings' Truth Social posts concerning Dropbox Initiative 2022, including this one stating that an individual had "[p]ulled ballots out of his shirt."



52.     On October 19, a local ABC reporter showed footage from that morning of Defendants' agents surveilling and filming the drop boxes at the Maricopa County Tabulation and Election Center (MCTEC) in Phoenix.[12] Defendant Jennings then made another call to her and Defendant CE-USA's followers: "CBS NBC and others out in force filming our people at the Mesa Arizona drop box. We are filming them back. Get out there people. Let's go watch that box and make there [*sic*] heads pop."[13] Following this, the ABC reporter that filmed the Defendants' volunteers received a number of threats

---

[12] *See, e.g.,* Nicole Grigg (@NicoleSGrigg), Twitter (Oct. 19, 2022, 8:13 PM), https://twitter.com/NicoleSGrigg/status/1582887636884066304.

[13] Melody Jennings (@TrumperMel), Truth Social (Oct. 19, 2022, 8:22 PM), https://truthsocial.com/@TrumperMel/posts/109197743435076301.

over social media, including threats to her life and accusations that she was working with the "mules."[14]

53.    In addition to in-person intimidation and harassment of voters at drop boxes, Defendant Jennings has also deployed other means of intimidating voters and implying that lawful voters are committing election crimes. For example, Defendant Jennings has openly promoted and amplified intimidating images from an anonymous group, Ben Sent Us, which has been circulating flyers that threaten voters and Democratic Party officials.





## II.    Defendants' Tactics Are Already Intimidating Voters

54.    Defendants' tactics are already having the natural and foreseeable consequences of intimidating Arizona voters. Since the beginning of early voting, there have been numerous reports of intimidating incidents in both Yavapai and Maricopa Counties.

55.    On the evening of October 17, a voter reported that he was intimidated by drop box monitors outside the Maricopa County Juvenile Court when he went to drop off

---

[14] Nicole Grigg (@NicoleSGrigg), Twitter (Oct. 23, 2022, 12:53 PM), https://twitter.com/NicoleSGrigg/status/1584226443520663553.

his ballot. According to the voter, a group of people were loitering near the ballot drop box and began filming and photographing him and his wife. The voter reported that the individuals accused him of being a "mule," photographed his license plate, and then followed him out of the parking lot while continuing to film. The voter reported the incident to the Secretary of State's office. A subsequent Truth Social post by Defendant Jennings confirmed that the individuals who intimidated the voter were volunteers working with her and Defendant CE-USA.[15]

56.    On October 19, a voter attempted to deposit his and his wife's ballots at the MCTEC drop box when he noticed a group of individuals with tripods and cameras filming him. As he drove through the parking lot, he noticed the individuals following him using their camera. This voter likewise complained about the intimidating conduct to the Secretary of State's office, and this complaint included photographs of the monitors. These individuals also separately confirmed to a reporter that they were volunteers with Defendant CE-USA.[16]

57.    On October 20, a 70-year-old voter and his wife attempted to deposit their ballots at the drop boxes outside the Maricopa County Juvenile Court when they were approached by a group of five or six  men in their 20s and 30s. After depositing their ballots, the group began taking photographs of the couple, their car and license plate, and told the couple that they were taking photos for "election security." The individuals continued to film the couple and their car as they departed. This voter likewise reported the intimidating conduct to the Secretary of State's office.

58.    On October 21, two armed individuals dressed in tactical gear, and who apparently were also carrying magazine clips, were onsite at a ballot box in Mesa. On her Truth Social page, Defendant Jennings claimed responsibility for these individuals:

---

[15]Melody Jennings (@TrumperMel), Truth Social (Oct. 17, 2022, 11:08 PM), https://truthsocial.com/@TrumperMel/posts/109187073366780060
[16] Nicole Grigg (@NicoleSGrigg), Twitter (Oct. 19, 2022, 9:20 PM), https://twitter.com/NicoleSGrigg/status/1582904476393820160.

