Joshua D. Bendor, 031908
Brandon T. Delgado, 035924
OSBORN MALEDON, P.A.
2929 North Central Ave., Suite 2100
Phoenix, Arizona  85012-2793
(602) 640-9000
jbendor@omlaw.com
bdelgado@omlaw.com

Orion Danjuma *(pro hac vice to be filed)*
NY Reg No. 4942249
PROTECT DEMOCRACY PROJECT
82 Nassau St. #601
New York, NY 10038
Tel: (202) 579-4582
orion.danjuma@protectdemocracy.org

Rachel F. Homer *(pro hac vice)*
DC Bar No. 1045077
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel: (202) 579-4582
rachel.homer@protectdemocracy.org

Attorneys for Plaintiff

Benjamin L. Berwick*(pro hac vice)*
MA Bar No. 679207
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Tel: (202) 579-4582
ben.berwick@protectdemocracy.org

Jared Davidson *(pro hac vice to be filed)*
LA Bar No. 37093
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| League of Women Voters of Arizona, <br><br> Plaintiff, <br><br> vs. <br><br> Lions of Liberty LLC; Yavapai County Preparedness Team; Jim Arroyo, Lucas Cilano; Nicholas Cilano; Brian Mounsey; Toby Fox; Bruce Mounsey; James Johnson; Melody Jennings; Clean Elections USA; John Does 1-10, <br><br> Defendants. | No. CV-22-08196-PCT-MTL <br><br> **PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION** |

**PRELIMINARY STATEMENT**

Defendant Melody Jennings and Defendant Clean Elections USA ("CE-USA") are the planners and coordinators of a scheme that is threatening the integrity of Arizona's elections. Defendants have spent months recruiting agents to execute their plan to surveil Arizonans who vote at drop boxes, photograph their faces and license plates while they vote, and baselessly accuse targeted individuals of voter fraud. They have sanctioned their followers conducting this surveillance while masked, bearing firearms, and clothed in tactical gear. Defendants and their agents have a right to their political beliefs, a right to bear arms in the State of Arizona, and a right to wear whatever clothing they please—but those rights are far from absolute. They do not have a right to station themselves as an anonymous, threatening, armed militia looming over voting locations in the United States of America. Such surveillance of voting is quintessentially intimidating and brazenly threatens the voting processes central to most "fundamental political right[:]" the right to vote. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Defendants bear direct responsibility for the scheme they have unleashed.

Plaintiff League of Women Voters of Arizona (the "League") seeks a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. A separate motion for similar preliminary relief is currently pending before this Court. *Arizona Alliance for Retired Americans v. Clean Elections USA*, No. 2:22-cv-1823, ECF No. 2 (hereinafter "*AARA*"). Plaintiff brings this parallel motion to present the Court with important evidence relevant to the propriety (and urgency) of that relief, including declarations from voters and Plaintiff's members affected by Defendants' drop box surveillance and related conduct.[1] Plaintiff seeks an order barring Defendants, their co-

---

[1] In addition to Defendants Jennings and CE-USA, Plaintiff's complaint names the Lions of Liberty, Yavapai County Preparedness Team, and its associated officers and agents as defendants. Yesterday evening, Thursday, October 27, the officers of Yavapai Defendants sent out "an Official Stand Down order" to their agents, volunteers and followers, indicated that they were to "stepping down [their] sponsorship of Operation Drop Box" in response to Plaintiff's suit and due to concerns that other drop box monitoring groups might be acting lawlessly. *See* Homer Decl., Ex. Y. In light of the

conspirators, and all of their volunteers and agents, from engaging in activity that is actively intimidating voters. Plaintiff's motion does not seek to enjoin all Arizonans from engaging in constitutionally protected conduct in the wake of the voter intimidation crisis caused by Defendants' actions. Rather, Plaintiff seeks to constrain the agents, volunteers, and confederates of Defendants from continuing an unlawful scheme that has had the demonstrated effect of dissuading Arizonans from voting using lawful and secure methods that the State has employed for years.

## STATEMENT OF FACTS

Defendants' campaign is inspired by a thoroughly discredited conspiracy theory that so-called "mules" illegally deposited large numbers of ballots at drop boxes to steal the 2020 election in various closely contested states, including Arizona. *See* Decl. of Rachel F. Homer ("Homer Decl."), Exs. A-B. As false claims in the documentary spread online, viewers began to circulate viral images of drop box voters and election officials portrayed in the film. *See Id.*, Ex. F. Some viewers began to post photos of individuals who had purportedly voted illegally—but, in fact, had not—in turn subjecting those voters to harassment and threats.

Defendants Jennings and CE-USA subscribe to the "mules" conspiracy theory and launched "Dropbox Initiative 2022" in response. The goal of the campaign is to surveil and harass voters at drop boxes and "gather video (and live witness evidence) of any ballot tampering that takes place in real time." *Id.*, Ex. K. Defendants are hoping to have at least ten monitors at each drop box. *Id.* Defendants began organizing drop box surveillance during the 2022 summer primary, referring to it as the campaign's "first run" before the general election. *Id.*, Ex. F. Defendant Jennings has stated that the objective of the surveillance tactics she has indeed had an intimidating effect on voters during the

---

Stand Down Order, Plaintiff declines to seek emergency relief enjoining Yavapai Defendants at this time. However, Plaintiff reserves the right to seek such relief in the future from this Court.

1   primary, with one post declaring: "We ram [*sic*] one mule off just by being there . . . ."

2   *Id.*, Ex. Z.

3          As we approach the November 8 elections, Defendants activities are continuing

4   unabated—they are recruiting and coordinating with volunteers for their surveillance-

5   and-intimidation campaign on platforms used by election deniers and extremist groups.

6   For example, Defendants are actively recruiting volunteers on Truth Social, a social

7   media platform well-known for disseminating election-related conspiracy theories.

8   Further, on an October 17, 2022, appearance on Steve Bannon's *War Room*, Defendant

9   Jennings made clear that she ensures all monitors are "one of us," implying that she is

10  only recruiting volunteers who already believe in the "mules" conspiracy theory. *See*

11  Homer Decl., Ex. K.

12         Critically, neither Defendants nor any of their volunteers or other co-conspirators

13  have any good-faith basis to conclude that a voter who deposits multiple ballots is doing

14  so illegally, because Arizona law specifically permits voters to deposit multiple ballots in

15  a number of circumstances. *See* Ariz. Rev. Stat. § 16-1005(I). Nevertheless, Defendants

16  have accused voters, without evidence, of illegal activity. For example, on October 16,

17  Defendant Jennings posted a highly shared social media post showing camera footage of

18  a voter, implying (without evidence) that the voter was engaged in illegal activity. Homer

19  Decl., Ex. N. The next day, Defendant Jennings called for additional volunteers to surveil

20  drop boxes in Mesa and Phoenix, alleging that her "crew" had spotted a "mule." *Id.*, Ex.

