KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

ELISE C. BODDIE
Principal Deputy Assistant Attorney General
Civil Rights Division

T. CHRISTIAN HERREN, JR. (AL Bar No. ASB6671R63T)
RICHARD A. DELLHEIM (NY Bar No. 2564177)
DANA PAIKOWSKY (CA Bar No. 329562)
MICHAEL E. STEWART (DC Bar No. 144926)
JENNIFER J. YUN (DC Bar No. 1600953)
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.: (202) 307-2767 / Fax: (202) 307-3961
Email: Chris.Herren@usdoj.gov
Richard.Dellheim@usdoj.gov
Dana.Paikowsky@usdoj.gov
Michael.Stewart3@usdoj.gov
Jennifer.Yun@usdoj.gov
*Attorneys for the United States*

GARY M. RESTAINO
United States Attorney
District of Arizona

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| League of Women Voters of Arizona, | No. CV-22-08196-MTL |
| Plaintiff, | |
| v. | **Statement of Interest of the United States** |
| Lions of Liberty LLC, et al., | |
| Defendants. | |

i

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ................................................................ 1

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 2

PROCEDURAL BACKGROUND .......................................................................... 3

STATUTORY BACKGROUND ............................................................................. 3

ARGUMENT .......................................................................................................... 4

   I.   Section 11(b) of the Voting Rights Act Prohibits Intimidation and Attempted

   Intimidation of Voters Attempting to Vote at Ballot Drop Boxes. ............................... 4

     A. Section 11(b) Broadly Prohibits Intimidation, Threats, and Coercion ................. 4

     B. Section 11(b)'s Protections Cover Voters Who Vote Using Mail Ballots and

     Ballot Drop Boxes ....................................................................................... 9

   II.  This Court May Grant Relief Against Violations of Section 11(b) Consistent with

   the First Amendment. ................................................................................ 11

CONCLUSION ...................................................................................................... 18

**TABLE OF AUTHORITIES**

C<span>ASES</span>

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...................................... 13

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021) ...................................................................................................................... 17

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018) ................................ 14

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011) .............. 13

*Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035 (9th Cir. 2018) .................................. 13

*Bartlett v. Strickland*, 556 U.S. 1 (2009)......................................................................... 12

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ........................................ 10

*Burson v. Freeman*, 504 U.S. 191 (1992) (plurality op.) .................................................. 12

*Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020).................................................................................................................*passim*

*Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 1, 2004).................... 6, 12

*Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457, 2022 WL 715973 (M.D.N.C. Mar. 10, 2022)......................................................................................... 10

*Democratic Nat. Comm. v. Republican Nat. Comm.*, 671 F. Supp. 2d 575 (D.N.J. 2009) ....................................................................................................................... 6, 7

*Doe v. Reed*, 561 U.S. 186 (2010)................................................................................... 16

*Elonis v. United States*, 575 U.S. 723 (2015).................................................................. 17

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ............................................ 14

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ..................................................... 13

*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................. 12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ........... 15

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022) ............................................... 13

*Jackson v. Riddell*, 476 F. Supp. 849 (N.D. Miss. 1979) ..................................... 4

*League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................................................. 8, 17

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) (*"Wohl I"*) .................................................................... 5, 9, 10, 16

*Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021) (*"Wohl II"*) ................................................................. 4, 8, 16

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ..................................... 16

*Orozco-Lopez v. Garland*, 11 F.4th 764 (9th Cir. 2021) ...................................... 10

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) ............................................................. 16

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ..................... 11, 14

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47 (2006)............... 14, 15

*Sanchez v. Cegavske*, 214 F. Supp. 3d 961 (D. Nev. 2016) ................................. 16

*Stanley v. Georgia*, 394 U.S 557 (1969) ............................................................. 14

*United States v. Bachmeier*, 8 F.4th 1059 (9th Cir. 2021) ................................. 17

*United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011) ........................... 17

*United States v. Barnett*, 667 F.2d 835 (9th Cir. 1982)..................................... 14

*United States v. Buttorff*, 572 F.2d 619 (8th Cir. 1978) ..................................................... 14

*United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965).................................................. 5

*United States v. Gonzales*, 520 U.S. 1 (1997) .................................................................... 10

*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) ................................................ 9, 18

*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) ..................................................... 8

*United States v. Stewart*, 420 F.3d 1007 (9th Cir. 2005) ................................................... 16

*United States v. The New Black Panther Party for Self-Defense*, 2:09-cv-00065, ECF No. 21 (E.D. Pa. May 18, 2009).................................................................................... 12

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) (Kennedy, J., concurring) .................................. 16

*Virginia v. Black*, 538 U.S. 343 (2003) ............................................................................ 17

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ......................................................... 11

*Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968) .................................................... 5

