Joshua D. Bendor, 031908
Brandon T. Delgado, 035924
OSBORN MALEDON, P.A.
2929 North Central Ave., Suite 2100
Phoenix, Arizona  85012-2793
(602) 640-9000
jbendor@omlaw.com
bdelgado@omlaw.com

Orion Danjuma *(pro hac vice)*
NY Reg No. 4942249
PROTECT DEMOCRACY PROJECT
82 Nassau St. #601
New York, NY 10038
Tel: (202) 579-4582
orion.danjuma@protectdemocracy.org

Rachel F. Homer *(pro hac vice)*
DC Bar No. 1045077
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel: (202) 579-4582
rachel.homer@protectdemocracy.org

Attorneys for Plaintiff

Benjamin L. Berwick*(pro hac vice)*
MA Bar No. 679207
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Tel: (202) 579-4582
ben.berwick@protectdemocracy.org

Jared Davidson *(pro hac vice to be filed)*
LA Bar No. 37093
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

League of Women Voters of Arizona,

Plaintiff,

vs.

Lions of Liberty LLC; Yavapai County Preparedness Team; Jim Arroyo, Lucas Cilano; Nicholas Cilano; Brian Mounsey; Toby Fox; Bruce Mounsey; James Johnson; Melody Jennings; Clean Elections USA; John Does 1-10,

Defendants.

No. CV-22-08196-PCT-MTL

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1

**INTRODUCTION**

2      Shortly after Plaintiff filed its motion for a temporary restraining order and

3  preliminary injunction, this Court denied a request for a much broader preliminary

4  injunction in another lawsuit raising similar claims. Order, *Ariz. All. for Retired Ams. v.*

5  *Clean Elections USA*, No. 2:22-cv-1823 (D. Ariz. Oct. 28, 2022), ECF No. 32

6  (hereinafter, the "Order"). The Court concluded that, based on the record developed in

7  that case, the injunction those plaintiffs sought would violate the First Amendment. *Id.*

8  at 5–10. Plaintiff submits this supplemental brief to explain why the narrower injunction

9  Plaintiff seeks here does not run afoul of the First Amendment.

10     At the outset, Plaintiff notes that, based on the record developed in this case,

11  Defendants are not engaged in mere monitoring. Instead, Defendants are successfully

12  deploying time-tested methods of voter intimidation: spreading false information about

13  voting and voters; engaging in threatening and harassing surveillance of voters,

14  including while armed and wearing tactical gear; and spreading and threatening to

15  spread voters' personal information along with false accusations of voter fraud.

16     Through its motion, Plaintiff does not seek a free-sweeping injunction impinging

17  on Defendants' rights to speech and assembly. Instead, Plaintiff seeks to halt unlawfully

18  intimidating components of Defendants' scheme. That includes the stationing of armed

19  individuals and individuals wearing body armor in proximity to ballot drop boxes, and

20  the spread of falsehoods about Arizona voting law and specific voters. Neither of those

21  components is protected by the Constitution. In addition, Plaintiff seeks to enjoin the

22  verbal harassment of voters and photography of individuals in the act of voting at drop

23  box locations. To the extent that conduct is otherwise protected, an injunction barring it

24  nevertheless comports with the First Amendment and is necessary under federal voting

25  law. Finally, Plaintiff explains that there is no constitutional obstacle to enjoining

26  Defendants' scheme, as it falls well within the speech-integral-to-criminal-conduct and

27  true threats exceptions to First Amendment coverage.

28

**ARGUMENT**

**I.   Defendants Are Not Engaged in Mere Surveillance, But Traditional and Effective Forms of Voter Intimidation.**

Plaintiff does not seek a blanket injunction to halt anything that might loosely be labeled poll monitoring. *Cf.* Order at 6. Instead, Plaintiff seeks to enjoin specific components of *Defendants' operation*, which include time-tested and highly effective methods of voter intimidation:

- **Spreading specific false information about voting and voters:** Defendants' scheme begins with their repeated, widespread, and *false* statements about drop box voting and voters: that depositing multiple ballots in a drop box is inherently unlawful. *See* Supp. Decl. of Rachel F. Homer ("Homer Supp. Decl.") Ex. A (when asked,"[a]re you allowed to drop more than one ballot into the box," Defendant Jennings responds, "You are not in Arizona," and that Arizona law allows voters to deposit "only one [ballot] or you and your spouse")[1]; Decl of Rachel F. Homer ("Homer Decl."), ECF Nos. 10-11, Ex. T (suggesting a voter who deposited multiple ballots on behalf of family members was behaving wrongfully); *id.* Ex. N (posting a picture of an individual beside a drop box in Arizona and linking to a Reddit post, titled "Ballot stuffing has already begun in Arizona")[2]; *see also* Homer Supp. Decl. Ex. B ("We are actually seeing mules be intimidated from doing their thievery. We're not intimidating voters. But the mules do not want to be caught on film, and that's what we're doing. We're catching them on telescopic film. We can zoom right in. We can get your face. So we've got you.")[3]; *cf.* Arellano Decl. Ex. K, *Arizona Alliance for Retired*

---

[1] Bannon's War Room, *Mastriano Stands Up For Pennsylvania Families* at 46:49, Rumble (Oct. 21, 2022), https://rumble.com/v1p2xof-episode-2243-mastriano-stands-up-for-pennsylvania-families.html.
[2] https://www.reddit.com/r/AskThe_Donald/comments/y5q1xo/ballot_stuffing_has_already_begun_in_arizona_this/.
[3] Bannon's War Room, *Melody Jennings: Clean Elections USA Is Fighting To Secure The Left's Vulnerable Dropboxes* at 00:44, Rumble (Oct. 17, 2022),

1    *Americans v. Clean Elections USA*, No. 2:22-cv-1823 (D. Ariz. Oct. 24, 2022),

2    ECF No. 3 (Jennings describing a voter who cast a single ballot as merely

3    "testing the waters"). In fact Arizona law allows voters to deposit multiple

4    ballots in a number of different circumstances. *See* Ariz. Rev. Stat. § 16-1005(I).

5    False statements about the consequences of voting, and the suggestion that voters

6    could be penalized for doing so, have been a common feature of conspiracies

7    found to constitute unlawful voter intimidation. *See Nat'l Coal. on Black Civic*

8    *Participation v. Wohl* ("*Wohl I*"), 498 F. Supp. 3d 457, 465 (S.D.N.Y. 2020)

9    (robocalls informing would-be mail-in voters that voting by mail would lead to

10   the collection of their personal information were unlawful voter intimidation);

11   *see also* Compl. ¶¶ 29–31, *United States v. N.C. Republican Party*, No. 92-161-

12   CIV-5-F (E.D.N.C. Feb. 26, 1992), Dkt. No. 1 (describing scheme to send

13   postcards to voters falsely warning them that they were not eligible to vote in

14   upcoming election).

15   ● **Threatening and harassing "monitoring" of voter behavior:** Coupled with

16   their false statements about the law, Defendants have directed their agents to

17   "hunt" for so-called "mules" by monitoring drop boxes. In-person monitoring of

18   voter locations, coupled with harassing conduct directed at individual voters, is

19   another common intimidation tactic. In *Daschle v. Thune*, for instance,

20   individuals held loud conversations about voters being prosecuted in polling

21   places, followed voters out to their cars after they voted, walked up to their

22   vehicles, and wrote down their license plates. *See* Compl. ¶ 15, *Daschle v.*

23   *Thune*, No. 04-cv-4177 (D.S.D. Nov. 1, 2004), ECF No. 1;[4] *see also U.S. by*

24   ─────────────────────

     https://rumble.com/v1oenkz-melody-jennings-clean-elections-usa-is-fighting-to-secure-

25   the-lefts-vulnera.html.

     [4] In its order denying a preliminary injunction in *Arizona Alliance for Retired*

26   *Americans*, the Court suggested that *Thune* was not apposite because the intimidation in
     that case specifically targeted Native Americans. But neither Section 11(b) of the

27   Voting Rights Act nor the relevant portions of the Klan Act require that a particular
     racial group be targeted in order for intimidation to be unlawful, and the public interest

28   in stopping intimidation aimed at a lawful, widely-used form of early voting is high.
     (The racial animus was relevant in that case for the plaintiff's other claims). The

*Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 341 (E.D. La. 1965) (describing members of the Klan showing up in Franklinton, Louisiana, to observe Black individuals registering to vote as part of an unlawful intimidation campaign). Defendants' conduct closely mirrors that described in *Thune* and *Katzenbach*. Multiple voters have submitted declarations in this case describing how they were harassed by Defendants' agents in the course of trying to vote. *See* Redacted Decl. ¶¶ 4–15, ECF No. 11-2 (Defendants' agents followed the voter to the drop box, told him they were "hunting mules" and asked if he was a mule, photographed his license plate, and followed him away from the voting location); Rivera Decl. ¶¶ 5–12, ECF No. 11-3 (Defendants' agent parked approximately 35 feet away from the drop box, filmed or photographed the voter depositing his and his family's ballots, and appeared to be recording additional information about voters); Overlock Decl. ¶¶ 6–17, ECF No. 11-4 (Defendants' agents photographed the voter's license plate and reacted angrily when the voter proposed to photograph them as well); Evans Decl. ¶¶ 5–16, ECF No. 11-5 (Defendants' agents appeared to photograph the voter, his vehicle and license plate as he cast his ballot). In some cases, Defendants' agents' conduct has been even more intimidating: The record demonstrates that, as Defendant Jennings has encouraged, some agents have carried weapons and/or worn military-style tactical gear to "monitor" the voting locations. Homer Decl. Ex. V (Defendant Jennings's Truth Social post describing "our people in tactical gear and armed" as a "win/win"); Evans Decl. ¶ 12, ECF No. 11-5 (describing reports from Maricopa County Recorder's Office staff that observers had brandished guns at the drop box location).