1

2

3

4

5

6

7

8

9

10

11



**TrumperMel** ✓
@TrumperMel · 1d

Replying to @ipod49, @intheMatrixxx, and 3 more

Someone called in seeing 2 of our people in tactical gear and armed. They will always gear up for a call like that. Thankfully wearing tactical gear and carrying in our country where the right to bear arms is an inalienable right, can and should be respected, especially  when the goal is protecting the sovereign rights granted of every American citizen to a free and fair election. To me it was all a win/win. #backtheblue #2A #freedom #gotv #vote

🔁 29       ❤️ 139                                    Oct 22, 2022, 16:46

12   59.     At least two additional intimidation episodes were reported on October 21.

13  In one instance, a senior citizen attempted to vote at a drop box at the MCTEC when he

14  noticed that a man with a large camera on a tripod was filming him, including by focusing

15  the camera on the voter's face and license plate. The individual also filmed the voter as

16  they deposited their ballot into the drop box. The voter reported the complaint to the

17  Secretary of State and noted that the incident was intimidating.

18   60.     Also on October 21, another voter likewise reported feeling "very

19  intimidated and scared" because a man with camera was filming the voter and their license

20  plate when depositing ballots at the MCTEC. The voter reported being photographed

21  throughout the time they were on the grounds until leaving. This voter reported being

22  "fearful of what he or his organization will do with [his] plate number."

23   61.     On October 22, another voter reported to the Secretary of State that people

24  were feeling "nervous" about an individual monitoring drop boxes at the juvenile court

25  in Mesa.

26   62.     Meanwhile in Yavapai County, voters and League members have reported

27  similar groups of individuals congregating around drop boxes in an intimidating and

28  disconcerting manner.

63.     These incidents likely represent only a fraction of those individuals who have already been or ultimately will be intimidated by Defendants' surveillance-and-intimidation tactics absent court intervention. Indeed, these reported incidents of intimidation at the ballot boxes do not account for the untold number of Arizonans who—as a result of Defendants' falsehoods about voting and threats to surveil and harass—have decided not to cast their ballots at drop boxes or lawfully assist others in doing so. Indeed, the League's members in Yavapai County have reported that due to Defendants' plans to surveil drop boxes, they have had to advise voters who were afraid to use drop box locations for fear of a confrontation with vigilante observers.

64.     Alarmingly, Defendants have promised to progressively escalate their surveillance and disruption in the days leading up to the general election. Defendant Jennings said that the initial surveillance she coordinated during the Arizona primary was a "dry run" for an expanded vigilante operation during the general election.

65.     Further, not only are Defendants aware that their surveillance tactics will have the natural and foreseeable consequence of intimidating voters, but they have explicitly stated that their intention is to intimidate voters. For example, in a recent Truth Social post, referring to filming near drop boxes, Defendant Jennings explicitly stated: "What's super fun is that they are being incredible deterrents to mules!"

66.     Even Arizona politicians who have openly encouraged drop box surveillance have explicitly acknowledged that Defendants' tactics are for the purpose of intimidating voters. For example, Mark Finchem, who is running for Secretary of State, has said, "The mere fact you are there watching scares the hell out of them."[17]

67.     At the same time, Arizona politicians have acknowledged that Defendants' tactics might constitute illegal voter intimidation. For example, on October 24, State Senator Townsend acknowledged in a social media post that some of the surveillance

---

[17] Jerod MacDonald-Evoy, *AZ Republicans urge vigilantes to watch ballot drop boxes, polling locations, to sniff out fraud,* (Aug. 2, 2022) https://www.tucsonsentinel.com/local/report/080222_gop_poll_ watchers/az-republicans-urge-vigilantes-watch-ballot-drop-boxes-polling-locations-sniff-out-fraud/

tactics being deployed could constitute intimidation: "I should not have to say this but wearing tactical gear while watching a ballot drop box could be considered voter intimidation."[18]

**III.    Plaintiff League of Women Voters of Arizona and Its Members Have Been Injured by Defendants' Intimidation Campaigns**

68.    The League's mission of educating voters and encouraging them to vote has been directly frustrated by Defendants' actions. Voter surveillance and harassment sharply curtails citizens' willingness to participate in the democratic process and thereby impedes the League's mission to expand and facilitate exercise of the franchise.