21  M.

22         In their TRO motion, the AARA plaintiffs have proffered evidence *inter alia*, that

23  (1) Defendants' conspired to intimidate voters, (2) that Defendants actively intend to

24  "dox" voters for engaging in lawful voting, and (3) that Jennings affirmed that two

25  individuals who appeared at a Mesa, Phoenix drop box on Friday Oct. 21 were affiliated

26  with Defendants and sanctioned their use of masks, firearms, and tactical gear to surveil

27  polling places. To avoid duplication here, Plaintiff League of Women Voters of Arizona

28

1  adopts and incorporates the evidence and argument presented in the AARA plaintiffs'

2  TRO motion.

3      A series of serious incidents of voter harassment and intimidation occurred almost

4  immediately after Defendants' agents began conducting surveillance occurring during the

5  early voting period. Plaintiff has obtained additional evidence from voters who lodged

6  complaints of voter intimidation and members of the League about the impact of

7  Defendants' surveillance. *See* Decl. of Complainant 240 (redacted); Decl. of Daniel

8  Rivera; Decl. of Donald C. Overlock; Decl. of John I. Evans.

9      On the evening of Monday, October 17, the individual who later filed complaint

10  #240 drove with his wife to the drop box at Maricopa Juvenile Court in Mesa to deliver

11  their ballots. When they arrived they saw between six and nine individuals stationed in

12  the parking lot clearly filming and photographing voters as they deposited their ballots.

13  One of the monitors had a very large camera. Complainant #240's wife was afraid that

14  observers could use cameras to zoom in on personal information in their ballots and target

15  them for harassment. She wanted to leave instead of voting. Complainant #240 told his

16  wife he would cover the ballots under his shirt to prevent observers from obtaining

17  personal information. When he got out of his car to drop off his ballot, he was followed

18  by four individuals at a distance of about 30 feet. The observers asked him if he was a

19  "mule" and told him they were "hunting mules." Complainant #240 reversed his car away

20  from the drop box to prevent the observers from photographing it. Another vehicle then

21  tailed him down the road attempting to record Complainant #240's license plate.

22      Complainant #240 filed a complaint for voter intimidation with the Arizona

23  Secretary of State. News outlets obtained security camera footage of the interaction which

24  was subsequently posted online. Defendant Jennings and her agents posted about the

25  incident on social media with one of the monitors displaying photos of Complainant

26  #240's car, writing "Mule hunting tonight. This is a mule driving up to the outdoor

27  dropbox." The interaction was highly distressing to Complainant #240 and his wife. He

28

is understandably concerned about security after the attacks against him online and has asked for his declaration to be filed under seal to prevent further threats and abuse.

On Wednesday, October 19th, 2022, John Evans drove to a drop box in downtown Phoenix, to deliver ballot for himself and his wife. He immediately saw three people monitoring the site with cameras and a tripod and tracking him with their cameras. He found their presence disturbing. After seeing that they were taking pictures of his license plate, he drove up to them and asked them to identify themselves. They refused to do so, only saying that they were monitoring voting irregularities. Evans told them they did not have his permission to photograph but they suggested that the County Recorder had given them permission to be there. Evans checked with County staff who advised they hadn't given this group permission but that they had experienced similar activity in the past, to the point that employees had quit due to feeling intimidated by these groups. County staff informed him that in some instances people from these groups had been brandishing guns outside the voting location.

Evans felt like the monitors were harassing him by photographing him and his license plate and that they were intentionally invading his privacy. He filed Complaint #241 with the Secretary of State.

On Thursday, October 20th, 2022, Don Overlock drove with his wife to the Mesa Juvenile Court to deposit their ballots. On arrival, he observed five or six men standing around a truck in the second row of parking spaces directly across from the drop box's location. Seeing that they were being monitored, Overlock and his wife went to individually drop off their ballots. They had seen news coverage of people being photographed for dropping off ballots and didn't want to be targeted.

Overlock noticed that the men started taking photos of their license plate and car anyway. He confronted them and told him he would report them for voter intimidation and harassment and took photographs of them. The drop box monitors became angry in response. Overlockz reported the incident to the Arizona Secretary of State as Complaint #243. He remains concerned that given how angrily the monitors reacted to being reported

for voter intimidation, they might use his license plate to try to find his address to harass him and his wife.

On Saturday, October 22, 2022, Daniel Rivera went with his wife to drop of their and their son's ballots at the drop box at the Maricopa Juvenile Court in Mesa. Rivera's son had told him he was too scared to vote himself because he had heard about people surveilling voters at drop boxes in Maricopa County. Rivera told his son he would drop off his ballot for him.

At the drop box, Rivera, saw someone holding up a sign stating "I invoke my right to vote" in front of a Range Rover about 35 feet away from the drop box. He could see a man in the vehicle monitoring voters who were dropping off ballots. It also looked like he was writing down information and had a recording device pointed at the drop box. This surveillance from the Range Rover made Rivera and his wife very uncomfortable. Rivera's wife was extremely concerned that the man might be armed and wanted to leave without voting.

A series of serious incidents of voter harassment and intimidation occurred almost immediately after Defendants' agents began conducting surveillance occurring during the early voting period. Plaintiff has obtained additional evidence from voters who lodged complaints of voter intimidation and members of the League about the impact of Defendants' surveillance.

On the evening of Monday, October 17, the individual who later filed complaint #240 drove with his wife to the drop box at Maricopa Juvenile Court in Mesa to deliver their ballots. When they arrived they saw between six and nine individuals stationed in the parking lot clearly filming and photographing voters as they deposited their ballots. One of the monitors had a very large camera. Complainant #240's wife was afraid that observers could use cameras to zoom in on personal information in their ballots and target them for harassment. She wanted to leave instead of voting. Complainant #240 told his wife he would cover the ballots under his shirt to prevent observers from obtaining personal information. When he got out of his car to drop off his ballot, he was followed

by four individuals at a distance of about 30 feet. The observers asked him if he was a "mule" and told him they were "hunting mules." Complainant #240 reversed his car away from the drop box to prevent the observers from photographing it. Another vehicle then tailed him down the road attempting to record Complainant #240's license plate.