**STATUTES**

28 U.S.C. § 517 .................................................................................................................... 1

42 U.S.C. § 1985(3)............................................................................................................. 3

52 U.S.C. § 10307(b).................................................................................................... 1, 3, 4

52 U.S.C. § 10308(d).......................................................................................................... 1

52 U.S.C. § 10310(c)(1) ................................................................................................ 4, 10

**OTHER AUTHORITIES**

Complaint, *United States v. N.C. Republican. Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 26, 1992)............................................................................................................................. 8

Consent Decree, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb.
27, 1992).................................................................................................................... 8

H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462
.................................................................................................................... 4, 17

Letter from Anita S. Hodgkiss, Deputy Assistant Att'y Gen., Civil Rights Div., Dep't of
Justice to the Honorable Martin Frost, Member of Congress (Oct. 30, 1998)................ 6

Letter from John Tanner, Acting Chief, Voting Section, Civil Rights Div., Dep't of
Justice to Edward S. Allen Esq. (Nov. 2, 1994)......................................................... 5, 6

Press Release of U.S. Attorney's Office for the District of Arizona, October 19, 2020 .... 6

Press Release of U.S. Attorney's Office for the District of Arizona, October 24, 2016 .... 7

Press Release of U.S. Attorney's Office for the District of Arizona, October 29, 2018 .... 7

Press Release of U.S. Attorney's Office for the District of Arizona, October 31, 2014 .... 7

*Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12
(1965) (statement of Nicholas deB. Katzenbach, Att'y Gen. of the United States) ....... 5

**INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States . . . ."  This case presents an important question regarding the interpretation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b).  Congress has vested the Attorney General with authority to enforce Section 11(b) on behalf of the United States.  *See* 52 U.S.C. § 10308(d).  Accordingly, the United States has a substantial interest in ensuring proper interpretation of Section 11(b).

The United States expresses no view on any factual dispute before the Court, nor on any legal question presented other than the interpretation of Section 11(b).

**INTRODUCTION**

This case alleges that organized and sometimes armed groups of individuals have engaged in campaigns to surveil, video record, and harass voters as they exercise their most fundamental right, the right to vote.  These allegations raise serious concerns of voter intimidation, which is proscribed under Section 11(b) of the Voting Rights Act. The United States files this Statement of Interest for the limited purpose of aiding the Court's interpretation of Section 11(b) and to provide illustrative, but by no means exhaustive, examples of Section 11(b)'s appropriate application to protect voters from threats, intimidation, and coercion.

Section 11(b), 52 U.S.C. § 10307(b), broadly prohibits threats and acts of intimidation and coercion at all stages of the voting process, including voters' depositing

1    of ballots in a drop box where provided for by state or local law.  By the statute's plain

2    terms, Congress brought within Section 11(b)'s wide ambit both violent and nonviolent

3    conduct that has the prohibited effect of intimidating, threatening, or coercing voters, or

4    attempting to do so.  Polling-place conduct, such as private surveillance or investigation,

5    that would ordinarily tend to intimidate voters and has little salutary purpose has long

6    been considered to implicate Section 11(b).  And while balancing any prohibition on

7    conduct or potential remedy against an individual's First Amendment rights can present a

8    fact-intensive inquiry, protecting voters' right to cast their ballot without the specter of

9    threats, intimidation, or coercion is fully consistent with appropriately crafted limitations

10   on private actors' conduct.

11                              **FACTUAL BACKGROUND**

12            According to allegations in Plaintiff League of Women Voters of Arizona's

13   Complaint, Defendants Lions of Liberty LLC, Yavapai County Preparedness Team, and

14   their members "have commenced a widespread campaign to surveil all drop boxes in

15   Yavapai County, film voters, and then report to law enforcement any voters who deposit

16   multiple ballots," despite Arizona law permitting individuals to deposit multiple voters'

17   ballots in certain circumstances.  Compl. ¶¶ 5, 31-42, ECF No. 1 (emphasis omitted).

18   The Complaint also alleges that Defendant Clean Elections USA (CEUSA) and its

19   founder, Defendant Melody Jennings, intend to "publicly reveal [voters'] personal

20   information online" and have "peddled images of innocent voters who have used drop

21   boxes and baselessly claimed" those voters are participating in election fraud in order to

22   deter use of drop boxes.  Compl. ¶¶ 6, 43-44, 49-53.  According to the Complaint,

1    individuals affiliated with CEUSA have also "guard[ed] drop boxes while armed and in

2    tactical gear," and Defendant Jennings has stated "these tactics are already deterring

3    voters from using drop boxes."  Compl. ¶¶ 6, 45, 55-56, 58.