- **False public accusations of voter fraud and disclosure of personal information ("doxing"):** The final piece of Defendants' intimidating scheme is

---

relevance of *Thune* here is in its analysis of what constituted intimidation: following voters and photographing the voters and their license plates in combination with loud discussions of prosecutions for illegal voting.

1    the threat to publicly accuse voters of unlawful voting and to publicly disclose

2    their personal identifying information. *See* Homer Decl. Ex. L (Defendant

3    Jennings explaining "that ballot trafficking mules are about to be completely

4    doxxed and put on blast at every drop box across America starting VERY

5    SOON!"); Homer Supp. Decl. Ex. C ("The point is these mules, you know they

6    clearly don't want to be doxxed. They don't want their face all over Truth Social,

7    and GETTR, and Facebook. They don't want to be seen everywhere.").[5] False,

8    public accusations of illegal voting behavior have been found to constitute

9    unlawful voter intimidation. In *League of United Latin American Citizens -*

10   *Richmond Region Council 4614 v. Public Interest Legal Foundation* ("*LULAC*"),

11   for example, voters' personal identifying information—including their names,

12   addresses, and telephone numbers—were collected and published in a report

13   identifying them as potential felons. No. 1:18-CV-00423, 2018 WL 3848404, at

14   *1 (E.D. Va. Aug. 13, 2018). Similarly, the Ninth Circuit has held that the threat

15   to distribute voters' personal information constitutes sufficient evidence to find

16   unlawful voter intimidation under California law. *United States v. Tan Duc*

17   *Nguyen*, 673 F.3d 1259, 1261, 1265 (9th Cir. 2012) (concluding that the wide

18   distribution of a letter among Latino immigrants warning that if they voted in the

19   upcoming election their personal information would be collected and could be

20   provided to anti-immigration organizations is unlawful intimidation). Here,

21   Defendants and their agents have repeatedly, publicly posted photographs of

22   Arizona voters online and baselessly implied that they are "mules" casting illegal

23   ballots. *See, e.g.*, Homer Decl. Exs. N, O. This type of conduct has a long history

24   as a classic form of voter intimidation: in *Katzenbach v. Original Knights of the*

25   *KKK*, the court explained that "handbills" posted by the defendants naming local

26   voters, accusing them of crimes and immoral behavior, constituted intimidation:

27   ────────────────

28   [5] MG Show, *A Conversation with Melody Jennings: CleanElectionsUSA.org* at 9:35,
     Rumble (Oct. 18, 2022), https://podcast.mg.show/e/a-conversation-with-melody-
     jennings-cleanelectionsusaorg/

"sometimes the attempted intimidation is by threat of violence, sometimes by character assassination." 250 F. Supp. 330, 342 (E.D. La. 1965); *see also King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) ("Reticence to apply for registration might have been intensified . . . by publication in the local newspaper of the names and addresses" of those registering, even though that information was technically public).

Moreover, Defendants' actions must be viewed in the context of the increased risk of violence around elections. On Friday, the Department of Homeland Security issued a bulletin warning local law enforcement that "election-related perceptions of fraud and [domestic violent extremist] reactions to divisive topics will likely drive sporadic [domestic violent extremist] plotting of violence and broader efforts to justify violence in the lead up to and following the 2022 midterm election cycle."[6] Earlier this month, the Department of Justice arrested a man for sending death threats to an election official in Maricopa County.[7] And, as has been widely reported, victims of conspiracy theories in the aftermath of the 2020 election received a deluge of death threats,[8] were forced to flee their homes,[9] and ended up on "death lists."[10] The "mules" conspiracy, in particular, has precipitated specific violent threats to identified individuals.[11]

---

[6] Homer Supp. Decl. Ex. D, Geneva Sands & Sean Lyngaas, *Feds Warn that Domestic Violent Extremists Pose Heightened Threat to Midterm Elections*, CNN (Oct. 28, 2022), https://www.cnn.com/2022/10/28/politics/midterm-domestic-extremist-threat/index.html.

[7] Homer Supp. Decl. Ex. E, *Man Arrested for Making Threats to Maricopa County Election Official and to Official with Office of Arizona Attorney General*, U.S. Dep't of Just. (Oct. 6, 2022), https://www.justice.gov/opa/pr/man-arrested-making-threats-maricopa-county-election-official-and-official-office-arizona.

[8] *E.g.*, Homer Supp. Decl. Ex. F, Gloria Rebecca Gomez, *Threats Against Election Officials Unlikely to Stop, Maricopa County Recorder Says*, AZ Central (Aug. 18, 2022), https://www.azcentral.com/story/news/politics/elections/2022/08/18/maricopa-county-recorder-stephen-richer-talks-threats-voter-vitriol/7835952001/.

[9] *E.g.*, Compl. ¶¶ 8, 28, *Konnech, Inc. v. True the Vote*, No. 22-cv-3096 (S.D. Tex. Sept. 12, 2022), ECF No. 1, https://s3.documentcloud.org/documents/22415420/konnechs-lawsuit-against-true-the-vote-422cv3096.pdf.

[10] *E.g.*, Homer Supp. Decl. Ex. G, Hannah Rabinowitz & Holmes Lybrand, *Judge Says Oath Keepers Jury Won't See 'Death List'*, CNN (Oct. 6, 2022), https://www.cnn.com/2022/10/06/politics/judge-says-oath-keepers-jury-wont-see-death-list-trial-day-3.

[11] Compl. ¶¶ 12, 174, *Andrews v. Dinesh D'Souza*, No. 22-cv-4259 (N.D. Ga. Oct. 26, 2022),

Against this backdrop, it is unsurprising that the record amply demonstrates that Defendants' campaign of intimidation is working. Voters who have encountered Defendants' agents at polling locations report feeling afraid or uncomfortable, as well as worried about future harassment. Redacted Decl. ¶ 16; Rivera Decl. ¶¶ 9–11; Overlock Decl. ¶¶ 12–13. This fear is heightened given the risk of doxxing, and the threats and harassment that is likely to cause. Hansen Decl. ¶ 6. Voters have specifically reported that this conduct is more intimidating in the context of recent political violence. Devine Decl. ¶ 6; Hansen Decl. ¶ 8. Public reports about the intimidation scheme have made some voters too afraid to use a drop box to drop off their ballot. Rivera Decl. ¶ 4; Devine Decl. ¶¶ 7–8; Banister Decl. ¶¶ 5–7; Hanson Decl. ¶¶ 5–6. Under these circumstances, the First Amendment does not shield Defendants' specific, intimidating conduct from appropriately tailored judicial restraints.

## II. Each Element of Plaintiff's Proposed Injunction Is Consistent with the First Amendment.

Plaintiff respectfully believes that the better view—as will be argued in Part IV of this filing—is that all of Defendants' intimidating scheme falls entirely outside of the protections of the First Amendment. However, even if this Court disagrees with Plaintiff on that point and concludes (as it did in *AARA*) that some of Defendants' activities are entitled to at least a modicum of First Amendment protection, well-established First Amendment doctrine still permits this Court to enter Plaintiff's proposed order to enjoin defendants from further violations of Section 11(b) of the Voting Rights Act (and Section 2 of the Klan Act).[12] That is so for three reasons:

---

https://storage.courtlistener.com/recap/gov.uscourts.gand.308676/gov.uscourts.gand.308676.1.0.pdf; Homer Supp. Decl. Ex. H, Philip Bump, *One of Dinesh D'Souza's 2,000 Alleged 'Mules' Sues, Claiming Defamation*, Wash. Post (Oct. 27, 2022), https://www.washingtonpost.com/politics/2022/10/27/2020-election-fraud-claims-voting; Homer Decl. Ex. E (describing the widespread distribution of fake "Wanted" posters depicting alleged "ballot mules").

[12] This section focuses on Section 11(b) because Section 1985(3) clauses 3 and 4 are narrower with respect to potential First Amendment concerns, and because the criminal companion (since repealed) to Section 1985(3) has already been upheld by the Supreme

- Defendants' conduct in carrying firearms near drop boxes is neither expressive of a protected First Amendment message nor protected by the Second Amendment, so Plaintiff is entitled to an injunction blocking such actions regardless of whether Defendants' intimidating photography and harassment is protected by the First Amendment.

- Defendants' circulation of specific false information about voting and voters fall outside of the First Amendment's protections, and Defendants' publication of those falsehoods can be halted consistent with the First Amendment, even if Defendants' intimidating photography and harassment is otherwise protected by the First Amendment.

- Because Section 11(b) survives strict scrutiny as narrowly tailored to advance a compelling governmental interest, Defendants' intimidating photography and harassment can be enjoined even if it is otherwise protected by the First Amendment. Moreover, if notwithstanding the strict scrutiny analysis, the Court still has lingering First Amendment concerns about the proper scope of an injunction, the proper solution to those concerns is prohibiting photography and harassment within a specified distance of a drop-box—not denying an injunction altogether.

Each element of Plaintiff's proposed injunction will be examined in turn.

### A. This Court can enjoin Defendants from carrying firearms near drop boxes because there is no First Amendment right to carry a gun near a drop box.[13]

The Court's Order in *AARA* concluded that Defendants' conduct qualifies for First Amendment protection because, taken together, it conveys a message: that people who attempt to break ballot-harvesting laws will be exposed. Order at 7. Some parts of Defendants' conduct may well convey that message. But that's certainly not true with

_____

Court, *see Ex Parte Yarborough*, 110 U.S. 651, 667 (1884). However, the arguments would apply equally to Section 1985(3).