69.    Furthermore, Defendants' conduct has caused and will continue to cause the League to divert resources away from its core mission of registering voters and encouraging voter participation. The League has earmarked funds to hire staff to assist with communications efforts, outreach to voters, and management of social media. In the wake of the evolving crisis over drop box surveillance, the League has had to divert the work of those staffers towards preparing and communicating know your rights materials to voters focusing on the right to vote without intimidation. The League has also had to divert time and effort of staff and volunteers to developing protocols for tracking misconduct by drop box vigilantes and providing voters with information about how to report voter intimidation. Senior staff of the League have had to adjust their focus from traditional voter mobilization efforts to respond to the drop box vigilante crisis as members have had increasing concerns about drop box intimidation. And the League has also had to expend roughly $2,000 to send text messages to its list of more than 200,000 women voters advising them of their rights related to voter intimidation.

70.    Furthermore, League members have been directly impacted by drop box intimidation. Voters and League members rely on drop box voting throughout Arizona. But many League members who have voted using drop boxes in the past will no longer

---

[18] Kelly Townsend (@AZKellyT), Twitter (Oct. 24, 2022, 10:01 AM), https://twitter.com/azkellyt/status/1584545662355374080.

use that method for the 2022 general election due to surveillance, intimidation, and harassment by Defendants and their agents. Drop boxes are particularly important in rural areas such as Yavapai County where mail is less reliable. But because of Defendants' intimidation campaign, League members in Yavapai County have had to educate voters who were too afraid to vote at drop box locations due to concerns about security and invasion of privacy regarding alternate options for voting.

## CAUSES OF ACTION

### Count 1: Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b)

71.     Plaintiff incorporates and realleges all preceding paragraphs as if set forth fully herein.

72.     Section 11(b) of the Voting Rights Act ("VRA") of 1965 provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . .

52 U.S.C. § 10307(b).

73.     Defendants, along with their agents and various John Does, are violating Section 11(b) of the VRA by taking actions that would intimidate a reasonable voter.

74.     These actions include but are not limited to: spreading disinformation about legal voting methods to intimidate and mislead voters and those who will assist them; organizing, coordinating, and widely promoting a voter-surveillance campaign at ballot drop boxes in Arizona; instructing volunteers to surveil, film, and/or photograph voters and their license plates; encouraging volunteers to accuse voters of engaging in unlawful voting when they have no reasonable basis for such accusations; instructing volunteers to report voters to law enforcement; subjecting voters to the possibility that they will be publicly and baselessly accused of voter fraud by having their images and the images of their cars publicized (which will foreseeably lead to threats of violence against them as well as harassment and other harm); promising to "dox" voters; actually accusing voters of engaging in voter fraud without a reasonable basis on social media and other means;

recruiting volunteers for their voter-surveillance campaign through extremist networks that already promote and amplify unfounded conspiracies about voter fraud; encouraging or instructing their agents to be armed or to wear paraphernalia that associates them with extremist organizations; and inciting others to engage in unlawful voter intimidation even if they are not directly participating in Defendants' surveillance campaigns.

75.    Additionally, the publicity accompanying Defendants' words and actions, and their consistent use of heated and violent rhetoric, are clear attempts to incite others to threaten, intimidate, and coerce Plaintiff's members and other eligible voters, and require Plaintiff to divert resources to respond to these threats, intimidation, and coercion, in further violation of Section 11(b). The threats, intimidation, and coercion from others are reasonably foreseeable (indeed, nearly guaranteed) direct consequences of Defendants' actions.

76.    Not only is intimidation the natural and foreseeable consequence of Defendants' actions, but more so, Defendants have engaged in this conduct with the subjective intent to threaten, intimidate, and coerce voters and those lawfully aiding eligible voters, and with the knowledge that the natural consequences of their conduct and speech will be the intimidation of such voters and those lawfully aiding voters.

77.    Defendants' unlawful actions have already actually intimidated Plaintiff's members, other eligible voters, and those lawfully aiding persons attempting to vote; and their actions have dissuaded these individuals from exercising their lawful right to vote or aid persons attempting to vote. These actions have also required Plaintiff to divert resources from its primary mission to respond to this voter intimidation crisis. These actions would also intimidate an objectively reasonable voter and discourage such a voter from attempting to vote or attempting to lawfully aid a voter.