Complainant #240 filed a complaint for voter intimidation with the Arizona Secretary of State. News outlets obtained security camera footage of the interaction which was subsequently posted online. Defendant Jennings and her agents posted about the incident on social media with one of the monitors displaying photos of Complainant #240's car, writing "Mule hunting tonight. This is a mule driving up to the outdoor dropbox." The interaction was highly distressing to Complainant #240 and his wife. He is understandably concerned about security after the attacks against him online and has asked for his declaration to be filed under seal to prevent further threats and abuse.

On Wednesday, October 19th, 2022, John Evans drove to a drop box in downtown Phoenix, to deliver ballot for himself and his wife. He immediately saw three people monitoring the site with cameras and a tripod and tracking him with their cameras. He found their presence disturbing. After seeing that they were taking pictures of his license plate, he drove up to them and asked them to identify themselves. They refused to do so, only saying that they were monitoring voting irregularities. Evans told them they did not have his permission to photograph but they suggested that the County Recorder had given them permission to be there. Evans checked with County staff who advised they hadn't given this group permission but that they had experienced similar activity in the past, to the point that employees had quit due to feeling intimidated by these groups. County staff informed him that in some instances people from these groups had been brandishing guns outside the voting location.

Evans felt like the monitors were harassing him by photographing him and his license plate and that they were intentionally invading his privacy. He filed Complaint #241 with the Secretary of State.

On Thursday, October 20th, 2022, Don Overlock drove with his wife to the Mesa Juvenile Court to deposit their ballots. On arrival, he observed five or six men standing around a truck in the second row of parking spaces directly across from the drop box's location. Seeing that they were being monitored, Overlock and his wife went to individually drop off their ballots. They had seen news coverage of people being photographed for dropping off ballots and didn't want to be targeted.

Overlock noticed that the men started taking photos of their license plate and car anyway. He confronted them and told him he would report them for voter intimidation and harassment and took photographs of them. The drop box monitors became angry in response. Overlockz reported the incident to the Arizona Secretary of State as Complaint #243. He remains concerned that given how angrily the monitors reacted to being reported for voter intimidation, they might use his license plate to try to find his address to harass him and his wife.

On Saturday, October 22, 2022, Daniel Rivera went with his wife to drop of their and their son's ballots at the drop box at the Maricopa Juvenile Court in Mesa. Rivera's son had told him he was too scared to vote himself because he had heard about people surveilling voters at drop boxes in Maricopa County. Rivera told his son he would drop off his ballot for him.

At the drop box, Rivera, saw someone holding up a sign stating "I invoke my right to vote" in front of a Range Rover about 35 feet away from the drop box. He could see a man in the vehicle monitoring voters who were dropping off ballots. It also looked like he was writing down information and had a recording device pointed at the drop box. This surveillance from the Range Rover made Rivera and his wife very uncomfortable. Rivera's wife was extremely concerned that the man might be armed and wanted to leave without voting. Rivera convinced his wife to let him drop off their ballots. He contacted the Arizona Secretary of State to file Complaint #248 for voter intimidation.

Beyond these declarants, numerous other complaints have been filed with the Secretary of State in response to Defendant's drop box surveillance.

1    Furthermore, Defendant's surveillance activities have directly impacted the
2  League's members. Four voters—Leslie Hanson, Lorna Banister, Karen Devine, and Lois
3  Hansen—all became too intimidated by Defendants' conduct to vote using drop boxes.
4  All are Arizona residents and members of the League, and have voted in past elections.
5  All originally intended to vote at drop boxes. However, after they became aware of
6  Defendants' intimidating conduct at drop boxes—dressing in tactical gear, watching
7  voters and photographing them, and verbally harassing and accosting voters—they felt
8  intimidated and afraid, and as a result of that intimidation, did not vote by drop box. *See*
9  Decl. of Leslie Hanson; Decl. of Lorna Banister; Decl. of Karen Devine; Decl. of Lois
10  Hansen.

11                          **LEGAL STANDARD**

12    "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to
13  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of
14  preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an
15  injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see*
16  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). "A preliminary injunction may
17  also be appropriate if a movant raises 'serious questions going to the merits' and the
18  'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter*
19  factors are satisfied." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th
20  Cir. 2017). The same legal standard governs both the issuance of preliminary injunctions
21  and temporary restraining orders. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,*
22  *Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

23    As explained below, (1) Plaintiff is likely to succeed on the merits of its claims
24  under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux
25  Klan Act of 1871, 42 U.S.C. § 1985(3); (2) irreparable harm to Plaintiff, its members, and
26  other voters, will occur in the absence of immediate relief; (3) the balance of equities tips
27  in favor of temporary relief barring Defendants' actions that intimidate voters; and (4) an
28  injunction barring such unlawful conduct is in the public interest.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ARGUMENT

## I.     Plaintiff is likely to succeed on the merits

### A.     Plaintiff has standing.

Plaintiff the League of Women Voters of Arizona (the "League") has sufficiently alleged standing. A plaintiff establishes standing by showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

First, the League has standing to sue on its own behalf. "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879–80 (9th Cir. 2022) (citation omitted). The League easily satisfies this standard. The League's mission is to educate Arizona voters and encourage them to vote by providing Arizona voters with information about their voting options, including options for early voting and voting by mail. Decl. of Pinny Sheoran ¶¶ 8-10. This mission has been frustrated by Defendants' actions, as reports of voter surveillance, intimidation, and harassment has curtailed voters' willingness to participate in the democratic process. *Id.* ¶ 11. Defendants' actions have also caused the League to divert resources in response, including by expending staff time and money and by repurposing its existing phone banking program. *Id.* ¶¶ 14-20.

The League has also established associational standing on behalf of its members. To establish associational standing, a plaintiff "must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to vindicate are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d at 1101–02 (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). The League is a membership

organization with 900 members statewide, the vast majority of whom use early voting, including drop box voting. Sheoran Decl. ¶ 7. At least three of those members have changed their plans to vote by drop box because of Defendants' actions to intimidate voters at dropboxes. Devine Decl. ¶¶ 7-8, Banister Decl. ¶¶ 5-7, Hanson Decl. ¶¶ 5-6. Losing access to a particular voting method is an injury sufficient to establish standing for the individual and for an association of which that individual is a member. *See Dem. Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd on other grounds*, *Dem. Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc).

**B.** **Plaintiff is likely to show that Defendants have violated Section 11(b) of the Voting Rights Act**

Plaintiff is likely to prevail on its claim that Defendants have violated Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b). That statute provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b) (formerly 42 U.S.C. § 1973i(b)). [2]

To prove a claim under Section 11(b), Plaintiff must demonstrate that Defendants have intimidated, threatened, or coerced (or attempted to intimidate, threaten, or coerce) a voter or someone assisting a voter. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("*Wohl I*"). The question is whether voters are intimidated, threatened, or coerced in any fashion. *See Dougherty County v. United States*, 439 U.S. 32, 50 n.4 (1978) (through Section 11, "Congress imposed an unlimited proscription on activities affecting the voting rights of others.").