4                              **PROCEDURAL BACKGROUND**

5             On October 25, 2022, Plaintiff filed a Complaint seeking declaratory and

6    injunctive relief under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and

7    under Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).  *See* Compl.,

8    ECF No. 1.  On October 27, 2022, Plaintiff moved to transfer this case to this Court as

9    related to *Arizona Alliance for Retired Americans v. Clean Elections USA*, No. 2:22-cv-

10   1823, based on common allegations and defendants.  ECF No. 8.[1]  This Court granted the

11   motion to transfer.  ECF No. 10.  On October 28, Plaintiff filed a motion for a temporary

12   restraining order and preliminary injunction, and a number of supporting declarations

13   from voters.  ECF No. 11.

14                              **STATUTORY BACKGROUND**

15            Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), holds that "[n]o

16   person, whether acting under color of law or otherwise, shall intimidate, threaten, or

17   coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to

18   vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any

19

20   ───────────────
     [1] On October 28, 2022, this Court denied a temporary restraining order and preliminary

21   injunction in *Arizona Alliance for Retired Americans*, finding on the facts presented in
     that case that preliminary injunctive relief was not appropriate.  *See* Order, *Ariz. Alliance*

22   *for Retired Americans v. Clean Elections USA*, No. 2:22-cv-1823, ECF No. 32 (Oct. 28,
     2022).

                                              3

person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties" under specific provisions of the Voting Rights Act.  Section 11(b) does not require proof of racial motivation or "subjective purpose or intent."  H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.  Section 11(b) "is to be given an expansive meaning," *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979), and incorporates the comprehensive definition of "vote" and "voting" in Section 14 of the Voting Rights Act, 52 U.S.C. § 10310(c)(1).

## ARGUMENT

I. **Section 11(b) of the Voting Rights Act Prohibits Intimidation and Attempted Intimidation of Voters Attempting to Vote at Ballot Drop Boxes.**

*A.  Section 11(b) Broadly Prohibits Intimidation, Threats, and Coercion*

Section 11(b) of the Voting Rights Act broadly prohibits any person from intimidating, threatening, or coercing any other person for voting or attempting to vote or for urging or aiding another person in voting or attempting to vote.  *See* 52 U.S.C. § 10307(b).  Section 11(b) does not require proof that a defendant caused a voter to refrain from casting a ballot or to vote contrary to their preferences: Section 11(b) applies equally to prohibit an "*attempt* to intimidate, threaten, or coerce" as it does to the completed act.  52 U.S.C. § 10307(b) (emphasis added); *see Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021) ("*Wohl II*").  In other words, the statute constrains successful, unsuccessful, and in-progress attempts to coerce,

4

1    intimidate, or threaten alike.  *See United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala.

2    1965).

3         "[T]hreats, intimidation or coercion may take on many forms."  *Nat'l Coal. on*

4    *Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ("*Wohl I*")

5    (quoting *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961)).  Under Section 11(b),

6    "[t]he threatened injury need not be one of violence or bodily harm," and "threats of

7    economic harm, legal action, dissemination of personal information, and surveillance can

8    qualify depending on the circumstances."  *Id.* at 477; *see also Voting Rights Act of 1965:*

9    *Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (statement of

10   Nicholas deB. Katzenbach, Att'y Gen. of the United States) (explaining that Section

11   11(b) was designed to proscribe violent intimidation as well as more "subtle forms of

12   pressure"), https://perma.cc/N9S4-KH2P.  In this context, courts are often called on to

13   determine when ordinarily lawful activities are being used for unlawful ends.  *See, e.g.*,

14   *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious

15   prosecutions" of those aiding voter registration fell within the scope of Section 11(b));

16   *Wohl I*, 498 F. Supp. 3d at 477 (finding a Section 11(b) violation for sending robocalls

17   containing false information intended to scare recipients from voting by mail).

18        Although lawful poll-watching activities can support democratic transparency and

19   accountability, when private citizens form "ballot security forces" and attempt to take

20   over the State's legitimate role of overseeing and policing elections, the risk of voter

21   intimidation—and violating federal law—is significant.  Letter from John Tanner, Acting

22   Chief, Voting Section, Civil Rights Div., Dep't of Justice to Edward S. Allen Esq. (Nov.

1  2, 1994) (Exhibit 1); *see also Democratic Nat. Comm. v. Republican Nat. Comm.*, 671 F.

2  Supp. 2d 575, 610 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012) (finding that the

3  "prevalence of voter intimidation" has rendered "[private] ballot security initiatives . . .  a

4  far greater threat to the integrity of modern elections than in-person voter fraud");

5  *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D.

6  Minn. 2020) (finding "[t]he presence of armed 'guards' at the polls with no connection to

7  state government is certainly likely to intimidate voters").