[13] Nor is bearing arms outside polling places immunized by the Second Amendment. TRO Mot. at 27–28, ECF No. 11.

9

1    respect to carrying weapons near a polling place, and therefore this Court can enjoin

2    such activities without offending the First Amendment.

3          Wearing body armor and carrying firearms while keeping watch at a polling

4    place does not convey a message about *exposure* of voting fraud. Homer Decl. Ex. V

5    (Jennings defending monitoring polls with weapons and tactical gear); Evans Decl. ¶ 12

6    (bearing guns), ECF No. 11-5; Banister Decl. ¶ 5 (news coverage of tactical gear), ECF

7    No. 11-8; Devine Decl. ¶ 7 (same), ECF No. 11-7; Hanson Decl. ¶ 6 (same), ECF No.

8    11-9.

9          It instead conveys a message about physical danger. "Our presence makes

10   approaching the ballot box dangerous" is unquestionably a message, but it cannot be a

11   constitutionally protected message. It is the essential message of voter intimidation.

12         Nor does bearing arms and wearing body armor in conjunction with speech that

13   conveys a message create expressive conduct—it is only through explanatory speech

14   that any such conduct would be understood to carry some other message. And that's not

15   good enough to qualify for First Amendment protection.

16         As the Supreme Court explained in *Rumsfeld v. FAIR*, the defendants are not

17   allowed to characterize their entire course of conduct as expressive conduct protected by

18   the First Amendment simply because some of their activities may be entitled to a

19   modicum of First Amendment protection. *See* 547 U.S. 47, 65–66 (2006). Stated

20   otherwise: just as tax evaders do not acquire a First Amendment right to engage in tax

21   evasion if they give a political speech explaining why they are evading taxes, *see id.* at

22   66, Defendants here have no First Amendment right to carry firearms near a polling

23   place in violation of the Voting Rights Act simply because they're also engaged in other

24   First Amendment activities. In both instances, the "expressive component" of

25   Defendants' actions "is not created by the conduct itself but by the speech that

26   accompanies it," and that is "strong evidence that the conduct at issue here is not so

27   inherently expressive that it warrants protection." *Id.*

28

10

Moreover, even if Defendants' decision to carry guns and body armor near a drop box conveys an expressive message—and it does not—a narrow restriction on openly carrying guns within 250-feet of drop box locations is necessary and narrowly tailored to serve the government's interest in preventing voter intimidation. *See infra* Section II.D (explaining strict scrutiny analysis and why Section 11(b) is narrowly tailored to achieve a compelling state interest); *see also Wohl I*, 498 F. Supp. 3d at 486 n.29 (noting that any "content-based speech restrictions imposed by" Section 11(b) "are narrowly tailored to advance compelling government interests"); *cf.* TRO Mot. at 27–28 (no Second Amendment right to carry firearms near polling places).

## B. The Court can also, consistent with the First Amendment, enjoin Defendants' narrow falsehoods about Arizona voting law and specific voters.

The First Amendment does not stand in the way of this Court enjoining two sets of narrow and demonstrably false claims about the mechanics of voting in Arizona and specific Arizona voters.

The First Amendment does not bar the government from regulating or proscribing certain, narrow categories of speech. *E.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383 (1992). In *United States v. Alvarez*, the Supreme Court reaffirmed the longstanding rule that certain categories of falsehoods fall outside the First Amendment's protections. 567 U.S. 709, 721 (2012); *see id.* at 719–23. That includes speech adjudged to be defamatory, *e.g.*, *R.A.V.*, 505 U.S. at 383; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), and the Court subsequently made clear that it also includes narrow falsehoods about the mechanics of voting, such as "messages intended to mislead voters about voting requirements and procedures," *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889 n.4 (2018); *see* Richard Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Am. Instit. (Oct. 21, 2021).[14] The permissibility of restricting falsehoods about the mechanics of voting makes sense,

---

[14] https://knightcolumbia.org/blog/drawing-the-line-between-false-election-speech-and-false-campaign-speech.

because such speech poses similar risks as perjury and impersonations of government officials—that is, undermining the integrity of government processes and the functioning and province of the law, in general, and elections, in particular. *Cf. Alvarez*, 567 U.S. at 721 (explaining why prohibitions on perjury and lying to or impersonating government officials are consistent with the First Amendment).

Defendants here are publishing two sets of false claims that are straightforwardly unprotected. It is not true that it is illegal in Arizona to deposit "only one [ballot]," or even only ballots for "you and your spouse" into drop boxes, as Defendant Jennings has claimed. Homer Supp. Decl. Ex. A. Instead, Arizona law provides several common circumstances in which depositing multiple ballots into a drop box is legal, including when family members deposit one another's ballots. *See* Ariz. Rev. Stat. § 16-1005(I). Claiming otherwise, as Defendants know, is false and will mislead their agents, voters, and the broader public about voting requirements and procedures. For the same reasons, posting specific identifying information about individuals in connection with a claim that that individual violated the law *based solely* on the fact that they deposited multiple ballots at a drop box—as Defendant Jennings has done, *see, e.g.*, Homer Decl. Exs. N, O, T—is defamation *per se. See, e.g.*, *Peagler v. Phx. Newspapers, Inc.*, 114 Ariz. 309, 316, 560 P.2d 1216, 1223 (1977); *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 1, 6 n.4, 730 P.2d 178, 183 n.4 (Ct. App. 1985), *approved as supplemented*, 152 Ariz. 9, 730 P.2d 186 (1986); *Modla v. Parker*, 17 Ariz. App. 54, 56 n.1, 495 P.2d 494, 496 n.1 (1972). These knowing, narrow lies about the mechanics of voting and specific, unfounded accusations about individuals committing voter fraud are unprotected.

Enjoining these narrow sets of publications, and specifying that enforcement of the injunction will be by criminal contempt proceedings, poses no First Amendment problem. The Supreme Court has "never held" that all injunctions of speech are impermissible. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973). The typical problem with a prior restraint is instead "that communication will be suppressed, either directly or by inducing excessive caution in

the speaker, *before* an adequate determination that it is unprotected by the First Amendment." *Id.* (emphasis added); *see also Kramer v. Thompson*, 947 F.2d 666, 675–76 (3d Cir. 1991); *id.* at 675 n.25 (collecting authority). Thus, where it is determined that a plaintiff is likely to succeed in proving that speech is unprotected, a preliminary injunction directing a party to remove that speech does not violate the First Amendment, particularly where the injunction is enforced through criminal contempt proceedings in which a jury will ultimately decide that the speech is unprotected and was nevertheless knowingly published. *See generally* Eugene Volokh, *Anti-Libel Injunctions*, 168 U. Penn. L. Rev. 73, 117–20 (2019).

### C. The Court may enjoin Defendants from directly harassing voters who visit drop box locations because in-person harassment is conduct, not speech.

Restrictions on unwanted, direct communication often do not offend the First Amendment. *See, e.g.*, *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 737, 738 (1970); *United States v. Waggy*, 936 F.3d 1014, 1018–20 (9th Cir. 2019); *United States v. Lampley*, 573 F.2d 783, 787 (3d Cir. 1978). In *United States v. Osinger*, for instance, the Ninth Circuit rejected a facial and as-applied challenge to a federal criminal statute that proscribes harassing and intimidating conduct. 753 F.3d 939, 944—48 (9th Cir. 2014). The Court explained that the statute criminalized a "course of *conduct*" not speech. *Id.* Coupled with the statute's *mens rea* requirement, and the fact that "'harass' . . . [is] not [an] esoteric or complicated term[] devoid of common understanding," the Court concluded that it raised no First Amendment problems. *Id.* For the same reasons, the Court can enjoin Defendants from carrying out their intimidation scheme through harassment at drop box locations.

### D. This Court can also enjoin photography and harassment near drop boxes even if the activities have some modicum of First Amendment protection because Section 11(b) of the Voting Rights Act survives strict scrutiny.

1    In the AARA litigation, this Court concluded on the record before it that

2    Defendants' activities are fully protected by the First Amendment and do not fit within

3    the "true threats" exception to First Amendment protection. Order at 8–10. This Court's

4    analysis stopped there (no doubt, in part, given the breadth of the requested injunction

5    before it in that case).[15]

6    But stopping the First Amendment analysis at the question of whether

7    photography is entitled to some modicum of First Amendment protection would be legal

8    error in this case. Even assuming Defendants' conduct is protected by the First

9    Amendment (and Plaintiff respectfully disagrees, particularly on the additional record

10   evidence submitted in support of Plaintiff's motion, *see infra*), the Court must further

11   consider whether any injunction nevertheless survives strict scrutiny.

12   A content-based restriction of speech that is fully protected by the First

13   Amendment is permissible, so long as it survives strict scrutiny—that is, so long as it is

14   narrowly tailored and necessary to serve a compelling state interest. *See, e.g.*, *Burson v.*

15   *Freeman*, 504 U.S. 191, 198 (1992). And restrictions aimed at safeguarding elections

16   and the right to vote regularly survive strict scrutiny. *E.g. Williams-Yulee v. Fla. Bar*,

17   575 U.S. 433 (2015) (restricting solicitation of campaign funds); *Burson*, 504 U.S. 191

18   (restricting electioneering in proximity to polling locations); *Wolfson v. Concannon*, 811

19   F.3d 1176 (9th Cir. 2016) (restricting solicitation of campaign funds). That includes

20   prohibitions which guard against voter intimidation. *Burson*, 504 U.S. at 198–99, 206;

21   *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th

22   Cir. 2009); *Wohl I*, 498 F. Supp. 3d at 486 n.29; *Silberberg v. Bd. of Elections of New*

23   *York*, 272 F. Supp. 3d 454, 469–70 (S.D.N.Y. 2017).