78.    Defendants' conduct as described herein plainly violates Section 11(b) and should be temporarily and permanently enjoined.

79.    Unless enjoined by the Court, Defendants will continue to violate Section 11(b) by spreading election falsehoods and continuing to organize, coordinate, amplify,

1   and encourage voter surveillance and harassment campaigns, thereby intimidating
2   eligible voters from exercising their constitutional right to vote and lawfully aiding others
3   in need of assistance voting.

4   **Count 2: Section 2 of the Ku Klux Klan Act, 42 U.S.C. §1985(3)**

5   80.   Plaintiff incorporates and realleges all preceding paragraphs as if set forth
6   fully herein.

7   81.   Plaintiff brings this claim under Section 2 of the Ku Klux Klan Act of 1871
8   ("Klan Act"), 42 U.S.C. § 1985(3) clauses 3 and 4, which prohibits conspiracies to
9   intimidate citizens for their support or advocacy for a candidate and provides a remedy
10  for anyone injured on account of their support or advocacy. Specifically, Section 1985(3)
11  provides, in relevant part:

12      if two or more persons conspire to [3] prevent by force, intimidation, or
13      threat, any citizen who is lawfully entitled to vote, from giving his support
        or advocacy in a legal manner, toward or in favor of the election of any
14      lawfully qualified person as an elector for President or Vice President, or
        as a Member of Congress of the United States; or [4] to injure any citizen
15      in person or property on account of such support or advocacy; . . . the party
        so injured or deprived may have an action for recovery of damages
16      occasioned by such injury or deprivation, against any one or more of the
        conspirators.

17  42 U.S.C. § 1985(3).

18  82.   Defendants have violated Section 1985(3).

19  83.   Defendants have conspired with one another, their agents, and various John
20  Does, to intimidate voters by organizing, coordinating, promoting, and executing the
21  voter-surveillance, harassment, and intimidation campaigns described herein to
22  intimidate and threaten Plaintiff, its members, and other Arizona citizens who are lawfully
23  entitled to vote, with the purpose of trying to prevent them from showing their support or
24  advocacy for candidates for federal office in the 2022 midterm election and to injure them
25  on account of such support or advocacy.

26  84.   Defendants formed an agreement with one another, as well as their co-
27  conspirators, agents, and various John Does, to launch their voter-surveillance and
28  intimidation campaigns to surveil voters when they cast their ballots, subject them to the

threat that they would be baselessly accused of engaging in voter fraud, and otherwise harass and intimidate citizens who vote by drop box. Defendants themselves have also taken—and encouraged their agents to take—additional actions that, when taken together, would intimidate a reasonable voter, including but not limited to: spreading disinformation regarding lawful voting practices to prevent voting; expressly calling voters "mules" or implying that they are "mules" or otherwise falsely suggesting voters are engaged in unlawful behavior; carrying weapons; wearing threatening paraphernalia; recruiting volunteers from extremist networks and/or networks of individuals who believe in the lie of mass voter fraud; following voters when they cast or attempt to cast their ballots; photographing and/or filming voters and/or their cars and license plates; posting or threatening to post images of voters and/or their cars and license plates on the internet and/or social media with baseless accusations of voter fraud; baselessly calling law enforcement on voters; and threatening to "dox" voters.

85.    Defendants have taken multiple  overt actions in furtherance of this conspiracy to intimidate voters, including but not limited to: spreading falsehoods about lawful voting practices; broadly publicizing their voter-surveillance campaigns; recruiting volunteers for their campaigns; deploying the intimidating surveillance and harassment tactics described herein; encouraging their agents to be armed and wear intimidating paraphernalia while engaged in surveillance of voters; encouraging the "dox"-ing of voters; baselessly accusing voters of engaging in voter fraud; and threatening to incite threats against and harassment of voters by posting the voters' images online along with baseless accusations of voter fraud.

86.    Defendants intended to intimidate voters and also knew or should have known that their conduct would intimidate a reasonable voter.