***Defendants' conduct is objectively intimidating.*** The operative words of the statute—"intimidate," "threaten," and "coerce," or attempt to do so—should be given their plain meaning. *Leocal v. Ashcroft*, 543 U.S. 1, 8-9 (2004); *CISPES v. FBI*, 770 F.2d

---

[2] Section 11(b) affords a private right of action. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *Gray v. Main*, 291 F. Supp. 998, 999-1000 (M.D. Ala. 1966); *see also* 28 U.S.C. § 1343(a)(4).

468, 476-77 & n.8 (5th Cir. 1985) (analogizing the statutory text at issue to Section 11(b) because it contains terms "obviously widely used and commonly understood in statutory contexts").[3] Merriam Webster defines "intimidate" as "to make timid or fearful"; "to compel or deter by or as if by threats." It defines "threaten" as "to utter threats against," "to hang over dangerously," or "to cause to feel insecure or anxious." And it defines "coerce" as "to restrain or dominate by force," "to compel to an act or choice," or "to achieve by force or threat."[4] The 1966 edition of Webster's dictionary—nearly contemporaneous with the passage of Section 11(b)—defines "intimidation" as "to make timid and fearful" or to "inspire or affect with fear." Webster's New International Dictionary 1184 (3d ed. 1966). Thus, the text's reach is broad, prohibiting voter intimidation in all its forms.

No physical violence or threat of physical violence is required to constitute intimidation. The text itself makes that plain: if "threats" were required for intimidation, that would render the words "threaten" and "intimidate" redundant. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."). Thus, courts have explicitly held that Section 11(b) does not require any physical violence. *See, e.g.*, *New York v. Horelick*, 424 F.2d 697, 700 (2d Cir. 1970) (Friendly, J.) (contrasting the Voting Rights Act to another provision of federal law that the court found applied only to "violent activity"); *Wohl I*, 498 F. Supp. 3d at 477; *League of United Latin Am. Citizens – Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug 13, 2018) ("*LULAC*").[5] The Department of Justice has

---

[3] *See also United States v. Shrader,* 675 F.3d 300, 310 (4th Cir.2012) (" 'Harass' and 'intimidate' are not obscure words.")

[4] https://www.merriam-webster.com/dictionary/intimidate#:~:text=transitive%20verb,tried%20to%20intimidate%20a%20witness (intimidate); https://www.merriam-webster.com/dictionary/threaten (threaten); https://www.merriam-webster.com/dictionary/coerce (coerce).

[5] Additionally, numerous courts have held conduct that does not include violence or threats of violence to be unlawful voter intimidation under Section 11(b) or similar laws

1    taken the same position. *See* DOJ brief in *Wohl*, No. 20-cv-08668-VM-OTW, ECF No.

2    235 at 4-12. In statutes outside the context of voting, Courts have also interpreted the

3    word "intimidation" to include non-violent actions. *See United States v. Gartman*, 1995

4    WL 265925, at *4 (4th Cir. May 9, 1995) (per curiam).

5          Defendants' conduct is undoubtedly intimidating to voters. The drop box

6    monitors' actions closely parallel conduct that courts have held constitute illegal voter

7    intimidation in the past. For example, in *Daschle v. Thune*, Senator Daschle challenged

8    conduct committed by supporters of his opponent as violating Section 11(b), namely:

9    "[f]ollowing Native American voters at [a] polling place . . . and standing two to three

10   feet behind Native American voters, and ostentatiously making notes"; "[f]ollowing

11   Native American voters out to their cars after they have voted, walking up to their

12   vehicles, and writing down their license plate numbers"; and "[h]aving a loud

13   conversation in a polling place, where Native Americans were voting, about Native

14   Americans who were prosecuted for voting illegally in Minnesota." *Daschle v. Thune*,

15   Complaint at 5-6, No. 04-cv-4177 (D.S.D. Nov. 1, 2004)). The district court granted a

16   temporary restraining order and enjoining all "Defendant John Doe's acting on behalf of

17   [Thune]" from "following Native Americans from the polling places" and copy[ing] the

18   license plates of Native Americans" driving to and from polling places. *Id.*

19         Defendants have directed their agents to engage in nearly identical conduct to that

20   enjoined in *Daschle*. As the voters' declarations demonstrate, drop box monitors are

21   conspicuously filming and photographing voters and recording their license plate

22   numbers. Each of the voters testified that they felt harassed by this surveillance. In some

23   cases drop box monitors stalked voters and followed them very closely. The experience

24   of Complainant #240 is a stark and harrowing example of voter intimidation. This voter

25   sought to avoid revealing personally identifying information upon seeing an unnerving

26

27   such as Section 131(b) or equivalent state voter intimidation laws. *See, e.g.*, *LULAC*,
     2018 WL 3848404, at *4 (defamation and doxxing are intimidation); *Consent Decree*,
     United States v. N.C. Republican Party, 92-161-CIV-5-F (E.D.N.C. Feb. 27, 1992)

28   (mailings with false election information and warning of prosecution are intimidation).

group of individuals poised to videotape and photograph him. For the offense of trying to protect the voter's privacy, Defendant's agents stalked and harassed Complainant #240 telling him they were "hunting mules." This is a pointed, unambiguous threat directed at a lawful voter. It is the definition of voter intimidation.

Defendants speciously claim that their sole purpose is to detect unlawful voter fraud. Even if that were true–and it is not– Defendant's surveillance campaign forces voters into an untenable Catch-22: either (1) disclose identifying information, such as a license plate number, to Defendants' agents who have a stated intention and demonstrated history of doxxing individuals who have voted lawfully, or (2) try to avoid disclosing identifying information to Defendants' agents and be attacked for being a "mule" and having something to hide. The Voting Rights Act prohibits Americans from being put to such a test.

Standing alone, Defendants' actions constitute textbook voter intimidation under settled law, but Defendants' conduct has been far more threatening. After authorities received complaints by voters about being surveilled at the Mesa drop box, Defendants' agents responded on Friday, October 21, by showing up carrying firearms while wearing masks, body armor, and tactical gear. *See* Homer Decl., Ex. V. Defendant Jennings tweeted that the individuals were "our people" and sanctioned surveillance of voting locations by armed, masked monitors in tactical gear. *Id.* Defendant Arroyo likewise made clear in his planning sessions with drop box monitors that they could be armed while conducting surveillance, and he urged them to wear Oathkeeper gear. *Id.*, Ex. I.