8       While Section 11(b) does not define any specifically prohibited activities, certain

9  kinds of citizen-led election monitoring activities are more likely to put voters in

10  reasonable fear of harassment, intimidation, coercion, or interference with their voting

11  rights, and therefore run afoul of Section 11(b).  Video recording or photographing voters

12  during the voting process, for example, has long been recognized to raise particularly

13  acute concerns under Section 11(b).[2]  *See Daschle v. Thune*, No. 4:04-cv-4177, ECF No.

14  

---

15  [2] The United States has routinely warned both the public and state officials that private
campaigns to video record voters risks voter intimidation in violation of federal law.  In a

16  1994 letter on the subject, the Department informed officials that such activity could
violate the Voting Rights Act, noting that "[w]hile this type of action often is proffered in
the guise of helping law enforcement officials, the filming at and near the polls achieves

17  nothing of the kind.  Instead, we have found that such action intimidates lawful voters
and interjects an element of fear into the process by which our republican form of

18  government is guaranteed to our citizens."  Letter from John Tanner, Acting Chief,
Voting Section, Civil Rights Div., Dep't of Justice to Edward S. Allen Esq. (Nov. 2,

19  1994) (Exhibit 1); *see also, e.g.*, Letter from Anita S. Hodgkiss, Deputy Assistant Att'y
Gen., Civil Rights Div., Dep't of Justice to the Honorable Martin Frost, Member of

20  Congress (Oct. 30, 1998) ("It is our position that all parties and organizations must avoid
intimidating minority voters at the polls by filming at polling places on election day.")

21  (Exhibit 3); Press Release of U.S. Attorney's Office for the District of Arizona, October
19, 2020 ("Actions designed to interrupt or intimidate a voter at a polling place by

22

6 (D.S.D. Nov. 1, 2004) (issuing a temporary restraining order because recording license plate numbers of Native American voters and those who drove them to the polls likely violated Section 11(b)) (Exhibit 2).  Courts have identified similar issues with efforts to track or follow voters; ascertain and record voters' personal information; obstruct, accost, question, or challenge voters; target discrete groups of voters based on identity or political affiliation; or monitor voting sites while armed or outfitted in military- or police-style uniforms.  *See id.*; *Council on Am.-Islamic Rels.-Minn.*, 497 F. Supp. 3d at 381 (enjoining under Section 11(b) a private security force's poll monitoring activities); *Democratic Nat. Comm.*, 671 F. Supp. 2d at 579 (discussing various private ballot security initiatives that raised intimidation concerns, including those involving baseless voter challenges, armed and uniformed poll monitoring, and private investigations of voters).  Although none of these activities is pre-requisite to finding a Section 11(b) violation, their use by private actors, singly or in combination, may nonetheless suffice to make such a finding.

Other vigilante ballot security efforts that threaten to subject voters to adverse consequences, including harassment, "public opprobrium," and baseless allegations of felonious conduct for voting or attempting to vote can run afoul of Section 11(b).  *See*

---

questioning, challenging, filming, or photographing the voter under the pretext of trying to uncover illegal voting may violate federal voting rights law."), https://perma.cc/5UN3-ZCRX; Press Release of U.S. Attorney's Office for the District of Arizona, October 29, 2018 (similar), https://perma.cc/PXN7-9BB4; Press Release of U.S. Attorney's Office for the District of Arizona, October 24, 2016 (similar), https://perma.cc/EQY5-E3YY; Press Release of U.S. Attorney's Office for the District of Arizona, October 31, 2014 (similar), https://perma.cc/V3QL-WHGV.

1   *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018

2   WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (finding plaintiffs stated a claim for a

3   violation of Section 11(b) alleging that defendants had published voters' names and

4   personal information in "a report condemning felonious voter registration in a clear effort

5   to subject the named individuals to public opprobrium"); *Wohl II*, 512 F. Supp. 3d at 511

6   (noting that "the threat of dissemination of personal information alone could plausibly

7   support a Section 11(b) claim"); *see also United States v. Nguyen*, 673 F.3d 1259, 1265

8   (9th Cir. 2012) (finding that a letter sent to Latino voters that warned "if they voted in the

9   upcoming election their personal information would be collected . . . [and] provided to

10  organizations who are 'against immigration'" constituted voter intimidation under

11  California law).[3]

12

13

---

14  [3] In another case, the United States challenged under Section 11(b) a political campaign's
    mailing of over 100,000 postcards targeting Black voters and falsely claiming that voters

15  must have lived in their current precinct for more than 30 days to vote and that they
    would be asked at the polling place to state the length of their current residence.