24   Here, the Court may enter an injunction enjoining Defendants' harassment and

25   photography near drop boxes because Section 11(b) can survive even strict scrutiny

26   (assuming, for the sake of argument, that it could be subject to an as-applied First

27   ────────────────

[15] As explained below, Plaintiff respectfully disagrees with the Court's conclusion that
28   Defendants' conduct—taken as a whole—does not amount to "true threats." *See infra*
Section IV.

Amendment challenge under which strict scrutiny is the correct mode of analysis).[16] In particular, Section 11(b) can survive strict scrutiny because it is "narrowly tailored to advance compelling government interests," *Wohl I*, 498 F. Supp. 3d at 486 n.29; *see also Burson*, 504 U.S. at 206 (preventing voter intimidation is a compelling governmental interest).[17]

      **1.** **Section 11(b) of the Voting Rights Act is narrowly tailored to achieve the government's compelling interest in protecting the right to vote free from intimidation.**

Because Section 11(b) plainly advances a compelling state interest, *see Burson*, 504 U.S. at 206, the strict scrutiny analysis necessarily becomes a question of narrow tailoring. And the best argument that Defendants likely could make that Section 11(b) was not narrowly tailored would be to suggest that Congress could have drafted Section 11(b) more narrowly to cover only subjective attempts to intimidate.

But Congress tried that solution, and it did not achieve Congress's compelling interest in protecting the constitutional right to vote by preventing voter intimidation. In

---

[16] Plaintiff does not concede that strict scrutiny is appropriate here, particularly as to the non-speech elements of defendants' entire course of conduct. But, given the procedural posture, Plaintiff assumes an order must survive strict scrutiny.

[17] As the Supreme Court explained when upholding the constitutionality of the Klan Act's (later repealed) criminal enforcement provision for the support-or-advocacy clauses:

> In a republican government, like ours, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptations to control these elections by violence and by corruption is a constant source of danger. Such has been the history of all republics, and, though ours has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources. . . . If the government of the United States has within its constitutional domain no authority to provide against these evils,—if the very sources of power may be poisoned by corruption or controlled by violence and outrage, without legal restraint,—then, indeed, is the country in danger, and its best powers, its highest purposes, the hopes which it inspires, and the love which enshrines it, are at the mercy of the combinations of those who respect no right but brute force on the one hand, and unprincipled corruptionists on the other.

*Ex Parte Yarbrough*, 110 U.S. 651, 666—67 (1884).

1  Section 131(b) of the Civil Rights Act of 1957, Congress tried to combat the scourge of

2  voter intimidation through a ban on subjective attempts to intimidate voters. *See* 52

3  U.S.C. § 10101(b) (banning voter intimidation "*for the purpose of* interfering with the

4  right of such other person to vote") (emphasis added). But Section 131(b) failed to end

5  voter intimidation because its subjective intent requirement thwarted effective

6  enforcement. As Attorney General Katzenbach explained during the consideration of

7  the Voting Rights Act of 1965,

8  > The litigated cases amply demonstrate the inadequacy of
9  > present statutes prohibiting voter intimidation. . . . [P]erhaps
   > the most serious inadequacy results from the practice of . . .
10 > courts to require the Government to carry a very onerous
   > burden of proof of 'purpose.' Since many types of
11 > intimidation, particularly economic intimidation, involve
   > subtle forms of pressure, this treatment of the purpose
12 > requirement has rendered the statute largely ineffective.

13 *Hearing on the Voting Rights Act of 1965 Before the H. Judiciary Comm.* at 12, 89th

14 Cong. (1965) (statement by Att'y Gen. Katzenbach) (hereinafter "Katzenbach

15 Statement").[18] Indeed, Section 131(b) was so ineffective that the United States couldn't

16 even protect its *own witnesses* in voting rights suits from voter intimidation. *See, e.g.*,

17 *United States v. Bd. of Educ.*, 332 F.2d 40, 44–46 (5th Cir. 1964); *id.* at 46–47 (Rives,

18 J., specially concurring) (noting "undisputed testimony" that "one of the reasons" that

19 witness for the United States was not re-employed was her "involvement in the [United

20 States]'s voting suit," but that government could not prove that the intimidation was

21 "for the purpose of interfering with the right to vote").

22  Unsurprisingly then, voter registration numbers remained dismally low

23 throughout the South even after the passage of Section 131(b), *see, e.g.*, Katzenbach

24 Statement at 3–4, in no small part due to the success of subtle voter intimidation

25 schemes similar to the one that defendants are perpetrating here. As the United States

26 Commission on Civil Rights explained in its study of why electoral participation in

27

28 _____

[18] *Available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/03-18-1965.pdf.

Mississippi remained low even after the passage of the Civil Rights Acts of 1957 and 1964, the practice of photographing and publishing the names of potential voters—conduct strikingly similar to Defendants' conduct here—intimidated potential voters out of registering due to fear of retaliation:

> [Black voters] in rural counties who attempt to register cannot hope to remain anonymous. Any doubt that applicants will be identified has been removed by the legal requirement that their names will be published in local newspapers and by *practices such as the photographing of [Black] applicants* by public officials. In this climate a single incident . . . may be sufficient to deter many potential registrants.

U.S. Comm'n on Civil Rights, *Voting in Mississippi* 39 (1965) (emphasis added); *see also id*. at 9–10, 22, 25, 32 (describing how Mississippi's practice of publishing names of voters and photography intimidated voters); *King*, 298 F. Supp. at 587 (explaining how Mississippi's practice of publishing voter's names and addresses in the paper made Black citizens "generally hesitant to apply for voter registration").

Thus, in the Voting Rights Act of 1965, Congress tried again to prevent voter intimidation. This time, however, Congress eliminated the subjective intent requirement, *see* H.R. Rep. No. 89-439, at 30 (1965), that thwarted their prior attempts to eliminate voter intimidation.

Even under a strict scrutiny analysis, that choice was acceptable. Strict scrutiny requires a law to "be narrowly tailored, not . . . 'perfectly tailored,'" to achieve the government's compelling objective. *Williams-Yulee*, 575 U.S. at 454. Moreover, given how compelling the government's interest in preventing voter intimidation is, the Supreme Court "never has held" the government "'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)). Thus, Congress's choice in Section 11(b) to eliminate the subjective intent requirement after watching Section 131(b)'s narrower prohibition on voter intimidation fail was an appropriately tailored response to its continued failure

1  to protect the right to vote; indeed, if anything, enduring nearly a decade of failure was

2  more than Congress had to do to survive strict scrutiny. *See, e.g.*, *id.* at 209 (courts

3  should not require a "political system" to "sustain some level of damage before the

4  legislature could take corrective action" under strict scrutiny analysis).

5
   **2. To the extent the Court still has constitutional concerns, enjoining harassment and photography within a specified distance from a ballot drop box is plainly constitutional.**
6

7      As explained, Defendants' violations of federal voter intimidation law are subject

8  to no First Amendment protection whatsoever. But even if the Court is nevertheless

9  hesitant to enjoin the full scope of Defendants' monitoring and harassment at this time,

10  this Court can clearly enjoin such conduct in the immediate vicinity of ballot drop

11  boxes.

12      Courts have regularly upheld direct restrictions on political speech and

13  photography within a certain distance from a polling place. *See, e.g.*, *Burson*, 504 U.S.

14  at 208–09 (100-foot campaign-free zone around polling places); *N.J. Press Ass'n v.*

15  *Guadagno*, No. 12-06353, 2012 WL 5498019, at *4–6 (D.N.J. Nov. 13, 2012)

16  (upholding 100-foot prohibition on photographing voters outside polling places);

17  *Firestone v. News-Press Pub. Co.*, 538 So. 2d 457, 460 (Fla. 1989) (upholding

18  restriction on photographing in polling places). In *Burson*, the Supreme Court explained

19  that there is a "widespread and time-tested consensus demonstrat[ing] that *some*

20  restricted zone is necessary in order to serve the States' compelling interests in

21  preventing voter intimidation and election fraud." *Id.* at 206 (emphasis added); *see id.* at

22  208 ("[W]e hold that *some* restricted zone around the voting area is necessary to secure

23  the State's compelling interest.").

24      Tracking these common-sense limitations on photography and harassment,

25  Arizona law provides that individuals may not (1) remain within 75 feet of a polling

26  place, except for the purpose of voting; (2) take photographs or videos while within that

27  limit; or (3) engage in electioneering–i.e. intend to influence someone's vote or induce

28  another to refrain from voting, within that 75-foot limit. Ariz. Rev. Stat. § 16-515. As a

1   practical matter, such restrictions ordinarily prevent individuals from being

2   photographed in the act of voting in typical polling locations, and, to Plaintiff's

3   knowledge, those restrictions have never been challenged as unconstitutional.

4        Here, Defendants are approaching voters within 75 feet of drop boxes to to tell

5   them they are "hunting mules" and inquire about whether voters are "mules"—i.e.,

6   whether they are committing the crime of election fraud. Redacted Decl. ¶ 10, ECF No.