87.    By threatening to watch, videotape, photograph, falsely accuse, harass, and report to law enforcement individuals lawfully depositing more than one ballot in a drop box, Defendants hoped to deter these constitutionally eligible voters from voting in the election, and to deter those lawfully assisting voters from providing that assistance.

Moreover, by publicizing their voter-surveillance campaigns through multiple traditional and social media outlets using incendiary rhetoric, Defendants aimed to foment fear among Arizona voters that they could be targeted with violence, harassment, and accusations of crimes just for legally casting a vote, and that they might be subject to further defamation, harassment, and threats by having their image posted online along with false accusations of crimes.

88.    Defendants' conspiracy has already intimidated Plaintiff's members and other voters, and would intimidate an objectively reasonable individual, and thereby discourage or prevent lawful voters from attempting to vote and those who would assist voters from providing that assistance.

89.    Plaintiff League has been and continues to be injured by Defendants' intimidating conduct, because it impedes one of the League's core goals: the promotion of active participation in government, including through voting. Instead of engaging in its ordinary-course initiatives, the League must devote time and resources to combat the false narrative that individuals dropping off more than one ballot at a drop box are engaged in illegal voter fraud and to assist voters who are scared of being confronted by vigilantes at drop boxes. The League has expended substantial time and effort combatting Defendants' false rhetoric and was required to divert significant resources to combatting and remedying those harms.

90.    Unless enjoined by the Court, Defendants, and those acting in concert and privity with them, will continue to violate Section 1985(3) by continuing to engage in voter surveillance, harassment, threats, and other unlawful intimidation tactics described herein in a manner that intimidates and attempts to intimidate constitutionally eligible voters and those who lawfully assist voters.

91.    Plaintiff, its members, and other eligible Arizona voters have been and will continue to be injured by Defendants' unlawful actions unless this Court grants relief.

. . . .

. . . .

**PRAYER FOR RELIEF**

Plaintiff prays for relief as follows:

1.      That the Court declare that Defendants have violated Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b);

2.      That the Court declare that Defendants have violated 42 U.S.C. § 1985(3);

3.      That the Court temporarily and permanently enjoin Defendants and anyone acting in concert or privity with them, including but not limited to all volunteers, agents, and unnamed co-conspirators, from further intimidating voters or otherwise violating the law;

4.      That the Court award compensatory and consequential damages in an amount to be determined at trial to compensate Plaintiff for the injuries it has suffered as a result of Defendants' unlawful conduct;

5.      That the Court award punitive damages as provided by law and as proved at trial to punish Defendants for intimidating voters;

6.      That the Court award attorneys' fees and litigation costs to Plaintiff's attorneys;

7.      That the Court retain jurisdiction to ensure Defendants' ongoing compliance with its orders;

8.      That the Court grant all other and further relief as it may deem necessary and appropriate.

1    DATED this 25th day of October, 2022.

2

3                                OSBORN MALEDON, P.A.

4                                By s/ Joshua D. Bendor
5                                   Joshua D. Bendor
                                    Brandon T. Delgado
6                                   2929 North Central Avenue, Suite 2100
                                    Phoenix, Arizona 85012-2793

7                                   Orion Danjuma *(pro hac vice to be filed)*
                                    PROTECT DEMOCRACY PROJECT
8                                   82 Nassau St. #601
                                    New York, NY 10038
9

10                                  Rachel F. Homer *(pro hac vice to be filed)*
                                    PROTECT DEMOCRACY PROJECT
11                                  2020 Pennsylvania Avenue NW, #163
                                    Washington, DC 20006
12

13                                  Benjamin L. Berwick*(pro hac vice to be filed)*
                                    PROTECT DEMOCRACY PROJECT
14                                  15 Main Street, Suite 312
                                    Watertown, MA 02472
15

16                                  Jared Davidson*(pro hac vice to be filed)*
                                    PROTECT DEMOCRACY PROJECT
17                                  3014 Dauphine Street, Suite J
                                    New Orleans, LA 70117
18
                                 Attorneys for Plaintiff
19

20

21

22

23

24

25

26

27

28