Any reasonable observer would view the prospect of voting under the surveillance of armed, masked individuals wearing tactical gear as quintessentially intimidating. Such conduct constitutes a barely veiled threat of violence—both from Defendants' themselves, and from others incited by Defendants' conduct. This action thus violates the prohibition on efforts to "threaten" as well as to "intimidate" voters. *See Wohl I*, 498 F. Supp. 3d at 483.

14

The implied threat is increased even further given Defendants' stated intention to dox voters they suspect (without basis) of voting illegally. *See* Homer Decl., Ex. L. Every complainant testified that they were deeply concerned that drop box monitors would use photos of their faces and license plates to identify, dox, and harass them. That fear is eminently reasonable, considering the use of that tactic by proponents of the 2000 mules conspiracy theory. A reasonable voter would understand that the recording of their face and license plate would present an immediate risk that their identity would be publicized online alongside false accusations that they committed voter fraud, leading to threats of violence against them. Courts have recognized that publishing a victim's personal information alongside accusations of illegal voting can constitute harassment. S*ee LULAC*, 2018 WL 3848404, at *4; *see also King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) ("Reticence to apply for registration might have been intensified . . . by publication in the local newspaper of the names and addresses of all applying for registration[.]"); *Original Knights of the KKK*, 250 F. Supp. at 342 (describing intimidating handbills posted to identify specific individuals and businesses that the KKK was targeting).

Furthermore, numerous courts have also held that baselessly accusing voters of violating the law, or warning of legal or other consequences for voting, is a well-recognized form of unlawful voter intimidation. *See, e.g.*, *Nguyen*, 673 F.3d at 1264-66 (letters sent to Hispanic voters warning of incarceration or deportation could have "constituted a tactic of intimidation" under state voter intimidation law); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509-11 (S.D.N.Y. 2021) 509-11 (*Wohl II*) (collecting cases); *McLeod*, 385 F.2d at 740-74 ("baseless arrests and prosecutions"); *see United States v. Wood*, 295 F.2d 772, 781-82 (5th Cir. 1961) (arrests of voting rights organizers); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (similar); *Olagues*, 797 F.2d at 1522 (investigations of voters who requested bilingual ballots); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725 (E.D. Va. 1992) (excessive investigations by a city rental agency); *LULAC*, 2018 WL 3848404, at

*4 (publishing voters' names and personal information with allegations of felonious voter registration "in a clear effort to subject the named individuals to public opprobrium."). Defendant's demonstrated history of baselessly accusing voters of being "mules" runs directly afoul of this settled precedent.

*Section 11(b) reaches private parties.* The plain language of the statute reaches conduct by individuals "whether acting under color of law *or otherwise* . . . ." 52 U.S.C. § 10307(b) (emphasis added). Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968). It is evident from the text that "the language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b)." *LULAC*, 2018 WL 3848404, at *3; *Wohl I*, 498 F. Supp. 3d at 476 ("Section 11(b) undoubtedly applies to private conduct, and private individuals are subject to its prohibitions).

*Section 11(b) does not require any showing of racial animus.* The text of Section 11(b) states that "[n]o person . . . shall intimidate, threaten, or coerce or attempt to intimidate, threaten or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). This language does not include any racial animus requirement, nor is there any basis for reading in any such extra-textual requirement. As the House Report accompanying the Voting Rights Act explained, "[t]he prohibited acts of intimidation need not be racially motivated." H.R. Rep. No. 89-439, at 30 (1965) *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462. Numerous courts have so held. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (no showing "of specific intent or racial animus is required" when bringing a claim under Section 11(b)); *Wohl I*, 498 F. Supp. 3d at 476-77 ("A plaintiff need not show racial animus or discrimination to establish a violation of Section 11(b)"); *Willingham v. County of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006) ("While the purpose of the VRA was to eliminate racial discrimination in voting, [Section] 11(b) of the act does not explicitly require proof that racial discrimination motivated the intimidation, threats, or coercion.")

1    ***Section 11(b) does not require any showing of subjective intent.*** Section 11(b)

2    was specifically written to *exclude* any intent requirement.  Section 11(b) is a modification

3    of an earlier provision, Section 131(b) of the Civil Rights Act of 1957, which states: "No

4    person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce,

5    or attempt to intimidate, threaten, or coerce any other person *for the purpose of*

6    interfering" with the right to vote. 52 U.S.C. § 10101(b) (emphasis added). Section 11(b)

7    is identical, except it omits the phrase "for the purpose of"—thus making it abundantly

8    clear that Section 11(b) explicitly *excludes* a subjective intent requirement.

9         The legislative history confirms what the text makes plain: that Congress

10   intentionally declined to incorporate a *mens rea* requirement into Section 11(b). As then-

11   Attorney General Nicholas Katzenbach explained, excluding a *mens rea* requirement was

12   necessary to combat nefarious activity difficult to reach under older voting rights statutes:

13   "Since many types of intimidation, particularly economic intimidation, involve subtle

14   forms of pressure, this treatment of the purpose requirement [in Section 131(b)] has

15   rendered the statute largely ineffective."[6] Thus, "no subjective 'purpose' need be shown

16   . . . in order to prove intimidation under [Section 11(b)].  Rather, defendants would be

17   deemed to intend the natural consequences of their acts." *Id.* The House Report

18   accompanying the Voting Rights Act echoes Katzenbach, stating that under Section

19   11(b), "no subjective purpose or intent need be shown." H.R. Rep. No. 89-439, at 30

20   (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437.

21        This is why numerous courts have interpreted the plain language to not require any

22   showing of subjective intent. *See, e.g.*, *Ariz. Democratic Party v. Ariz. Republican Party*,

23   No. 16-3752, 2016 WL 8669978, at *4 n.3 (D. Ariz. Nov. 4, 2016) ("[T]he plain language

24   of the statute does not require a particular mens rea."); *LULAC*, 2018 WL 3848404, at *4

25   ("The text of § 11(b), unlike § 131(b), plainly omits 'for the purpose of,' suggesting §

26

27   [6]Hearing on the Voting Rights Act of 1965 Before the H. Comm. on the Judiciary, 89th
     Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States),
28   https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/03-18-1965.pdf.

11(b)'s deliberately unqualified reach."); *Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6, at *2 (D.S.D. Nov. 1, 2004) ("Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters."); *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (concluding that the "inevitable effect" of challenged conduct would be to deter voters).

However, since courts often look to Section 131(b) when applying Section 11(b),[7] some courts have erroneously imported the *mens rea* requirement into Section 11(b). *See, e.g.*, *Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006).