16  Complaint ¶¶ 21–30, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C.
    Feb. 26, 1992). The postcard message ended with a warning that "[i]t is a Federal Crime,

17  punishable up to five years in jail, to knowingly give false information about your name,
    residence, or period of residence to an Election Official." *Id.* ¶ 21. The case was

18  resolved through a consent decree that enjoined the defendants from engaging in "any
    activity or program which is designed, in whole or in part, to intimidate, threaten, coerce,

19  deter, or otherwise interfere with a qualified voter's lawful exercise of the franchise or
    which, based on objective factors, would reasonably be expected to have that effect" or

20  "any ballot security program directed at qualified voters in which the racial minority
    status of some or all of such voters is a factor in the decision to target those voters."

21  Consent Decree, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb.
    27, 1992).

22

To determine if unlawful intimidation or attempted intimidation has occurred, context matters: the challenged activities "cannot be viewed in isolation" but instead "must be considered against the background of contemporaneous events . . . and the general climate prevailing [] at the time." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).  Although voters need not actually be intimidated or threatened in order to give rise to liability under Section 11(b), *see* 52 U.S.C. § 10307(b), whether challenged activities have created an environment of fear or fostered concerns about threats and intimidation in the community may be probative, *see also Council on Am.-Islamic Rels.-Minn.*, 497 F. Supp. 3d at 379, 381 (issuing injunction under Section 11(b), noting that voters had "substantial concerns about voting in person on Election Day," government officials had expressed "serious concerns" about defendants' conduct, and election judges left their posts because of defendants' activities).  Similarly, although the statute requires no specific intent to interfere with voting rights to prove a violation, expressions of intent to intimidate voters or otherwise dissuade voting with threats or coercion can be dispositive.  *See id.*; *Wohl I*, 498 F. Supp. 3d at 485, 488 (issuing a temporary restraining order after finding that defendants have "intentionally . . . raised the specter of arrest, financial distress, infirmity, and compulsory medical procedures" and "intended the robocall to harm Democrats by suppressing turnout among Black voters").

### B. Section 11(b)'s Protections Cover Voters Who Vote Using Mail Ballots and Ballot Drop Boxes

Section 11(b) protects voters from intimidation, threats, and coercion at all stages of the voting process, including during mail and drop-box voting.  The statutory term

1   "voting" incorporates the Voting Rights Act's broad definition of "vote" to include "all

2   action necessary to make a vote effective in any primary, special, or general election,

3   including, but not limited to," taking any "action required by law prerequisite to voting,

4   casting a ballot, and having such ballot counted properly."  52 U.S.C. § 10310(c)(1);

5   *cf. Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2346 (2021) (explaining

6   Arizonans may vote using "an early ballot drop box" and describing travel to a drop box

7   as "squarely within the heartland of the usual burdens of voting").  Wherever a voter

8   votes absentee as provided for by state law, returning one's completed ballot by an

9   acceptable means is plainly an "action necessary" for "having such ballot counted

10  properly."  52 U.S.C. § 10310(c)(1).

11         Courts have routinely affirmed this plain reading when applying provisions of the

12  Voting Rights Act that incorporate this same definition of "vote."  *See, e.g.*, *Wohl I*, 498

13  F. Supp. 3d at 463 (finding that Section 11(b) prohibited threatening robocalls intended to

14  dissuade voters from voting by mail); *Democracy N.C. v. N.C. State Bd. of Elections*, No.

15  20-cv-457, 2022 WL 715973, at *13 (M.D.N.C. Mar. 10, 2022) (finding that the Voting

16  Rights Act's voter assistance provisions cover "delivery of an absentee ballot to a county

17  board of elections as an action 'necessary to make a vote effective'—an absentee ballot

18  must be delivered in order to be counted.").  And it is further underscored by Section

19  11(b)'s protection of "*any* person" who is voting, attempting to vote, or urging or aiding

20  another person to vote.  *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read

21  naturally, the word 'any' has an expansive meaning, that is, 'one or some

22  indiscriminately of whatever kind.'"); *Orozco-Lopez v. Garland*, 11 F.4th 764, 766 (9th

1   Cir. 2021) (quoting *Gonzales*, 520 U.S. at 5).  In short, just as Section 11(b) prohibits

2   intimidation, threats, or coercion of voters seeking to cast ballots at polling places, *see*

3   *Council on Am.-Islamic Rels.-Minn.*, 497 F. Supp. 3d at 379, it also prohibits such

4   activities directed at voters using officially designated drop boxes, as alleged here.

5   **II.    This Court May Grant Relief Against Violations of Section 11(b) Consistent with the First Amendment.**

6

7        While the First Amendment protects expressive conduct and peaceable assembly

   generally, it affords no protection for threats of harm directed at voters.