7   11-2. In addition, Defendants—some from positions within the 75-foot radius of the

8   drop box—are taking photos of voters driving up to deposit boxes and depositing

9   ballots. *Id.* ¶¶ 5–9; Rivera Decl. ¶ 6, ECF No. 11-3; Evans Decl. ¶ 8, ECF No. 11-5;

10  Overlock Dec. ¶ 9, ECF No. 11-4. These actions have the predicted (and intended)

11  effect of intimidating voters, leading some voters to refrain from using the drop boxes at

12  all.

13       Clearly, as in *Burson*, some restricted zone around the ballot boxes is "necessary

14  in order to serve the [government]'s compelling interests in preventing voter

15  intimidation." 504 U.S. at 206. Regardless of whether such a restriction is required by

16  state law, federal voting law does require it on this record, and such a restriction does

17  not "significantly impinge on constitutionally protected rights." *Id.* at 209. *Cf.* TRO

18  Order at 2, ECF No. 6, *Daschle v. Thune*, No. 04-cv-4177 (D.S.D. Nov. 2, 2004)

19  (entering TRO "prohibiting [defendants] from following Native Americans from the

20  polling places and directing that they not copy the license plates of Native Americans

21  driving to the polling places, or being driven to polling places, and further directing that

22  the license plates of Native Americans driving away from the polling places also not be

23  recorded").

24       The Court can, at a minimum, enter an injunction prohibiting Defendants from

25  taking photos of voters or harassing them within 75 feet of drop boxes. Moreover, if this

26  Court chooses to place a geographic limit on an injunction prohibiting Defendants from

27  photographing voters and their license plates, Plaintiff requests that it not just enjoin

28  Defendants from being within a 75-foot radius, but also from photographing voters who

are within that protected 75-foot radius (even if Defendants themselves are outside of that radius). Such a ban is supported by the justifications of other bans held to be constitutional and comports with their contents. *See, e.g.*, *Burson*, 504 U.S. at 206 (explaining that "a secret ballot secured in part by a restricted zone around the voting compartments" is necessary to prevail in "a persistent battle against two evils: voter intimidation and election fraud"); *id.* at 211 (noting that "the exercise of free speech rights [sometimes] conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud" and that "[a] long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right"); *see id.* at 198–211.

To conclude that such an injunction is inconsistent with the First Amendment would mean, in effect, that the First Amendment permits the government to ban core political speech within 100 feet of voting locations to guard against voter intimidation, but is powerless to protect voters from accusations of criminal conduct and unwanted photography aimed at identifying and harassing them as long as the harasser stands a bit more than 100 feet away. That cannot be correct.

## III. Speech Integral to Defendants' Intimidation Scheme May Be Enjoined Consistent with the First Amendment.

While the Court *may* enter a narrow injunction, the First Amendment permits broader relief on these facts. Because the totality of Defendants' conduct is part and parcel of an unlawful conspiracy in violation of the Klan Act, and, taken together, conveys a true threat, the Court can instead enjoin the full scope of Defendants' voter intimidation scheme, including by barring Defendants from following voters away from drop boxes, recording them on their way home, and continuing to organize their campaign of intimidation.

As Plaintiff noted in its initial motion, making a "course of conduct" illegal "has never been deemed an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken,

written, or printed." *Cox v. State of Louisiana*, 379 U.S. 559, 563 (1965) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)); *see* TRO Mot. at 25; *id.* at 25–26 (collecting authority). The same goes for civil restrictions on unlawful courses of conduct. *Rumsfeld*, 547 U.S. at 62, 65–66, 70.

The Court may enjoin Defendants from continuing to conspire to engage in voter intimidation, as well as to solicit others to do the same. *See, e.g.*, Homer Decl. Exs. K, M. The classic example of otherwise protected activity that may be restricted as integral to an unlawful course of conduct are conspiracies. "Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment." *Brown v. Hartlage*, 456 U.S. 45, 55 (1982). "The fact that such an agreement necessarily takes the form of words does not confer upon it, *or upon the underlying conduct*, the constitutional immunities that the First Amendment extends to speech." *Id.* (emphasis added). Importantly, conspiracies may be proscribed, even when the underlying conduct would otherwise be legal. In *Sorrell v. IMS Health Inc.*, the Supreme Court explained that this is why antitrust law's prohibition on agreements in restraint of trade are permissible. 564 U.S. 552, 567 (2011); *see also Giboney*, 336 U.S. at 502. A closely related line of cases recognizes that specific solicitations to engage in unlawful activity are categorically excluded from constitutional protection. *United States v. Williams*, 553 U.S. 285, 297–98 (2008); *Pittsburgh Press Co.*, 413 U.S. at 388–89. In other words, solicitations to engage in unlawful conduct are not merely banned in some contexts (e.g., commercial transactions) but in every context. *Williams*, 553 U.S. at 298.

For similar reasons, there is no constitutional problem with enjoining Defendants from following voters away from the polls after they have voted to photograph them and their cars as part of their scheme. Photographing individuals and their license plates in public places and sharing them for fun or any number of purposes may be perfectly protected and legal; photographing individuals and sharing them as part of a voter

21

intimidation scheme is not. In *United States v. Osinger*, for example, the Ninth Circuit rejected a claim that a defendant's emailing photographs of a former girlfriend to her co-workers was protected expression. 753 F.3d 939, 947 (9th Cir. 2014). Instead, the Ninth Circuit concluded that "[a]ny expressive aspects of Osinger's speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress." *Id.*

## IV.    Defendants' Conduct, As A Whole, Amounts to A True Threat and Should Be Enjoined.

A broader injunction would also comport with the First Amendment because Defendants' actions as a whole amount to a "true threat."

As the Court rightly noted, the First Amendment does not protect "true threats." Order at 8 (citing *Virginia v. Black*, 538 U.S. 343, 360 (2003); *Watts v. U.S.*, 394 U.S. 705, 708 (1969); *U.S. v. Tan Duc Nguyen*, 673 F.3d 1259, 1266 (9th Cir. 2012)).  The Constitutional carveout for true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (internal quotation marks and alteration omitted).

To determine whether words and actions constitute true threats, courts look not only at specific statements, but also at "the surrounding events and reaction of the listeners." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021); *see also United States v. Carmichael*, 326 F. Supp. 2d 1267, 1281 (M.D. Ala. 2004). Context matters because, as this Court explained, statements that appear to threaten violence may nevertheless be protected when viewed in context, just as statements that do not explicitly threaten violence may be unprotected in context. Order at 8.

True threats notably extend beyond threats of imminent bodily harm. In *Black*, the Court held only that the First Amendment exception "encompasses" such threats, not that it is limited to them. 538 U.S. at 359; *see Wohl I*, 498 F. Supp. at 479. The Ninth Circuit, for its part, has held that even a letter telling would-be voters that their

information could be obtained by hostile groups or used against them in deportation proceedings falls within the true threats exception. *Nguyen*, 673 F.3d at 1266.

Nor must true threats be communicated verbally. *Black*, 538 U.S. at 360 ("Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so."). For example, conspicuously taking down license-plate information can amount to a true threat. *E.g.*, *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) (noting that when a hostile protestor "makes a show of noting the license plate of a car, a car owner would reasonably interpret the gesture as intended to communicate an intent to track the owner down and harm her").

Against the backdrop of increased violence and threats around elections, *see supra*, Defendants' words and actions clearly convey threats, including violent threats. In September, Defendant Jennings explained "that ballot trafficking mules are about to be completely doxxed and put on blast at every drop box across America starting VERY SOON!" Homer Decl. Ex. L; *see also* Homer Supp. Decl. Ex. C ("The point is these mules, you know they clearly don't want to be doxxed. They don't want their face all over Truth Social, and GETTR, and Facebook. They don't want to be seen everywhere."). She referred to herself and her followers as "the patriot army," *id.*, and Defendants have repeatedly explicitly stated that they are "hunting mules." Redacted Decl. ¶ 12, ECF No. 11-2; *id.* Ex. D. Unsurprisingly, given these analogies, Defendants' agents have shown up to monitor drop boxes armed, and wearing tactical gear. Homer Decl. Ex. V; *see also id.* Ex. I; Evans Decl. ¶ 12, ECF No. 11-5. Defendant Jennings explained that this is standard practice for her agents, who "will always gear up" in responding to potential mules. Homer Decl. Ex. V. Defendants have further confronted voters at drop boxes to ask if they are "mules." Redacted Decl. ¶ 10, ECF No. 11-2. Defendants are conspicuously photographing voters and their license plates at drop boxes, including *after* voters have deposited a small number of ballots. *E.g.*, *id.* ¶ 15; Overlock Decl. ¶¶ 8–11, ECF No. 11-4; Rivera Decl. ¶¶ 7–11, ECF No. 11-3; Evans Decl. ¶ 8, ECF No. 11-5; Redacted Decl. ¶¶ 5–9, ECF No. 11-2. And Defendants are

further posting pictures of voters and their cars on social media, accusing them of being "mules." Redacted Decl. ¶¶ 17–18, ECF No. 11-2.[19]

Those on the receiving end of Defendants' actions have plainly understood Defendants' threats as true threats. *See* TRO Mot. at 2–5; *supra* at pp. 5–6. One declarant confronted by Defendants felt the need to redact their name, given Defendants' conduct and, "especially given their social media posts," concerns that Defendants would disparage, harass, and threaten their safety. Redacted Decl. ¶ 19, ECF No. 11-2.

Together, Defendants' words and actions, viewed in context and in light of their demonstrated effect, amount to a true threat that does not receive First Amendment protection.

## CONCLUSION

For the reasons above, and those in Plaintiff's original motion, the Court should enter Plaintiff's requested temporary restraining order and preliminary injunction.