In a since-vacated opinion, *Olagues v. Russoniello*, 797 F.2d 1511, 1522 (9th Cir. 1986) (en banc), the Ninth Circuit made this initial error. There, the Court considered a claim under 52 U.S.C. § 10303(f)(2) (then 42 U.S.C. § 1973b(f)(2)), which did explicitly include a *mens rea* requirement, and then assumed without any analysis that 52 U.S.C. § 10307(b) (then, 42 U.S.C. § 1973i(b)) also included a *mens rea* requirement. *Olagues* was vacated on other grounds and thus is no longer binding on this Court. *Russoniello v. Olagues*, 484 U.S. 806 (1987) (vacating and remanding). This Court should not extend Olagues's now-vacated error, and should instead apply the plain text of the statute.

In any event, this Court need not decide at this preliminary stage whether Section 11(b) requires a showing of subjective intent, because the evidence demonstrates both that Defendants' conduct is objectively intimidating to a reasonable voter *and* that Defendants' subjective intention was to intimidate voters. *See* Homer Decl, Ex. L (Defendant Jennings's Truth Social post asserting that "ballot trafficking mules are about to be completely doxxed and put on blast"). Thus, under either standard, Plaintiff is likely to prevail.

---

[7] Which is appropriate, to the extent the statutory text is identical, such as in the use of the phrase "intimidate, threaten, or coerce." *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes").

**C.      Plaintiff is likely to prevail on its claim under the Ku Klux Klan Act, 42 U.S.C. § 1985(3).**

Plaintiff is likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "Klan Act").

***The elements of a § 1985(3) clauses 3 and 4 claim.*** Four clauses of what was once Section 2 of the Klan Act are now codified in 42 U.S.C. § 1985(3). Clauses 1 and 2 of Section 2 incorporate the concept of Equal Protection from the Fourteenth Amendment and are known as the "equal protection clauses"; clauses 3 and 4 do not—instead, these are the "support or advocacy" clauses, and they protect a citizen's right to support or advocate for federal electoral candidates. Section 1985(3) provides:

> If two or more persons in any State or Territory conspire . . .
>> [1] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or
>>
>> [2] for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;
>
> **or if two or more persons conspire**
>> **[3] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States;** or
>>
>> **[4] to injure any citizen in person or property on account of such support or advocacy. . .**
>
> the party so injured or deprived may have an action for the recovery of damages . . . against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis, brackets, and line breaks added).

To prove a claim under clauses 3 and 4 of § 1985(3), a plaintiff must allege and prove four elements: (1) a conspiracy; (2) either to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; or to injure a lawful voter in person or in property for such support; (3) an act in furtherance of the conspiracy;

and (4) injury. *Wohl I*, 498 F. Supp. 3d at 487; *Ariz. Democratic Party*, 2016 WL 8669978, at *5; *LULAC*, 2018 WL 3848404, at *5-6 (E.D. Va. 2018).

This is distinct from claims under clauses 1 and 2 of § 1985(3) (known as the "equal protection clauses"), which typically require a showing of an equal protection violation. As the Supreme Court explained in *Kush v. Rutledge*, it is improper to import equal protection elements into the clauses of Section 1985 that proscribe conspiracies to interfere with federal functions that do not contain the equal protection language. 460 U.S. 719, 725 (1983) (explaining that "there is no suggestion" that the equal protection language should apply to "any other portions of § 1985")[8]; *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 n.13 (1993) (noting the centrality of the equal protection language to *Kush*'s holding); *McCord v. Bailey*, 636 F.2d 606, 614 & n.12 (D.C. Cir. 1980) (holding that no showing of class-based animus is required where the text "does not demand a denial of 'equal protection of the laws'"); *Wohl I*, 498 F. Supp. 3d at 487. Thus, there cannot be a class-based animus requirement for the "support or advocacy" clauses for the simple reason that the clauses lack the statutory text that gives rise to that requirement.[9]

---

[8] *See also Arizona Democratic Party,* 2016 WL 8669978, at *5 n.4. ("the plain language of the statute does not require" any racial animus showing, but "[t]he Court need not read into the statute a racial animus requirement to resolve Plaintiff's Motion").

[9] Some courts have failed to properly distinguish between the "equal protection" clauses and the "support or advocacy" clauses, and erroneously concluded that the "support or advocacy" clauses are remedial and simply enforce the First Amendment (in the same way that the "equal protection" clauses are remedial to enforce the Fourteenth Amendment and rights found elsewhere). *See Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004). Those cases are wrongly decided. Not only do they make clauses 3 and 4 redundant with clauses 1 and 2—which courts should not do, *see Bailey,* 516 U.S. at 146—but also because they rely on an anachronism. When the Klan Act was passed in 1871, First Amendment rights could only be asserted against the *federal* government. It wasn't until a half-century later that the Supreme Court held that the First Amendment applied to state governments as well. *See Stromberg v. California*, 283 U.S. 359 (1931) (incorporating the First Amendment's free speech clause against the states). Thus, if cases like *Federer* are correct, then the "support or advocacy" clauses of the Klan Act would not have provided a remedy against Nathan Bedford Forrest (the first Grand Wizard of the Klan), thus defeating the key purpose of the Act—to provide a legal

***Defendants have conspired and undertaken acts in furtherance of that conspiracy.*** Plaintiff is likely to succeed on the merits of its claim that Defendants have engaged in a conspiracy. A conspiracy is "an agreement . . . to do an unlawful act . . . between or among two or more" persons. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). As the Ninth Circuit has explained:

> To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

*Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012).

Plaintiff is likely to prove that Defendants agreed, tacitly or explicitly, on a "common objective": to surveil drop boxes, deter voters from using drop boxes, and intimidate voters. Indeed, Defendants statements and actions. detailed above show that they intentionally and explicitly agreed on a common objective—and did so explicitly, on their websites, social media pages, and other public statements. The objective was explicit: to drive off "mules," in other words, to intimidate voters. Defendants in fact have already undertaken that activity by: them and their agents appearing at drop boxes (at times with weapons, body armor, and cameras), verbally harrased voters, photographed voters, and posted those photographs online.

***The purpose of Defendants' conspiracy was to intimidate voters.*** Plaintiffs will likely prove that Defendants' conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat," or injuring them for exercising the franchise.

---

remedy against the Klan. Cases from near the time that the Klan Act was passed confirm that the Act created causes of action against defendants other than federal officials. *See Goldman*, 25 F. Cas. at 1351-53 (Reconstruction-era case recognizing a properly alleged claim under the criminal equivalent of what is now Section 1985(3) clause 3, with no examination of whether the defendant was a federal officer and observing that the right to provide "support or advocacy" under the statute is broader than merely the act of voting). *See also* Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 157 (2020); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1399-1400 (2020).