8

9        First, the First Amendment's guarantee of the right to assemble peaceably is not a

10  per se bar preventing this Court from issuing a narrowly tailored injunction that furthers

   the significant governmental interest of protecting voters from unlawful intimidation,

11

12  threats, and coercion.  As a threshold matter, the right to assemble peaceably protects

   individuals' right to "'assembl[e] *for any lawful purpose*.'"  *Richmond Newspapers, Inc.*

13

14  *v. Virginia*, 448 U.S. 555, 578 (1980) (emphasis added) (quoting *Hague v. CIO*, 307 U.S.

   496, 519 (1939) (opinion of Stone, J.)).  Intimidating voters or coercing them from

15

16  exercising their right to vote is not a lawful purpose.  Thus, the First Amendment does

   not protect individuals' right to assemble to engage in voter intimidation or coercion, nor

17

18  does it transform an unlawful activity for one individual—voter intimidation—into a

   permissible activity simply because multiple individuals have assembled to engage in it.

19

20  Even if those engaging in voter intimidation were protected by their right to assemble, an

   injunction that is narrowly tailored to further a significant or compelling interest would

21

22  not run afoul of the First Amendment.  *See Ward v. Rock Against Racism*, 491 U.S. 781,

1  791 (1989).  Protecting "one of the most fundamental rights of our citizens: the right to

2  vote," *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009), against intimidation, threat, or

3  coercion is a compelling governmental interest, *Burson v. Freeman*, 504 U.S. 191, 206-

4  07 (1992) (plurality op.).  Courts have accordingly provided injunctive relief that bars

5  individuals from taking certain intimidating actions—such as following voters, taking

6  pictures of license plates outside polling locations, or accusing voters of engaging in

7  illegal activities—in order to protect voting rights, based on the particular factual

8  circumstances of each case.  *See, e.g.*, *Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6

9  (D.S.D. Nov. 1, 2004) (enjoining defendants and their agents from recording license plate

10  numbers of Native American voters); *Council on Am.-Islamic Rels.-Minn.*, 497 F. Supp.

11  3d at 381 (enjoining defendants from deploying armed agents within 2,500 feet of polling

12  places or otherwise monitoring polling places); *United States v. The New Black Panther*

13  *Party for Self-Defense*, 2:09-cv-00065, ECF No. 21 (E.D. Pa. May 18, 2009) (issuing a

14  default judgment and an injunction barring the defendant from displaying a weapon

15  within 100 feet of any polling location on any election day in Philadelphia) (Exhibit 4);

16  *cf. Hill v. Colorado*, 530 U.S. 703, 730 (2000) (holding a criminal statute prohibiting any

17  person from knowingly approaching within eight feet of another person near reproductive

18  health facilities without that person's consent to be "reasonable and narrowly tailored").

19      The United States is aware of questions that have arisen in a parallel proceeding

20  regarding the differences between recording the activities of voters and those of law

21  enforcement.  *See* Order, *Ariz. Alliance for Retired Americans v. Clean Elections USA*

22  No. 22-cv-1823, ECF No. 32 (D. Ariz. Oct. 28, 2022).  Critical differences exist.  Video

1   recording, accosting, threatening, or accusing voters of engaging in criminal activities at

2   ballot drop box locations is manifestly distinct from the public's clearly established right

3   to "record *law enforcement officers* engaged in the exercise of their *official duties* in

4   public places" under the First Amendment. *Askins v. Dep't of Homeland Sec.*, 899 F.3d

5   1035, 1044 (9th Cir. 2018) (emphasis added); *see also ACLU of Ill. v. Alvarez*, 679 F.3d

6   583, 597 (7th Cir. 2012) (finding that an anti-eavesdropping statute, as applied to a police

7   accountability program, likely violated the First Amendment); *Glik v. Cunniffe*, 655 F.3d

8   78, 82 (1st Cir. 2011) (recognizing "that the First Amendment protects the filming of

9   government officials in public spaces").  The public's right to record law enforcement

10  officers in the course of their official duties stems from the premise that "a major purpose

11  of the First Amendment was to protect the free discussion of governmental affairs," *i.e.*,

12  how governmental agents are conducting themselves.  *Ariz. Free Enter. Club's Freedom

13  Club PAC v. Bennett,* 564 U.S. 721, 755 (2011) (internal quotation marks omitted); *see

14  also Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) ("Filming the police and

15  other public officials as they perform their official duties acts as a watchdog of

16  government activity" (internal quotation marks omitted)).  Just as private citizens are not

17  governmental agents, exercising the fundamental right to vote by depositing a ballot into

18  a drop box is not a governmental activity.  First Amendment jurisprudence on recording

19

20

21

22

13

1   public officials therefore does not bear on this Court's authority to remedy violations of

2   the right to vote freely without intimidation or coercion under the Voting Rights Act.[4]

3       With respect to the First Amendment right to expression, the question whether

4   certain conduct around a polling place or drop box is constitutionally protected

5   expressive conduct can be context- and fact-dependent.  The First Amendment protects

6   only conduct that is "inherently expressive," rather than any conduct engaged in by a

7   person "intend[ing] . . . to express an idea."  *Rumsfeld v. Forum for Acad. & Inst'l Rights,*

8   *Inc.*, 547 U.S. 47, 65-66 (2006).  While expressive conduct is not required to have "a

9

10  [4] Further, although the First Amendment generally protects the right to film "matters of
    public interest," *see Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir.