---

[19] Note that the Ninth Circuit has not yet decided whether a civil plaintiff must demonstrate that a defendant subjectively intended to convey a true threat in addition to demonstrating that it may be understood as such objectively. *Kazal*, 13 F.4th at 746. Under either standard, Plaintiff posits that the only inference to be drawn here is that Defendants well understand themselves to be conveying true threats. *See, e.g.*, Homer Supp. Decl. Ex. B ("We are actually seeing mules be intimidated from doing their thievery. . . . We're catching them on telescopic film. We can zoom right in. We can get your face. So we've got you.").

DATED this 31st day of October, 2022.

OSBORN MALEDON, P.A.

By s/ Joshua D. Bendor
   Joshua D. Bendor
   Brandon T. Delgado
   2929 North Central Avenue, Suite 2100
   Phoenix, Arizona 85012-2793

   Orion Danjuma *(pro hac vice)*
   PROTECT DEMOCRACY PROJECT
   82 Nassau St. #601
   New York, NY 10038

   Rachel F. Homer *(pro hac vice)*
   PROTECT DEMOCRACY PROJECT
   2020 Pennsylvania Avenue NW, #163
   Washington, DC 20006

   Benjamin L. Berwick*(pro hac vice)*
   PROTECT DEMOCRACY PROJECT
   15 Main Street, Suite 312
   Watertown, MA 02472

   Jared Davidson*(pro hac vice to be filed)*
   PROTECT DEMOCRACY PROJECT
   3014 Dauphine Street, Suite J
   New Orleans, LA 70117

Attorneys for Plaintiff

1
2
3
4
5
6
7
8
9
10
11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

League of Women Voters of Arizona,

Plaintiff,

vs.

Lions of Liberty LLC; Yavapai County
Preparedness Team; Jim Arroyo, Lucas
Cilano; Nicholas Cilano; Brian Mounsey;
Toby Fox; Bruce Mounsey; James Johnson;
Melody Jennings; Clean Elections USA;
John Does 1-10,

Defendants.

No. CV-22-08196-PCT-MTL

**SUPPLEMENTAL DECLARATION
OF RACHEL F. HOMER**

12   I, Rachel F. Homer, declare as follows:

13   1.  I am over the age of 18 and have personal knowledge of the matters stated in this
14   Declaration.

15   2.  I am an attorney with the Protect Democracy Project, and am counsel for
16   Plaintiff League of Women Voters of Arizona. I submit this declaration to
17   provide the Court true and correct copies of certain documents submitted in
18   support of Plaintiff's Motion for Temporary Restraining Order and Preliminary
19   Injunction. Audio and video interviews will be submitted to the Court on a thumb
20   drive.

21   3.  **Exhibit A** is a true and correct recording of an interview with Defendant
22   Jennings on Bannon's War Room, dated October 21, 2022. The recording is
23   available at https://rumble.com/v1p2xof-episode-2243-mastriano-stands-up-for-
24   pennsylvania-families.html.

25   4.  **Exhibit B** is a true and correct recording of an interview with Defendant
26   Jennings on Bannon's War Room, dated October 17, 2022. The recording is
27   available at https://rumble.com/v1oenkz-melody-jennings-clean-elections-usa-is-
28   fighting-to-secure-the-lefts-vulnera.html.

5. **Exhibit C** is a true and correct recording of an interview with Defendant Jennings on the MG Show, dated October 18, 2022. The recording is available at https://podcast.mg.show/e/a-conversation-with-melody-jennings-cleanelectionsusaorg.

6. **Exhibit D** is a true and correct copy of a CNN article titled "Feds Warn that Domestic Violent Extremists Pose Heightened Threat to Midterm Elections," dated October 28, 2022. The article is available at https://www.cnn.com/2022/10/28/politics/midterm-domestic-extremist-threat/index.html.

7. **Exhibit E** is a true and correct copy of a U.S. Department of Justice press release titled "Man Arrested for Making Threats to Maricopa County Election Official and to Official with Office of Arizona Attorney General," dated October 6, 2022. The release is available at https://www.justice.gov/opa/pr/man-arrested-making-threats-maricopa-county-election-official-and-official-office-arizona.

8. **Exhibit F** is a true and correct copy of an AZ Central article titled "Threats Against Election Officials Unlikely to Stop, Maricopa County Recorder Says," dated August 18, 2022. The article is available at https://www.azcentral.com/story/news/politics/elections/2022/08/18/maricopa-county-recorder-stephen-richer-talks-threats-voter-vitriol/7835952001.

9. **Exhibit G** is a true and correct copy of a CNN article titled "Judge Says Oath Keepers Jury Won't See 'Death List'," dated October 6, 2022. The article is available at https://www.cnn.com/2022/10/06/politics/judge-says-oath-keepers-jury-wont-see-death-list-trial-day-3.

10. **Exhibit H** is a true and correct copy of a Washington Post article titled "One of Dinesh D'Souza's 2,000 Alleged 'Mules' Sues, Claiming Defamation," dated October 27, 2022. The article is available at https://www.washingtonpost.com/politics/2022/10/27/2020-election-fraud-claims-voting.

1

2        I declare under penalty of perjury that the foregoing Declaration is true and correct.

3

4        Executed on October 31, 2022.        /s/ *Rachel F. Homer*

5                                             Rachel F. Homer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Interview with Defendant Jennings on Bannon's War Room, dated October 21, 2022. The recording is available at https://rumble.com/v1p2xof-episode-2243-mastriano-stands-up-forpennsylvania-families.html, and will be submitted to the Court on a thumb drive.

# EXHIBIT B

Interview with Defendant Jennings on Bannon's War Room, dated October 17, 2022. The recording is available at https://rumble.com/v1oenkz-melody-jennings-clean-elections-usa-isfighting-to-secure-the-lefts-vulnera.html, and will be submitted to the Court on a thumb drive.

EXHIBIT C

Interview with Defendant Jennings on the MG Show, dated October 18, 2022. The recording is available at https://podcast.mg.show/e/a-conversation-with-melody-jenningscleanelectionsusaorg, and will be submitted to the Court on a thumb drive.

# EXHIBIT D

Case 3:22-cv-08106-MTL  Document 23  Filed 10/31/22  Page 36 of 51

# Feds warn that domestic violent extremists pose heightened threat to midterm elections

By Geneva Sands and Sean Lyngaas, CNN

Updated 8:35 PM EDT, Fri October 28, 2022



Justin Sullivan/Getty Images

A voter places a ballot in a drop box outside of the Maricopa County Elections Department on August 02, 2022 in Phoenix, Arizona.

(CNN) — Federal officials on Friday warned that domestic violent extremists pose a heightened threat to the 2022 midterm elections, in a joint intelligence assessment sent to state and local officials and obtained by CNN.

The bulletin, released by the Department of Homeland Security, FBI, US Capitol Police and National Counterterrorism Center, says that perceptions of election fraud will likely result in heightened threats of violence.

The bulletin did not list any specific credible threats.

"Following the 2022 midterm election, perceptions of election-related fraud and dissatisfaction with electoral outcomes likely will result in heightened threats of violence against a broad range of targets—such as ideological opponents and election workers," it states.

Enduring perceptions of election fraud related to the 2020 general election continue to contribute to the radicalization of some violent extremists, and likely would "increase their sensitivity to any new claims perceived as reaffirming their belief that US elections are corrupt," according to the assessment.

The joint federal assessment comes as election workers are increasingly concerned about physical threats to themselves and election infrastructure, and foreign actors seek to widen divisions in the United States.

"We assess that election-related perceptions of fraud and [domestic violent extremist] reactions to divisive topics will likely drive sporadic [domestic violent extremist] plotting of violence and broader efforts to justify violence in the lead up to and following the 2022 midterm election cycle," the bulletin states.

"The midterm elections are occurring at a time when the nation is experiencing what has been described as the most volatile, complex and dynamic threat environment in recent times," former DHS intel chief and counterterrorism coordinator John Cohen told CNN.

"Communities across the nation continue to experience mass casualty attacks and other acts of targeted violence by individuals inspired

by conspiracy theories."

## Law enforcement on alert

Law enforcement across the country is on the lookout for threats to election officials, such as, intimidating behavior directed at voters, vandalism of ballot boxes and the potential of people visiting polling sites and questioning the legitimacy of voters, according to Cohen, who continues to work with state and local law enforcement.

Over past weeks, law enforcement agencies across country have been discussing steps that can be taken to mitigate these risks and ensure election is conducted in safe and secure manner, he said.



**Sign up for CNN's**

✕

# THE**PO**INT
WITH **CHRIS** CILLIZZA

CNN's Chris Cillizza cuts through the political spin and tells you what you need to know.

| Sign Me Up | No, Thanks |
|---|---|

By subscribing, you agree to our privacy policy.

"The Department of Homeland Security regularly shares information regarding the heightened threat environment with federal, state, local, tribal, and territorial officials to ensure the safety and security of all communities across the country," a DHS spokesperson told CNN.

The assessment was released on the same day that Paul Pelosi, the husband of House Speaker Nancy Pelosi, was attacked at the couple's home in San Francisco. The assailant who attacked him was searching for the speaker of the House, according to a source briefed on the attack.

As of Friday evening, authorities hadn't yet determined a motive for the attack.

Cohen said it should serve as a warning to Democratic and Republican elected officials that "they are being targeted by individuals who are motivated by extremist ideological beliefs."