As detailed above, Defendants have directly stated–indeed celebrated–that their purpose is to deter voter fraud in drop boxes. At the same time, they automatically target voters as "mules" for dropping off more than one ballot–making no allowance for the fact that Arizona law expressly permits individuals to assist, *e.g.*, family and household members by depositing their ballots. Thus, Defendant's conduct is not aimed at voter fraud or illegal conduct–it is aimed at discouraging lawful voting using a method that they disapprove of. The purpose is intimidation.

Finally, Plaintiff and its members have been injured, as detailed above, *see supra* Part I.A.

## II.    Plaintiffs will be irreparably harmed absent immediate relief

There are "no do-overs in elections." *League of Women Voters of N.C.*, 769 F.3d at 247. For that reason, intimidation efforts that deter eligible voters from voting, like those that Defendants are currently undertaking and will continue to undertake absent injunctive relief, cause irreparable harm. Indeed, "when an alleged constitutional right is involved," such as the right to vote, "most courts hold that no further showing of irreparable injury is necessary." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). As this circuit has explained, *"it is well established that deprivation of constitutional rights unquestionably constitutes irreparable injury."* *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).

Because there is no "redress of a denial of the right to vote after an election, denial of that right weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction." *Fish*, 840 F.3d at 752; *see also Veasey v. Abbott*, 870 F.3d 387, 394 (5th Cir. 2017) (because the challenged actions "affect—or threaten to affect— the plaintiffs' right to vote . . . [they] have shown they will suffer an irreparable injury"); *Tex. League of United Latin Am. Citizens v. Abbott*, 2020 WL 5995969, at *22 (W.D. Tex. Oct. 9, 2020) ("We have already determined that the fundamental right to vote is likely either threatened or in fact being impaired, on the eve of an election, and this

1

2

3

4

conclusion mandates a finding of irreparable injury.").[10] In the absence of preliminary relief, Defendants' voter intimidation scheme already has and likely will continue to cause irreparable harm to voters' ability to exercise the franchise, including Plaintiff's members, and to Plaintiff by forcing it to divert resources to respond to Defendants' actions.

5

### III.   The balance of equities and public interest favor Plaintiff

6

7

8

9

10

11

12

13

14

The final two factors—the balance of equities and the public interest—both favor Plaintiff. Preventing voter intimidation is a critical public interest enshrined in federal law. "[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part). Indeed, the constitutional interest at stake in this litigation is the voters' "most precious" "right . . . to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.).

15

16

17

18

19

20

21

22

The weight of this interest is substantial in balancing the equities. *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883-34 (3d Cir. 1997) ("[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of" voters and candidates.); *League of Women Voters*, 769 F.3d at 247 ("By definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible."); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the

23

24

25

26

27

28

---

[10] *See also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997 ("voting and associational rights . . . cannot be alleviated after the election."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."); *Cf. Elrod v. Burns*, 427 U.S. 347, 374 & n.29 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" because "[t]he timeliness of political speech is particularly important").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

fundamental political right to vote") (internal quotation marks omitted); *Husted*, 697 F.3d at 437 ("That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006) ("the public interest weighs strongly in favor of letting every eligible resident of Washington register and cast a vote").

For all of these reasons, the balance of equities and the public interest would be advanced by the temporary restraining order and preliminary injunction sought here. Defendants cannot be permitted to engage in conduct that threatens the most basic right in American democracy—the right of voters to cast their votes free of coercion and intimidation. "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

**IV.    The Proposed Injunction Raises No Constitutional Concerns**

**A. Enjoining Voter Intimidation Is Consistent with the First Amendment**

**1.    Defendants' conspiracy to intimidate voters is not protected speech**

***True Threats.*** The surveillance by Defendants' agents carrying weapons, many of whom are wearing body armor and tactical gear, in combination with publicly accusing voters of voter fraud amount to "[i]ntimidation in the constitutionally proscribable sense of the word" because it contains a "threat to a person or group of persons with the intent of placing the victim in fear of bodily harm," *Virginia v. Black*, 538 U.S. 343, 360 (2003). Moreover, as explained above, the threat of "doxxing" voters along with accusations of felonious conduct and knowledge that this will almost certainly lead to violent threats online, is a true threat. *See LULAC*, 2018 WL 3848404, at \*4. Courts have long recognized that publicizing voter information (even technically public information, such as their names), along with accusations of crimes or the implication the wrong people are voting, predictably and foreseeably leading to threats against those voters, is a form of threat and intimidation. *See King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969); *Original Knights of the KKK*, 250 F. Supp. at 342; *see also*

1  *Wohl II*, 512 F. Supp. 3d 500, 513 (S.D.N.Y. 2021) (noting that a threatened injury need

2  not be physical or violent to constitute a "true threat" and that the prohibition on true

3  threats "protect[s] individuals from the fear of violence and the disruption that fear

4  engenders, as well as from the possibility that the threatened violence will occur");

5  *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1281 (M.D. Ala.) (a true threat is

6  determined by "the language itself"; the "context"; "the testimony of the recipient"

7  ((citing *Watts v. United States*, 394 U.S. 705, 708 (1969)).

8            **2.  Enjoining An Unlawful Conspiracy Is Consistent With the**

9                **First Amendment.**

10        "[I]t has never been deemed an abridgement of freedom of speech or press to

11  make a course of conduct illegal merely because the conduct was in part initiated,

12  evidenced, or carried out by means of language, either spoken, written, or printed."

13  *Rumsfeld v. Forum for Acad. & Institutional Rts.,* 547 U.S. 47, 62 (2006) (quoting

14  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Thus, "[i]t rarely has

15  been suggested that the constitutional freedom for speech . . . extends its immunity to

16  speech or writing used as an integral part of conduct in violation of a valid criminal

17  statute." *New York v. Ferber*, 458 U.S. 747, 761–62 (1982) (quoting *Giboney*, 336 U.S.

18  at 498). The exception applies not only to speech integral to proscribed criminal conduct

19  but also to speech integral to civilly actionable conduct. *See Rumsfeld*, 547 U.S. at 62.

20  An injunction halting Defendants' unlawful course of conduct[11] does not violate the

21

22

23

24

25  [11] Even if Defendants' actions were not part of an unlawful conspiracy, they are better
understood as conduct rather than speech. "Words can in some circumstances violate

26  laws directed not against speech but against conduct" *R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377, 389 (1992). Any "incidental[]" burden on speech due to an injunction

27  "directed at the conduct rather than the speech" is permissible. *See id.* at 389. But the
Court need not decide this issue, because Defendants' actions are explicitly also part of

28  a conspiracy, which of course the Court can enjoin.