11  2018), the mere existence of concerns with drop-box voting does not automatically
    transform individual acts of voting into "matters of public interest" under the First

12  Amendment.  Likewise, cases that discuss the First Amendment right to "receive
    information and ideas" are inapposite here: those cases decided that the First Amendment

13  protected the right of public access to criminal trials, *Richmond Newspapers*, 448 U.S. at
    576; the right of corporations to make campaign contributions, *First Nat'l Bank of Boston*

14  *v. Bellotti*, 435 U.S. 765, 791 (1978); and the right to possess obscene materials at home,
    *Stanley v. Georgia*, 394 U.S 557, 564 (1969).  In none of these case did the "right to

15  receive information" involve surveillance of or interference with other individuals'
    conduct, much less did the Supreme Court authorize assertion of First Amendment rights

16  to infringe upon another individual's fundamental rights, such as the right to vote.  The
    Supreme Court has made clear that the application of a First Amendment right to "receive

17  information and ideas" is context-dependent.  *See Richmond Newspapers*, 448 U.S. at
    576 (referring to "a variety of contexts" in which the Court had recognized "a First

18  Amendment right to receive information and ideas" to conclude that the First
    Amendment prohibits closing courtroom doors to the public); *see also United States v.*

19  *Barnett*, 667 F.2d 835, 842-43 (9th Cir. 1982) (finding no First Amendment protection
    for selling printed instructions for the manufacture of Phencyclidine (PCP), because the

20  First Amendment does not provide defense "simply because the actor uses words to carry
    out his illegal purpose"); *United States v. Buttorff*, 572 F.2d 619, 624 (8th Cir. 1978)

21  (finding no First Amendment protection for aiding filing of fraudulent tax forms by
    giving speeches before large groups encouraging and advising others to evade income

22  taxes).

1    narrow, succinctly articulable message" to be protected, *Hurley v. Irish-Am. Gay, Lesbian*

2    *& Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995), it must still be recognizable as

3    inherently expressive by reference to "the conduct itself" rather than "the speech that

4    accompanies it," *Rumsfeld*, 547 U.S. at 66 (explaining that message expressed by

5    requiring military interviews to be held outside of law school campuses was not

6    "overwhelmingly apparent").  Here, much like a citizen's refusal to pay taxes does not

7    become protected speech because she is attempting to express disapproval of the IRS, *id.*,

8    photographing a voter's license plate does not become protected speech whenever the

9    photographer seeks to express disapproval of drop-box voting or those using it.  And like

10   the observer who witnesses military recruiters conducting interviews off-campus would

11   "ha[ve] no way of knowing" what, if any, message the law school sought to send, *id.*, the

12   voter who is approached or recorded at a ballot drop box would have no way of knowing

13   whether, for example, the person approaching them disapproves of drop boxes, has

14   specifically targeted the voter for another reason, is expressing disapproval of the United

15   States or of electoral democracy in general, or is attempting to express some other

16   message entirely.  Fact-sensitive and narrowly-tailored relief under Section 11(b) to

17   address such potentially intimidating conduct therefore does not categorically infringe on

18

19

20

21

22

First Amendment rights.[5]  Such relief can appropriately account for the fundamental interests at stake.[6]

Nor does the First Amendment protect any speech that constitutes "true threats." *See United States v. Stewart*, 420 F.3d 1007, 1016 (9th Cir. 2005) (analyzing whether a statute criminalizing speech is consistent with the First Amendment under the true threat exception).  What amounts to a true threat is a context-dependent inquiry that must consider "all of the circumstances."  *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002).  Although case law analyzing the contours of the true threat exception in the context of Section 11(b), a civil enforcement statute, is limited, robocalls warning of legal and financial consequences for mail voting were found to likely constitute a true threat and a violation of Section 11(b). *Wohl I*, 498 F. Supp. 3d at 485–86.[7]  Enforcement of Section 11(b) against expressions of

---

[5] In *Wohl II*, First Amendment issues arose because the intimidation at issue occurred based on the content of speech itself—robocalls that threatened nonviolent consequences to attempt to intimidate voters.  512 F. Supp. 3d at 505-06, 512-15.  No consideration of expressive conduct was involved, and the court ultimately found the speech unprotected as a true threat.  *Id.* at 513-14.