On Thursday, the New York Police Department advised "elevated vigilance" in the closing days of the midterm election season, according to an NYPD bulletin obtained by CNN, though there are currently no credible threats to New York City polling sites, candidates or poll workers

There are three "primary threat vectors" concerning officials amid the midterm elections – cybersecurity, mis- and disinformation and physical security, Homeland Security Secretary Alejandro Mayorkas said at a conference on Wednesday.

Election officials and federal agencies have been on heightened alert for any attempt by hackers to breach computer systems that support the election process.



**RELATED ARTICLE**
'Our security here is a joke': Election workers lament lack of federal spending on security ahead of crucial midterms

Unidentified hackers twice in the last month have sent phishing emails to employees of an elections board in a Midwestern state, US officials told election officials on a Friday briefing, sources familiar with the call told CNN. The apparently run-of-the-mill cybercriminal activity was blocked and didn't result in any breach of election board computers, officials said.

The department has received reports of "a number of election officials" expressing concern about their physical security, Mayorkas said at the Homeland Security Enterprise Forum.

"And I must say in 2022, it's a very sad state of affairs when election officials are concerned about their physical security," he added.

Since Russia's interference in the 2016 election, a range of foreign governments have shown more of an interest in shaping US public opinion or spreading disinformation in advance of US elections, according to US intelligence officials.

When it comes to spreading lies, Mayorkas pointed to Russia, Iran and China, saying "the disinformation that they spread, both pre- and

When it comes to spreading lies, Mayorkas pointed to Russia, Iran and China, saying, "the disinformation that they spread, both pre- and post-election, undermine the integrity, the perception of the integrity of the elections, to sow further discord in our country."

Iran's level of aggressiveness in trying to interfere in the 2020 election – in part by impersonating the far-right Proud boys – surprised some US national security officials. China considered trying to influence the 2020 election outcome, but ultimately chose not to, according to a public US intelligence assessment.

Ahead of the 2022 midterm elections, Russian and Chinese government-affiliated operatives and organizations have amplified misinformation from Americans about the integrity of elections, senior FBI officials told reporters this month.

But it's physical security that has risen to the top of the list of concerns for election officials as conspiracy theories about voter fraud have boomed.

The FBI and sheriffs from across the country last week discussed the possibility of misinformation fueling violence at polling stations during the midterm elections, a sheriffs group told CNN.

Election workers have reported over 1,000 interactions, including death threats, with the public that they considered hostile or threatening to a Justice Department task force, but that is likely just a fraction of the threatening behavior that has occurred since 2020.

In response, federal officials are now offering state and local election officials training to "safely de-escalate" confrontations with voters that could turn violent, CNN first reported.

*This story has been updated Friday with additional information.*

**Paid Links**

---

---

---

---

---

---

Search CNN...

&#9906;

**Log In**

Live TV

Audio

World

EXHIBIT E

10/31/22, 10:31 AM      Man Arrested for Making Threats to Maricopa County Election Official and to Official with Office of Arizona Attorney General | OPA | Depa...

Case 3:22-cv-08196-MTL   Document 23   Filed 10/31/22   Page 40 of 51



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
**STICE NEWS**

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                       Thursday, October 6, 2022

## Man Arrested for Making Threats to Maricopa County Election Official and to Official with Office of Arizona Attorney General

An Iowa man was arrested today in Hiawatha, Iowa, for allegedly sending a threatening communication to an election official on the Maricopa County Board of Supervisors in Maricopa County, Arizona, and for allegedly sending a threatening communication to an official with the Office of the Arizona Attorney General.

Mark A. Rissi, 64, of Hiawatha, is expected to make his initial appearance today at the federal courthouse in Cedar Rapids.

According to the indictment, on or about Sept. 27, 2021, Rissi allegedly left the following voicemail for the election official with the Maricopa County Board of Supervisors: "Hello Mr. [VICTIM], I am glad that you are standing up for democracy and want to place your hand on the Bible and say that the election was honest and fair. I really appreciate that. When we come to lynch your stupid lying Commie [expletive], you'll remember that you lied on the [expletive] Bible, you piece of [expletive]. You're gonna die, you piece of [expletive]. We're going to hang you. We're going to hang you."

Additionally, on or about Dec. 8, 2021, Rissi allegedly said the following in a voicemail message he left for an official with the Office of the Arizona Attorney General: "I'm a victim of a crime. My family is a victim of a crime. My extended family is a victim of a crime. That crime was the theft of the 2020 election. The election that was fraudulent across the state of Arizona, that [VICTIM] knows was fraudulent, and [VICTIM] has images of the conspirators deleting election fraud data from the Maricopa County Board of Supervisors computer system. Do your job, [VICTIM], or you will hang with those [expletive] in the end. We will see to it. Torches and pitchforks. That's your future, [expletive]. Do your job."

Rissi is charged with two counts of making a threatening interstate communication and one count of making a threatening telephone call. If convicted, Rissi faces a maximum penalty of up to five years in prison for each count of making a threatening interstate communication and up to two years in prison for making a threatening telephone call. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

Assistant Attorney General Kenneth A. Polite, Jr. of the Justice Department's Criminal Division, U.S. Attorney Gary M. Restaino for the District of Arizona, Assistant Director Luis Quesada of the FBI's Criminal Investigative Division, and Acting Special Agent in Charge Chris Ormerod of the FBI Phoenix Field Office made the announcement.

The FBI Phoenix Field Office is investigating the case, with the assistance of the FBI Cedar Rapids Field Office.

Trial Attorney Tanya Senanayake of the Criminal Division's Public Integrity Section and Assistant U.S. Attorney Sean K. Lokey for the District of Arizona are prosecuting the case.

This case is part of the Justice Department's Election Threats Task Force. Announced by Attorney General Merrick B. Garland and launched by Deputy Attorney General Lisa O. Monaco in June 2021, the Task Force has led the department's efforts to address threats of violence against election workers, and to ensure that all election workers —

whether elected, appointed, or volunteer — are able to do their jobs free from threats and intimidation. The Task Force engages with the election community and state and local law enforcement to assess allegations and reports of threats against election workers, and has investigated and prosecuted these matters where appropriate, in partnership with FBI Field Offices and U.S. Attorneys' Offices throughout the country. A year after its formation, the Task Force is continuing this work and supporting the U.S. Attorneys' Offices and FBI Field Offices nationwide as they carry on the critical work that the Task Force has begun.

Under the leadership of Deputy Attorney General Monaco, the Task Force is led by the Criminal Division's Public Integrity Section and includes several other entities within the Department of Justice, including the Computer Crime and Intellectual Property Section of the Criminal Division, the Civil Rights Division, the National Security Division, and the FBI, as well as key interagency partners, such as the Department of Homeland Security and the U.S. Postal Inspection Service. For more information regarding the Justice Department's efforts to combat threats against election workers, read the Deputy Attorney General's memo.

To report suspected threats or violent acts, contact your local FBI office and request to speak with the Election Crimes Coordinator. Contact information for every FBI field office may be found here: https://www.fbi.gov/contact-us/field-offices/. You may also contact the FBI at 1-800-CALL-FBI (225-5324) or file an online complaint at: tips.fbi.gov. Complaints submitted will be reviewed by the task force and referred for investigation or response accordingly. If someone is in imminent danger or risk of harm, contact 911 or your local police immediately.

*An indictment is merely an allegation. All defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*

---

**Topic(s):**
Voting and Elections

**Component(s):**
Criminal - Public Integrity Section
Federal Bureau of Investigation (FBI)
USAO - Arizona

**Press Release Number:**
22-1072

*Updated October 6, 2022*

EXHIBIT F

# azcentral.

ELECTIONS

# Threats against election officials unlikely to stop, Maricopa County recorder says

**Gloria Rebecca Gomez** Arizona Republic

Published 1:44 p.m. MT Aug. 18, 2022 | **Updated 12:58 p.m. MT Aug. 22, 2022**

The state's top elections official received a death threat last year. It wasn't the first, and he fears it won't be the last.

On Tuesday, 50-year-old Missouri resident Walter Lee Hoornstra was indicted on suspicion of sending a threatening voicemail to Maricopa County Recorder Stephen Richer in May 2021. In it, Hoornstra warned Richer to stop speaking out against the Arizona Senate audit, or Richer would "never make it to (his) next little board meeting," according to the indictment.

**Previous coverage:** Missouri man indicted after threatening voicemail was left for Maricopa County Recorder

Baseless claims that fraud occurred during the 2020 election sowed mistrust among voters, and election officials have borne the brunt of their vitriol. Across the country, election officials have resigned after dealing with relentless harassment. Richer estimates that he's received thousands of hateful messages during his tenure since January 2021. So many that the threat from Hoornstra, at that point, wasn't enough to cancel meetings or give him pause.

"This would've been one of a deluge of voicemails, emails and social media messages at this time," Richer said Thursday in an interview with The Arizona Republic.

Allegations from the Arizona Senate audit inspired many of the messages, Richer said. Hoornstra's voicemail came after the audit's Twitter account falsely accused election officials of deleting electronic databases, Richer said. In fact, contractors had simply been looking in the wrong place for the information.

The spread of inflammatory misinformation about election integrity invariably leads to a spike in harassment, Richer said.

"We would see an uptick in vitriol correspondence, and thinly veiled threats whenever they would make some sort of comment like that," he said.

Despite the audit's end, and its various debunkings, hateful messages from the public continue, latching on to new conspiracy theories, like those forwarded by the '2000 Mules' documentary.

**Debunked:** Arizona Capitol event with '2000 Mules' filmmakers was long on claims, short on evidence

"Now, more recently, most of them have moved on from the Cyber Ninjas and other schemes," Richer said. "When the silly documentary about mules came out we received a lot of communications at that point as well."