First Amendment, because Defendants' actions are all part of unlawful conspiracies to intimidate voters, in violation of Section 11(b) and Section 1985(3).[12]

### 3. The proposed order would survive even strict scrutiny

Because there is "such a compelling interest in securing the right to vote freely and effectively," the Supreme Court has never required that regulations of voting aimed at guarding against voter intimidation be "perfectly tailored." *Burson v. Freeman*, 504 U.S. 191, 199, 208-09 (1992). Instead, the Supreme Court and lower courts have regularly issued or upheld common-sense protections against voter intimidation and interference as passing constitutional muster. *See, e.g.*, *id.* at 198–211 (upholding buffer zone on electioneering communications); *Firestone v. News-Press Pub. Co.*, 538 So. 2d 457 (Fla. 1989) (upholding restriction on photographing in polling places); *Ohio Democratic Party v. Ohio Republican Party*, No. 16-CV-02645, 2016 WL 6542486, at *2 (N.D. Ohio Nov. 4, 2016) (entering injunction prohibiting unauthorized pollwatching

---

[12] The specific element of the proposed order requiring Defendants to remove narrow, false claims about Arizona law and specific voters does not violate the First Amendment. It is not true that "[i]t is illegal in Arizona to put more than one ballot in the box other than your own." Compl. ¶ 37 n.6. Instead, Arizona law provides several common circumstances in which depositing multiple ballots into a dropbox is legal, including when family members deposit one another's ballots. *See* Ariz. Rev. Stat. § 16-1005(I)(2)(a), (c), (d). Stating otherwise, as Defendants' know, is false and intended to mislead voters and the broader public about voting requirements and procedures. Similarly, posting specific identifying information about individuals in connection with a claim that that individual violated the law based solely on the fact that they deposited multiple ballots at a dropbox is defamatory. These knowing, narrow lies about the mechanics of voting and specific, unfounded accusations about individuals committing voter fraud are unprotected. *Minnesota Voters All. v. Mansky*, 201 L. Ed. 2d 201, 138 S. Ct. 1876, 1889 n.4 (2018) (clarifying that "messages intended to mislead voters about voting requirements and procedures" may be prohibited); *see* Richard Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Am. Instit. (Oct. 21, 2021) (same); *R.A.V.*, 505 U.S. at 383 (defamatory speech may be proscribed). Where it is determined that a plaintiff is likely to succeed in proving that speech is unprotected, a preliminary injunction directing a party to remove that speech does not violate the First Amendment. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel.*, 413 U.S. 376, 390 (1973); *Kramer v. Thompson*, 947 F.2d 666, 675 (3d Cir. 1991); *id.* at 675 n.25 (collecting authority); Eugene Volokh, *Anti-Libel Injunctions*, 168 U. Penn. L. Rev. 73, 117–20 (2019).

within a buffer zone, loitering, and following and taking photos of voters); *New Jersey Press Ass'n v. Guadagno*, No. CIV.A. 12-06353 JAP, 2012 WL 5498019 (D.N.J. Nov. 13, 2012) (upholding prohibition on photographs within a certain distance of polling places).

> **B. Enjoining ongoing voter intimidation by requiring Defendants to refrain from carrying firearms within 250 feet of drop boxes does not violate the Second Amendment**

The Second Amendment plainly permits restrictions on carrying firearms near drop boxes because such restrictions are "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Prohibiting firearms in "sensitive places," as the Supreme Court has repeatedly recognized, is a "longstanding" type of regulation permitted under the Second Amendment. *Id.*; *see also District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Just this year, the Court reaffirmed that "polling places" in particular were historically considered "sensitive places" at which "weapons were altogether prohibited." *Bruen*, 142 S. Ct. at 2133; *see also Antonyuk v. Hochul*, 2022 WL 5239895, *15 (N.D.N.Y. Oct. 6, 2022). *Bruen* further explained that "sensitive places" were not limited to those recognized at the founding, but that courts Could identify "*new* and analogous sensitive places" through historical analogy. *Bruen*, 142 S. Ct. at 2133. In short, firearms may clearly be banned at polling places *and* their modern-day analogues, like ballot drop boxes.

Enjoining the open carrying of firearms within 250 feet of drop boxes is consistent with this recognized and permissible historical practice. Drop boxes are analogous to "polling places," because they are election-specific locations where millions of citizens return their ballots to be counted. The historical record shows that the Founding-era regulations of firearms at polling places swept broadly in order to prevent violence and intimidation at the polls. For example, the 1776 Delaware Constitution prohibited both firearms at polling places *and* armed militia within "*a mile*" of polling places 24 hours before or after the election in order "[t]o prevent any

27

violence or force being used at . . . said elections." Del. Const. art. 28 (1776) (emphasis added). Maryland adopted similar provisions in its early constitutions. *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill of Rights J. 459, 473 (2019) (citing Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis 1774, 1775, & 1776 185 (1836)). Similarly, a 1787 New York statute provided that "all elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election." *Id.* (citing Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345). Thus, historical regulation of firearms at "polling places" were drawn broadly to mitigate the threat posed to free and fair elections by armed individuals. Limiting the carrying of firearms within 250 feet of a drop box to only concealed carry is thus entirely consistent with (and less burdensome than) these historical regulations.

## V.     This Court Should Waive The Bond Requirement

The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). And "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* Here, there is no harm to the Defendants from enjoining their conduct and certainly no financial harm that would be remedied by a bond. This Court should therefore waive the bond requirement.

## VI.    CONCLUSION

This Court should grant Plaintiff's motion for preliminary injunctive relief.

1  DATED this 28th day of October, 2022.

2

3                                OSBORN MALEDON, P.A.

4                                By s/ Joshua D. Bendor
5                                    Joshua D. Bendor
                                     Brandon T. Delgado
6                                    2929 North Central Avenue, Suite 2100
                                     Phoenix, Arizona 85012-2793

7                                    Orion Danjuma *(pro hac vice to be filed)*
8                                    PROTECT DEMOCRACY PROJECT
                                     82 Nassau St. #601
9                                    New York, NY 10038

10                                   Rachel F. Homer *(pro hac vice)*
                                     PROTECT DEMOCRACY PROJECT
11                                   2020 Pennsylvania Avenue NW, #163
                                     Washington, DC 20006

12                                   Benjamin L. Berwick *(pro hac vice)*
13                                   PROTECT DEMOCRACY PROJECT
                                     15 Main Street, Suite 312
14                                   Watertown, MA 02472

15                                   Jared Davidson *(pro hac vice to be filed)*
                                     PROTECT DEMOCRACY PROJECT
16                                   3014 Dauphine Street, Suite J
                                     New Orleans, LA 70117

17

18                                   Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

29