[6] In this regard, any potential burden on expression must be weighed against not only the burden on voters' fundamental and irreparable right to vote, *see, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016), but also any expressive rights of the *voter*, *cf. Doe v. Reed*, 561 U.S. 186, 195-96 (2010) (electoral activities may still be expressive even when they have "legal effect in the electoral process."); *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring) (describing a "First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process").

[7] In the context of criminal statutes, the Ninth Circuit has found "a serious expression of intent to harm" to constitute a true threat.  *United States v. Stewart*, 420 F.3d 1007, 1018 (9th Cir. 2005).  The Ninth Circuit has also required a finding of subjective intent to

1   threats, intimidation, or coercion based on physical or nonphysical harm is therefore

2   consistent with the First Amendment.

3   Notably, a "true threat" is unprotected even when the speaker does not carry it out,

4   and indeed even when the speaker has no intention of carrying it out. *Virginia v. Black*,

5   538 U.S. 343, 359-60 (2003) ("The speaker need not actually intend to carry out the

6   threat."); *see also United States v. Bachmeier*, 8 F.4th 1059, 1064 (9th Cir. 2021). A true

7   threat is unprotected because of its effect on the *subject of intimidation*, rather than the

8   threatener's intent to carry out the the threat. *Black*, 538 U.S. at 360 ("[A] prohibition on

9   true threats protects individuals from the fear of violence and from the disruption that fear

10  engenders, in addition to protecting people from the possibility that the threatened

11  violence will occur.") (alterations and internal quotation marks omitted). Accordingly,

12  behavior such as photographing license plates or video recording voters attempting to

13  vote must be evaluated based on whether it creates or attempts to create a *fear* of

14  retribution or violence for the affected voters (such as through publicly posting of these

15  voters' information or pictures), as opposed to whether the individuals taking

16  photographs or recordings actually plan to publicly post or otherwise use the photographs

17

18  ───────────────
    sustain a criminal conviction for making threats. *United States v. Bagdasarian*, 652 F.3d
19  1113, 1118 (9th Cir. 2011); *see also Elonis v. United States*, 575 U.S. 723, 737-38 (2015)
    (overturning a criminal conviction for making threatening communications because
    subjective "awareness of some wrongdoing" was required for a criminal conviction).
20  Section 11(b), however, is a civil voter-protection statute that does not result in a criminal
    conviction and has been applied without proof of subjective purpose, as Congress
21  intended. *See, e.g.*, *Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *8
    (M.D.N.C. June 2, 2021); *League of United Latin Am. Citizens*, WL 3848404, at *4; *see
22  also* H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.

1    or recordings, much less whether they follow through on that plan.  Context may further

2    elucidate this anlysis, including by clarifying how voters are likely to understand and

3    react to such activities.  *Cf. McLeod*, 385 F.2d at 740-41 (analyzing the impact of

4    intimidation activities on voters under Section 11(b)'s predecessor statute).  And relief

5    can be tailored to those aspects of an individual's conduct that are unprotected under an

6    appropriate "true threats" analysis.

7                                              **CONCLUSION**

8            The United States respectfully submits the foregoing Statement of Interest to assist

9    the Court's evaluation of Plaintiff's claim under Section 11(b) of the Voting Rights Act.

10

11   Date:  October 31, 2022

12                                                      Respectfully submitted,

13   GARY M. RESTAINO                          KRISTEN CLARKE
     United States Attorney                    Assistant Attorney General
14   District of Arizona                       Civil Rights Division

15                                             ELISE C. BODDIE
                                               Principal Deputy Assistant Attorney General
16                                             Civil Rights Division

17                                             */s/ Michael E. Stewart*
                                               T. CHRISTIAN HERREN, JR.
18                                             RICHARD A. DELLHEIM
                                               DANA PAIKOWSKY
19                                             MICHAEL E. STEWART
                                               JENNIFER J. YUN
20                                             Attorneys, Voting Section
                                               Civil Rights Division
21                                             U.S. Department of Justice
                                               950 Pennsylvania Avenue, NW
22                                             Washington, DC 20530

                                              18

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 31, 2022, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system, which will send notification of this filing

4

to counsel of record.

5

6
                                    */s/ Michael E. Stewart*
                                    Michael E. Stewart
7                                   Civil Rights Division
                                    U.S. Department of Justice
8                                   950 Pennsylvania Ave, NW
                                    Washington, DC 20530
9                                   (202) 307-2767
                                    Michael.Stewart3@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

19