While Richer is the public face of elections in Maricopa County, he is not alone in receiving threats. The most upsetting messages for him are those that are focused on unmasking and intimidating non-public election workers.

"Wherein it disappoints me is in respect to some of the videos when some of these antagonists — some of these malcontents — take the initiative to try to identify some of our people, name them, cook up alleged wrongs that these people are doing and then say horrible things about them," he said.

He fears the continued negative climate election officials deal with will have a chilling effect on hiring and retention. Richer pointed to the resignation of an entire elections department in a Texas county last week as evidence that voter harassment is taking a toll on the career.

"I just don't think people should be making professional work decisions under threat because it could have an effect," he said.

Arizona is no stranger to resignations among its elections officials. In July  the county recorder and elections director in Yavapai County left their posts after a year and a half of heated harassment.

Richer says he has no plans to resign and remains committed to his work despite the likelihood threats will continue.

"I wish this were the last of it, but I strongly doubt that will be the case," he said.

*Reach criminal justice reporter Gloria Rebecca Gomez at grgomez@gannett.com or on Twitter @glorihuh.*

1

EXHIBIT G

# Judge says Oath Keepers jury won't see 'death list'

By Hannah Rabinowitz and Holmes Lybrand, CNN

Updated 6:23 PM EDT, Thu October 6, 2022



☐ Video Ad Feedback

Death list won't be admitted in Oath Keepers trial, judge rules

02:27 - Source: CNN

**See More Videos**

**(CNN)** — US District Judge Amit Mehta ruled Thursday that the jury in the Oath Keepers seditious conspiracy case will not see a "death list" of Georgia election officials allegedly written by a defendant, saying that it is "too prejudicial."

The document was found in a search of defendant Thomas Caldwell's home when he was arrested in January 2021, according to prosecutors. The handwritten note was titled "DEATH LIST," and had the names of Ruby Freeman and her daughter Wandrea "Shaye" Moss, both of whom were the subjects of a conspiracy theory about voter fraud, prosecutors said.



**RELATED VIDEO**

'This turned my life upside down': Former election worker testified in Jan 6 hearing

Freeman and Moss testified publicly to the House select committee investigating January 6 in June about how the conspiracy led to constant harassment from supporters of former President Donald Trump.

Mehta had previously ruled that prosecutors could not present the document to the jury, but Justice Department lawyers asked the judge

Mehta had previously ruled that prosecutors could not present the document to the jury, but Justice Department lawyers asked the judge to reconsider, arguing that Caldwell's defense attorney opened the door to introducing the death list in his cross-examination of an FBI agent.

Prosecutors cited a line of questioning from Caldwell's attorney, David Fischer, that claimed Caldwell was only preparing to confront antifa in DC and did not consider violence against lawmakers or government officials.

"Evidence that Caldwell intended to commit violence against these particular employees is directly relevant to that criminal objective and flatly contradicts Caldwell's conjured impression that his attention and actions were narrowly tailored to rally attendance and self-defense against 'antifa' individuals unrelated to the election process," prosecutors wrote in their motion.

Mehta wasn't persuaded that the list itself was relevant.



**RELATED ARTICLE**
Secret recording played at trial shows Oath Keepers allegedly planning for violence in DC

"I continue to believe about the evidence...is at most what it shows is Mr. Caldwell maybe, maybe at most that he had some thinking about violence," Mehta said in court Thursday, but the "note itself has (nothing) to do with" the government's case.

Caldwell and four other defendants have pleaded not guilty to the seditious conspiracy charges they face, which carries a maximum sentence of 20 years behind bars.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

World

EXHIBIT H

## The Washington Post

*Democracy Dies in Darkness*

# One of Dinesh D'Souza's 2,000 alleged 'mules' sues, claiming defamation

Analysis by Philip Bump

National columnist

October 27, 2022 at 5:32 p.m. EDT

Right-wing commentator Dinesh D'Souza welcomed a special guest to his podcast on Tuesday: former president Donald Trump. The two spent about 20 minutes discussing the subject that has animated them both for the past two years: false claims about rampant ballot fraud affecting the outcome of the 2020 presidential election.

Trump has seen D'Souza's film "2000 Mules." He held a screening of the film at his Mar-a-Lago event facility. He's advocated for it regularly, and for good reason: "2000 Mules" purports to show that Trump didn't lose his reelection bid but, rather, that it was stolen by a network of people shuttling ballots around swing states. The film is entirely unconvincing both in its specific assertions about the number of ballots shuttled (a figure that D'Souza admitted to The Washington Post was essentially a guess) and in its overall methodology. But no one on this planet is less fazed by obviously false claims about voter fraud than Trump.

After declaring that he won by "millions of votes," Trump praised "2000 Mules" as being particularly useful to his effort to subvert his loss. The film, he said, showed fraud in a "very conclusive way, because you were taking government tapes" as evidence. That is, the film's claims that a group called True the Vote had compiled geolocation data to show people visiting multiple ballot drop boxes was augmented by video from those drop boxes — and who could argue with that?

One person who could is Mark Andrews.

Here are two stills from "2000 Mules" showing Andrews depositing ballots in a drop box in Georgia before the election that year. As the footage airs, D'Souza speaks in a voice-over.

"What you are seeing is a crime," D'Souza says. "These are fraudulent votes."

But it was not a crime. And that's not just our weighing in; that was the determination of the Georgia Bureau of Investigation, which investigated Andrews's behavior and established that the multiple ballots Andrews submitted were simply his and his family's ballots — fully in compliance with state law.

D'Souza insists that anyone shown on-screen was a "mule," someone who True the Vote's crack detective work had identified as visiting multiple ballot drop boxes as well as unidentified left-wing organizations. (Those organizations are unnamed in the film but *were* named in the first release of D'Souza's companion book to the movie. That release was pulled from shelves and the organization names removed.) But no evidence is shown in the film to suggest that's true of Andrews, no evidence of his visiting more than one drop box with video footage or even a map of his activity. (There was one such map in the movie, which True the Vote's Gregg Phillips admitted to me was fake.)

Nonetheless, according to a lawsuit filed Wednesday against D'Souza and True the Vote by attorneys representing Andrews, footage of Andrews was shown as part of 11 programs as D'Souza and True the Vote promoted the film — including at least three occasions after Andrews had been cleared. (The lawsuit establishes that D'Souza knew that Andrews had been cleared, in part because of his conversation with The Post.) A representative for True the Vote told The Post that the organization "is confident that the claims regarding True the Vote in this litigation will be found to be without merit." D'Souza did not respond to a request for comment.

"Combining junk pseudoscience and excerpted surveillance video of innocent voters," the lawsuit states near the beginning, "Defendants produced, distributed, and widely marketed *2000 Mules*, which they label a 'documentary' proving their 'mules' theory."

This is an important point. There's no evidence at all that any of the video footage used in the film was linked to the purported geolocation analysis.

"Defendants *never* had any means to connect this video footage of voters such as Andrews with their individualized cell phone geolocation data," it adds later. "... Moreover, Defendants appear to lack *any* surveillance footage that actually shows any individual depositing ballots at multiple locations."

Among the examples of media appearances in which Andrews is put forward as an example of someone casting illegal votes is one featuring True the Vote's Phillips. Appearing on a show hosted by the right-wing Epoch Times, Phillips introduced the footage of Andrews by saying: "The data itself is immutable. Even if you don't believe your lying eyes on that, then just go look at the video. ... I can show you the [cellphone geolocation] pings, and then we can show you where he did it again and again and again and again. It really takes an extraordinary person with an agenda that's probably not America's agenda to say, 'I don't believe that.'"

But, of course, he didn't show any of that, so saying "I don't believe that" is perfectly warranted. Last week, the office of Arizona Attorney General Mark Brnovich (R) sent a letter to federal authorities suggesting that True the Vote's activities surrounding "2000 Mules" be investigated. At an event this summer, Phillips and the head of the organization attempted to explicitly close the book on the subject.

Andrews's lawsuit isn't just about correcting the record, though. He details the ways in which this false accusation disrupted his life. The lawsuit aims to paint as sympathetic a portrait of him as possible, certainly, but he describes the importance of voting to him and his family, since he grew up in the Jim Crow South. A technology executive at a Fortune 500 company, he became aware of his inclusion in the film only when a reporter contacted him about it.

That snippet of his casting his family's ballots has been clipped and published on social media. The lawsuit details some of the responses it generated:

> "Comments on these posts include threats to have the 'mules' 'forcibly amputated from the country and sent somewhere else en masse,' and proclamations that the 'mules' should be arrested, 'face a firing squad,' or receive 'Bullets to Mules Heads.' Defendants' followers have also assured 'mules' through social media comments that 'we're coming after you.'"

It further claims that Andrews has installed security cameras at his home and attempted to disguise his vehicle, since it is easily identifiable in footage. In the film, at least, his license plate and face are blurred. When the clip was shown in some media appearances, neither was.

He's not the only one affected. The claim elevated by the film that people are stuffing ballot boxes — a claim for which, again, no evidence is presented — has led to a rash of encounters at ballot boxes in Arizona. Voters casting ballots have been challenged by self-appointed observers. One group affiliated with the right-wing Oath Keepers extremist group was sued and forced to end its drop-box monitoring effort.

"At all times, Defendants knew that their portrayals of Mr. Andrews were lies," the lawsuit states, "as was the entire narrative of *2000 Mules*. But they have continued to peddle these lies in order to enrich themselves."

The trailer to the film remains online. In it, you can see Andrews depositing his and his family's ballots.